# EXHIBIT A

## STEVENSON-WYDLER (15 USC 3710) COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT (hereinafter CRADA) No. 11-CR-19

### BETWEEN

### Battelle Energy Alliance, LLC (BEA)

### under its U.S. Department of Energy Contract

### No.  DE-AC07-05ID14517 (hereinafter Contractor)

### AND

### TerraPower, LLC

### (hereinafter Participant), both being

### hereinafter referred to singularly as "Party" and jointly as "Parties"

### ARTICLE I:  DEFINITIONS

A.  "Government" means the Federal Government of the United States of America and agencies thereof.

B.  "DOE" means the Department of Energy, an agency of the Federal Government.

C.  "Contracting Officer" means the DOE employee administering the Contractor's DOE contract.

D.  "Generated Information" means information produced in the performance of this CRADA.

E.  "Proprietary Information" means information which embodies (i) trade secrets or  (ii) commercial or financial information which is privileged or confidential under the Freedom of Information Act (5 U.S.C. 552(b)(4)), either of which is developed at private expense outside of this CRADA and which is marked as Proprietary Information.

F.  "Protected CRADA Information" means Generated Information which is marked as being Protected CRADA Information by a Party to this CRADA and which would have been Proprietary Information had it been obtained from a non-Federal entity.

G.  "Subject Invention" means any invention of the Contractor or Participant conceived or first actually reduced to practice in the performance of work under this CRADA.

Template v. 3/20/2009

H.   "Intellectual Property" means Patents, Trademarks, Copyrights, Mask Works, Protected CRADA Information, and other forms of comparable property rights protected by Federal Law and foreign counterparts, except trade secrets.

I.   "Trademark" means a distinctive mark, symbol, or emblem used in commerce by a producer or manufacturer to identify and distinguish its goods or services from those of others.

J.   "Service Mark" means a distinctive word, slogan, design, picture, symbol, or any combination thereof, used in commerce by a person to identify and distinguish its services from those of others.

K.   "Mask Work" means a series of related images, however fixed or encoded, having or representing the predetermined, three-dimensional pattern of metallic, insulating, or semiconductor material present or removed from the layers of a semiconductor chip product and in which series the relation of the images to one another is that each image has the pattern of the surface of one form of the semiconductor chip product.

L.   "Background Intellectual Property" means the Intellectual Property identified by the Parties in Appendix B, Background Intellectual Property, which was in existence prior to or is first produced outside of this CRADA, except that in the case of inventions in those identified items, the inventions must have been conceived outside of this CRADA and not first actually reduced to practice under this CRADA to qualify as Background Intellectual Property.

M.   "Foreign Interest" is defined as any of the following:

   (1)   A foreign government or foreign government agency;

   (2)   Any form of business enterprise organized under the laws of any country other than the United States or its possessions;

   (3)   Any form of business enterprise organized or incorporated under the laws of the United States, or a State or other jurisdiction within the United States, which is owned, controlled, or influenced by a foreign government, agency, firm, corporation or person; or

   (4)   Any person who is not a U.S. citizen.

N.   "Foreign ownership, control, or influence (FOCI)" means the situation where the degree of ownership, control, or influence over a participant by a Foreign Interest is such that a reasonable basis exists for concluding that compromise of classified information or special nuclear material, as defined in 10 CFR Part 710, may result.

## ARTICLE II:  STATEMENT OF WORK

Appendix A, Statement of Work, is an integral part of this CRADA.

## ARTICLE III:  TERM, FUNDING AND COSTS

A.   The effective date of this CRADA shall be the latter date of (1) the date on which it is signed by the last of the Parties, (2) the date on which it is approved by DOE, or (3) the date on which the advance funding referred to in Article III.E is received by the Contractor.  The work to be performed under this CRADA shall be complete within five years from the effective date.

Template v. 3/20/2009

B. The Participant's estimated contribution for Phase I of this CRADA is $826,798 funds-in and $300,000 in-kind for FY12. The Government's estimated contribution, which is provided through the Contractor's contract with DOE, is $0 for FY12, subject to available funding.

C. Neither Party shall have an obligation to continue or complete performance of its work at a contribution in excess of its estimated contribution as contained in Article III B, above, including any subsequent amendment.

D. Each Party agrees to provide at least 30 days notice to the other Party if the actual cost to complete performance will exceed its estimated contribution.

E. The Participant shall provide Contractor sufficient advance funds to maintain approximately a 90-day advance of funds during the entire period of work. No work will begin before the receipt of a cash advance. Failure of the Participant to provide the necessary advance funding is cause for termination of the CRADA.

F. The Contractor shall invoice the Participant monthly, and provide funding status monthly to allow adequate advancement of funds, and cost allocation. Upon termination or completion of the term of this CRADA, Contractor shall reconcile final costs, and return any remaining funds to Participant.

## ARTICLE IV: PERSONAL PROPERTY

All tangible personal property produced or acquired under this CRADA shall become the property of the Participant or the Government, depending upon whose funds were used to obtain it. Such property is identified in Appendix A, Statement of Work. Personal Property shall be disposed of as directed by the owner at the owner's expense. All jointly funded property shall be owned by the Government.

## ARTICLE V: DISCLAIMER

THE GOVERNMENT, THE PARTICIPANT, AND THE CONTRACTOR MAKE NO EXPRESS OR IMPLIED WARRANTY AS TO THE CONDITIONS OF THE RESEARCH OR ANY INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT MADE OR DEVELOPED UNDER THIS CRADA, OR THE OWNERSHIP, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE RESEARCH OR RESULTING PRODUCT. NEITHER THE GOVERNMENT, THE PARTICIPANT, NOR THE CONTRACTOR SHALL BE LIABLE FOR SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES ATTRIBUTED TO SUCH RESEARCH OR RESULTING PRODUCT, INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT MADE OR DEVELOPED UNDER THIS CRADA.

## ARTICLE VI: LIABILITY

Except to the extent of any liability resulting from any willful misconductor negligent acts or omissions of the Government or the Contractor, the Participant indemnifies the Government and the Contractor for all damages, costs and expenses, including attorney's fees, arising from personal injury or property damage occurring as a result of the making, using, or selling of a product, process, or service by or on behalf of the Participant, its assignees, or licensees, which was derived from the work performed under this CRADA. In respect to this article, neither the Government nor the Contractor shall be considered assignees or licensees of the Participant, as a result of reserved Government and Contractor rights. The indemnity set forth in this paragraph shall apply only if the Participant shall have been informed as soon and as completely as practical by the Contractor and/or the Government of the action alleging such claim

and shall have been given an opportunity, to the maximum extent afforded by applicable laws, rules, or regulations, to participate in and control its defense, and the Contractor and/or the Government shall have provided all reasonably available information and reasonable assistance requested by the Participant. No settlement for which the Participant would be responsible shall be made without the Participant's consent unless required by final decree of a court of competent jurisdiction.

## ARTICLE VII: OBLIGATIONS AS TO PROPRIETARY INFORMATION

A. Each Party agrees to not disclose Proprietary Information provided by another Party to anyone other than the CRADA Participant and Contractor without written approval of the providing Party, <u>except to Government employees who are subject to the statutory provisions against disclosure of confidential information set forth in the Trade Secrets Act (18 U.S.C. 1905).</u>

B. If Proprietary Information is orally disclosed to a Party, it shall be identified as such, orally, at the time of disclosure and confirmed in a written summary thereof, appropriately marked by the disclosing Party, within 30 days as being Proprietary Information.

C. All Proprietary Information in tangible form shall be returned to the disclosing Party or destroyed with a certificate of destruction submitted to the disclosing Party upon termination or expiration of this CRADA, or during the term of this CRADA upon request by the disclosing Party.

D. All information marked as Proprietary Information shall be protected by the recipient as Proprietary Information for a period of five years from the effective date of disclosure under this CRADA, unless, as shown by the recipient, such Proprietary Information becomes publicly known without the fault of the recipient, comes into recipient's possession from a third party without an obligation of confidentiality on the recipient, is independently developed by recipient's employees who did not have access to such Proprietary Information, is released by the disclosing Party to a third party without restriction, or is released for disclosure with the written consent of the disclosing Party.

E. If any documents or materials provided to Participant under this CRADA by Contractor are marked as Applied Technology (AT), Participant shall adhere to all required and appropriate regulations and protocols for the review, management, and as applicable, eventual release of such documents by Participant.

## ARTICLE VIII: OBLIGATIONS AS TO PROTECTED CRADA INFORMATION

A. Each Party may designate as Protected CRADA Information any Generated Information produced by its employees which meets the definition of Article I.F and, with the agreement of the other Party, so designate any Generated Information produced by the other Party's employees which meets the definition of Article I.F. All such designated Protected CRADA Information shall be appropriately marked. It is envisioned by the Parties that some Generated Information specified in Section III, Reports and Other Deliverables, of the Statement of Work will be designated as Protected CRADA Information.

B. For a period of five years from the date Protected CRADA Information is produced, pursuant to 15 U.S.C. 3710 a(c)(7)(B), the Parties agree not to further disclose such information and to use the same degree of care and discretion, but no less than reasonable care and discretion, to avoid disclosure, publication, or dissemination of such information to a third party, as the Party employs for similar protection of its own information which it does not desire to disclose, publish, or disseminate except:

(1) as necessary to perform this CRADA;

(2) as provided in Article XI [REPORTS AND ABSTRACTS];

(3) as requested by the DOE Contracting Officer to be provided to other DOE facilities solely for Government use only at those DOE facilities with the same protection in place;

(4) to existing or potential licensees, affiliates, customers, or suppliers of the Parties in support of commercialization of the technology with the same protection in place. Disclosure of Participant's Protected CRADA Information under this subparagraph shall only be done with the Participant's consent; or

(5) as mutually agreed by the Parties in advance.

C.  The obligations of paragraph B above shall end sooner for any Protected CRADA Information which shall become publicly known without fault of either Party, shall come into a Party's possession without breach by that Party of the obligations of paragraph B above, or shall be independently developed by a Party's employees who did not have access to the Protected CRADA Information.

## ARTICLE IX:  RIGHTS IN GENERATED INFORMATION

The Parties agree that they shall have no obligations of nondisclosure or limitations on their use of, and the Government shall have unlimited rights in, all Generated Information produced and information provided by the Parties under this CRADA, except for (a) information which is marked as being Copyrighted (subject to Article XIII) or as Protected CRADA Information (subject to Article VIII B) or as Proprietary Information (subject to Article VII D), or (b) information that discloses an invention which may later be the subject of a U.S. or foreign Patent application.

## ARTICLE X:  EXPORT CONTROL

A.  THE PARTIES UNDERSTAND THAT, TO THE EXTENT MATERIALS AND INFORMATION RESULTING FROM THE PERFORMANCE OF THIS CRADA ARE SUBJECT TO EXPORT CONTROL LAWS, EACH PARTY IS RESPONSIBLE FOR ITS OWN COMPLIANCE WITH SUCH LAWS.

B.  The Parties acknowledge that to the extent the activities covered by this Agreement are subject to U.S. export control laws, (i) transactions with certain persons, and (ii) the exportation of certain types and levels of technologies and services, are prohibited or restricted. These laws include, without limitation, the Arms Export Control Act, the Export Administration Act, the International Emergency Economic Powers Act, and the Atomic Energy Act and regulations issued pursuant to these, including the Export Administration Regulations (EAR)(15 CFR Parts 730-774), the International Traffic in Arms Regulations (ITAR) (22 CFR Parts 120-130), and the Nuclear Regulatory Commission and Department of Energy export regulations (10 CFR Parts 110 and 810).

C.  Export licenses or other authorizations from the U.S. Government may be required for the export of goods, technical data or services under this Agreement. The Parties acknowledge that export control requirements may change and that the export of goods, technical data or services from the U.S. without an export license or other appropriate governmental authorization may result in criminal liability.

D. Each Party is responsible for its own compliance with laws and regulations governing export controls and acknowledges that it can contact the U.S. Departments of Commerce, State, Energy and Treasury for guidance as to applicable licensing requirements and other restrictions.

E. The Participant has a continuing obligation to provide the Contractor written notice of any changes in the nature and extent of foreign ownership, control, or influence over the Participant which would affect the Participant's answers to the previously completed FOCI certification.

## ARTICLE XI:  REPORTS AND ABSTRACTS

A. The Parties agree to produce the following deliverables:

   (1) an initial abstract suitable for public release at the time the CRADA is approved by DOE;

   (2) other abstracts (final when work is complete, and others as substantial changes in scope and dollars occur);

   (3) a final report, upon completion or termination of this CRADA, to include a list of Subject Inventions;

   (4) reserved;

   (5) other topical/periodic reports, when the nature of research and magnitude of dollars justify; and

   (6) computer software in source and executable object code format as defined within the Statement of Work or elsewhere within the CRADA documentation.

*Each of the above-identified deliverables shall include the project identification number as described in DOE's Research and Development (R&D) Tracking System Data and Process Guidance Document (http://www.osti.gov/rdprojects/guidance.jsp).*

B. The Parties acknowledge that the Contractor has the responsibility to provide the above information at the time of its completion to the DOE Office of Scientific and Technical Information.

C. The Participant agrees to provide the above information to the Contractor to enable full compliance with paragraph B of this article.

D. The Parties acknowledge that the Contractor and DOE have a need to document the long-term economic benefit of the cooperative research to be conducted under this CRADA. Therefore, the Participant shall respond to the Contractor's reasonable requests, during the term of this CRADA and for a period of 5 years thereafter for pertinent information.

## ARTICLE XII:  PRE-PUBLICATION REVIEW

A. The Parties anticipate that their employees may wish to publish technical developments and/or research findings generated in the course of this CRADA. On the other hand, the Parties recognize that an objective of this CRADA is to provide business advantages to the Participant. In order to reconcile publication and business concerns, the Parties agree to a review procedure as follows:

   (1) Each Party ("Submitter") shall submit to the other Party ("Recipient"), in advance, proposed written and oral publications pertaining to work under the CRADA. Proposed oral publications

shall be submitted to the Recipient in the form of a written presentation synopsis and a written abstract;

(2) Recipient shall provide a written response to the Submitter within 30 days, either objecting or not objecting to the proposed publication. The Submitter shall consider all objections of the Recipient and shall not unreasonably refuse to incorporate the suggestions and meet the objections of the Recipient. The proposed publication shall be deemed not objectionable, unless the proposed publication contains Proprietary Information, Protected CRADA Information, export controlled information or material that would create potential statutory bars to filing the United States or corresponding foreign Patent applications, in which case express written permission shall be required for publication. In the event an objection is raised because of a potential statutory bar, the Recipient shall file its Patent application within ninety (90) days of making such objection, after which time the Submitter is free to publish.

B. The Parties agree that neither will use the name of the other Party or its employees in any promotional activity, such as advertisements, with reference to any product or service resulting from this CRADA, without prior written approval of the other Party.

## ARTICLE XIII:  COPYRIGHTS

A. The Parties may assert Copyright in any of their Generated Information. Assertion of Copyright generally means to enforce or give an indication of an intent or right to enforce such as by marking or securing Federal registration.

B. Allocation of rights to Copyrights in Generated Information will be negotiated by the Parties.

C. For Generated Information, the Parties acknowledge that the Government has for itself and others acting on its behalf, a royalty-free, nontransferable, nonexclusive, irrevocable worldwide Copyright license to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the Government, all Copyrightable works produced in the performance of this CRADA, subject to the restrictions this CRADA places on publication of Proprietary Information and Protected CRADA Information.

D. For all Copyrighted computer software produced in the performance of this CRADA, the Party owning the Copyright will provide the source code, an expanded abstract as described in Appendix A, the executable object code and the minimum support documentation needed by a competent user to understand and use the software to DOE's Energy Science and Technology Software Center, P.O. Box 1020, Oak Ridge, TN 37831. The expanded abstract will be treated in the same manner as Generated Information in paragraph C of this article.

E. The Contractor and the Participant agree that, with respect to any Copyrighted computer software produced in the performance of this CRADA, DOE has the right, at the end of the period set forth in paragraph B of Article VIII hereof and at the end of each 2-year interval thereafter, to request the Contractor and the Participant and any assignee or exclusive licensee of the Copyrighted software to grant a nonexclusive, partially exclusive, or exclusive license to a responsible applicant upon terms that are reasonable under the circumstances, provided such grant does not cause a termination of any licensee's right to use the Copyrighted computer software. If the Contractor, or the Participant or, any assignee, or exclusive licensee refuses such request, the Contractor and the Participant agree that DOE has the right to grant the license if DOE determines that the Contractor, the Participant, assignee, or licensee has not made a satisfactory demonstration that it is actively pursuing commercialization of the Copyrighted computer software.

Before requiring licensing under this paragraph E, DOE shall furnish the Contractor/Participant written notice of its intentions to require the Contractor/Participant to grant the stated license, and the Contractor/Participant shall be allowed 30 days (or such longer period as may be authorized by the cognizant DOE Contracting Officer for good cause shown in writing by the Contractor/Participant) after such notice to show cause why the license should not be required to be granted.

The Contractor/Participant shall have the right to appeal the decision by DOE to the grant of the stated license to the Invention Licensing Appeal Board as set forth in paragraphs (b)-(g) of 10 CFR 781.65, "Appeals."

F.   The Parties agree to place copyright and other notices, as appropriate for the protection of copyright, in human readable form onto all physical media, and in digitally encoded form in the header of machine-readable information recorded on such media such that the notice will appear in human-readable form when the digital data are off loaded or the data are accessed for display or printout.

## ARTICLE XIV:  REPORTING INVENTIONS

A.   The Parties agree to disclose to each other each Subject Invention which may be patentable or otherwise protectable under the Patent Act.  The Parties agree that the Contractor and the Participant will disclose their respective Subject Inventions to DOE and each other within 2 months after the inventor first discloses the Subject Invention in writing to the person(s) responsible for Patent matters of the disclosing Party.

B.   These disclosures should be in sufficiently complete technical detail to convey a clear understanding, to the extent known at the time of disclosure, of the nature, purpose, and operation of the Subject Invention.  The disclosure shall also identify any known actual or potential statutory bars, i.e., printed publications describing the Subject Invention or the public use or "on sale" of the Subject Invention in this country.  The Parties further agree to disclose to each other any subsequent known actual or potential statutory bar that occurs for a Subject Invention disclosed but for which a Patent application has not been filed.  All Subject Invention disclosures shall be marked as confidential under 35 U.S.C. 205.

## ARTICLE XV:  TITLE TO SUBJECT INVENTIONS

Wherein DOE has granted the Participant and the Contractor the right to elect to retain title to their respective Subject Inventions, and wherein the Participant has the option to choose an exclusive license, for reasonable compensation, for a pre-negotiated field of use to the Contractor's Subject Inventions,

A.   Each Party shall have the first option to elect to retain title to any Subject Invention made by its employees and that election shall be made: (1) for the Participant, within 12 months of disclosure of the Subject Invention to DOE or (2) for the Contractor, within 12 months of disclosure of the Subject Invention to DOE.  If a Party elects not to retain title to any Subject Invention of its employees, the other Party shall have the second option to elect to retain title to such Subject Invention.  DOE shall retain title to any Subject Invention which is not retained by any Party.

For Subject Inventions conceived or first actually reduced to practice under this CRADA, which are joint Subject Inventions made by the Contractor and the Participant, title to such Subject Inventions shall be jointly owned by the Contractor and the Participant.

B. The Parties acknowledge that DOE may obtain title to each Subject Invention reported under Article XIV for which a Patent application or applications are not filed pursuant to Article XVI and for which any issued Patents are not maintained by any Party to this CRADA.

C. The Parties acknowledge that the Government retains a nonexclusive, nontransferable, irrevocable, paid-up license to practice or to have practiced for or on behalf of the United States every Subject Invention under this CRADA throughout the world. The Parties agree to execute a Confirmatory License to affirm the Government's retained license. Participant is entering into this CRADA based upon the understanding said Government license is limited to Government purposes only.

D. During the term of this CRADA and for a period of 6 months after the termination or completion of the CRADA, the Participant shall have the opportunity, pursuant to 15 U.S.C. 3710a, to obtain a license to the Contractor Subject Inventions. In particular, the Participant shall have the option to obtain, up to and including, an exclusive license to Contractor Subject Inventions within a defined field of use on agreed-upon reasonable terms and conditions, including the payment of negotiated license fees and royalties.

## ARTICLE XVI:  FILING PATENT APPLICATIONS

A. The Parties agree that the Party initially indicated as having an ownership interest in any Subject Invention ("Inventing Party") shall have the first opportunity to file U.S. and foreign Patent applications. If the Participant does not file such applications within 1 year after election, or if the Contractor does not file such applications within the filing time specified in its prime contract, the other Party to this CRADA exercising an option pursuant to Article XV may file Patent applications on such Subject Inventions. If a Patent application is filed by the other Party ("Filing Party"), the Inventing Party shall reasonably cooperate and assist the Filing Party, at the Filing Party's expense, in executing a written assignment of the Subject Invention to the Filing Party and in otherwise perfecting the Patent application, and the Filing Party shall have the right to control the prosecution of the Patent application. The Parties shall agree between themselves as to who will file Patent applications on any joint Subject Invention.

B. The Parties agree that DOE has the right to file patent applications in any country if neither Party desires to file a patent application for any Subject Invention. Notification of negative intent shall be made in writing to the DOE Contracting Officer within 3 months of the decision of the non-Inventing Party to not file a patent application for the Subject Invention pursuant to Article XV or not later than sixty days prior to the time when any statutory bar might foreclose filing of a U.S. patent application.

C. The Parties agree to include within the beginning of the specification of any U.S. Patent applications and any patent issuing thereon (including foreign Patents) covering a Subject Invention, the following statement: "This invention was made under a CRADA (11-CR-19) between TerraPower, LLC and Battelle Energy Alliance, LLC under Contract No. DE-AC07-05ID14517, operated by the United States Department of Energy. The U.S. Government has certain rights in the invention."

D. A Party electing title or filing a Patent application in the United States or in any foreign country shall advise the other Party and DOE if it no longer desires to continue prosecution, pay maintenance fees, or retain title in the United States or any foreign country. The other Party and then DOE will be afforded the opportunity to take title and retain the Patent rights in the United States or in any such foreign country.

## ARTICLE XVII: TRADEMARKS

The Parties may seek to obtain Trademark/Service Mark protection on products or services generated under this CRADA in the United States or foreign countries. [The ownership and other rights relating to this Trademark shall be as mutually agreed to in writing by the Parties.] The Parties hereby acknowledge that the Government shall have the right to indicate on any similar goods or services produced by or for the Government that such goods or services were derived from and are a DOE version of the goods or services protected by such Trademark/Service Mark with the Trademark and the owner thereof being specifically identified. In addition, the Government shall have the right to use such Trademark/Service Mark in print or communications media.

## ARTICLE XVIII: MASK WORKS

Reserved

## ARTICLE XIX: COST OF INTELLECTUAL PROPERTY PROTECTION

Each Party shall be responsible for payment of all costs relating to Copyright, Trademark, and Mask Work filing; U.S. and foreign patent application filing and prosecution; and all costs relating to maintenance fees for U.S. and foreign Patents hereunder which are solely owned by that Party. Government/DOE laboratory funds contributed as DOE's cost share to a CRADA cannot be given to the Participant for payment of the Participant's costs of filing and maintaining patents or filing for Copyrights, Trademarks, and Mask Works. With respect to jointly owned Intellectual Property, the costs associated in protecting such jointly owned Intellectual Property will be shared by the Parties as mutually agreed.

## ARTICLE XX: REPORTS OF INTELLECTUAL PROPERTY USE

The Participant agrees to submit, for a period of 3 years from the date of termination or completion of this CRADA and upon request of DOE, a nonproprietary report no more frequently than annually on efforts to utilize any Intellectual Property arising under the CRADA.

## ARTICLE XXI: DOE MARCH-IN RIGHTS

The Parties acknowledge that DOE has certain march-in rights to any Subject Inventions in accordance with 48 CFR 27.304-1(g) and 15 U.S.C. 3710a(b)(1)(B) and (C).

## ARTICLE XXII: U.S. COMPETITIVENESS

The Parties agree that a purpose of this CRADA is to provide substantial benefit to the U.S. economy.

A.  In exchange for the benefits received under this CRADA, the Participant therefore agrees to the following:

   (1)  Products embodying Intellectual Property developed under this CRADA shall be substantially manufactured in the United States, and

   (2)  Processes, services, and improvements thereof which are covered by Intellectual Property developed under this CRADA shall be incorporated into the Participant's manufacturing facilities

Template v. 3/20/2009

11-CR-19

in the United States either prior to or simultaneously with implementation outside the U.S. Such processes, services, and improvements, when implemented outside the United States shall not result in reduction of the use of the same processes, services, or improvements in the United States.

B. Contractor agrees to a U.S. Industrial Competitiveness clause in accordance with its prime contract with respect to any licensing and assignments of its Intellectual Property arising from this CRADA, except that any licensing or assignment of its Intellectual Property rights to the Participant shall be in accordance with the terms of paragraph A of this article.

## ARTICLE XXIII:  ASSIGNMENT OF PERSONNEL

A. Each Party may assign personnel to the other Party's facility as part of this CRADA to participate in or observe the research to be performed under this CRADA.  Such personnel assigned by the assigning Party shall not during the period of such assignments be considered employees of the receiving Party for any purpose.

B. The receiving Party shall have the right to exercise routine administrative and technical supervisory control of the occupational activities of such personnel during the assignment period and shall have the right to approve the assignment of such personnel and/or to later request their removal by the assigning Party.

C. The assigning Party shall bear any and all costs and expenses with regard to its personnel assigned to the receiving Party's facilities under this CRADA.  The receiving Party shall bear facility costs of such assignments.

## ARTICLE XXIV:  FORCE MAJEURE

No failure or omission by the Contractor or the Participant in the performance of any obligation under this CRADA shall be deemed a breach of this CRADA or create any liability if the same shall arise from any cause or causes beyond the control of the Contractor or the Participant, including but not limited to the following, which, for the purpose of this CRADA, shall be regarded as beyond the control of the Party in question: Acts of God, acts or omissions of any government or agency thereof, compliance with requirements, rules, regulations, or orders of any governmental authority or any office, department, agency, or instrumentality thereof, fire, storm, flood, earthquake, accident, acts of the public enemy, war, rebellion, insurrection, riot, sabotage, invasion, quarantine, restriction, transportation embargoes, or failures or delays in transportation.

## ARTICLE XXV:  ADMINISTRATION OF THE CRADA

The Contractor enters into this CRADA under the authority of its prime contract with DOE.  The Contractor is authorized to and will administer this CRADA in all respects unless otherwise specifically provided for herein.  Administration of this CRADA may be transferred from Contractor to DOE or its designee with notice of such transfer to the Participant, and the Contractor shall have no further responsibilities except for the confidentiality, use, and/or nondisclosure obligations of this CRADA.

Template v. 3/20/2009

## ARTICLE XXVI: RECORDS AND ACCOUNTING FOR GOVERNMENT PROPERTY

The Participant shall maintain records of receipts, expenditures, and the disposition of all Government property in its custody related to this CRADA, for a period of three years after the termination or expiration of the CRADA.

## ARTICLE XXVII: NOTICES

Any communications required by this CRADA, if given by postage prepaid first class U.S. Mail or other verifiable means addressed to the Party to receive the communication, shall be deemed made as of the day of receipt of such communication by the addressee, or on the date given if by verified facsimile. Address changes shall be given in accordance with this Article and shall be effective thereafter. All such communications, to be considered effective, shall include the number of this CRADA.

The addresses, telephone numbers and facsimile numbers for the Parties are as follows:

| For Contractor: | For Participant: |
|---|---|
| Agreements Administrator | J. Greg Field |
| Technology Deployment | Manager, Project and Supplier Development |
| Battelle Energy Alliance, LLC | TerraPower, LLC |
| 2525 North Fremont Avenue | 11235 S.E. 6th Street, Suite A-200 |
| P.O. Box 1625, M.S. 3805 | |
| Idaho Falls, ID 83415-3805 | Bellevue, WA 98004 |
| Telephone: (208) 526-6141 | Telephone: (425) 283-4740 |
| Facsimile: (208) 526-0876 | Facsimile: (425) 516-8879 |

## ARTICLE XXVIII: DISPUTES

The Parties shall attempt to amicably resolve all disputes arising under or as a result of this CRADA. Neither Party will be prevented from resorting to a judicial proceeding if (1) good faith efforts to resolve the dispute have been unsuccessful or (2) interim relief from a court is necessary to prevent serious injury. To the extent that there is no applicable U.S. Federal law, this CRADA and performance thereunder shall be governed by the law of the State of Idaho. Any and all litigation involving disputes, claims, or either Party's rights and duties under or arising as a result of this CRADA shall be brought in a court of competent jurisdiction in the State of Idaho.

## ARTICLE XXIX: ENTIRE CRADA AND MODIFICATIONS

A.  This CRADA with its appendixes contains the entire agreement between the Parties with respect to the subject matter hereof, and all other prior representations or agreements relating hereto have been merged into this document and are thus superseded in totality by this CRADA. This CRADA shall not be effective until approved by DOE.

B.  Any agreement to materially change any terms or conditions of this CRADA or the appendixes shall be valid only if the change is made in writing, executed by the Parties hereto, and approved by DOE.

C.  Modification to this CRADA for purposes of changing the appendixes may be issued by Amendment to this CRADA, subject to and executed as set forth in paragraph B above.

11-CR-19

## ARTICLE XXX:  TERMINATION

This CRADA may be terminated by either Party upon 90 days written notice to the other Party.  This CRADA may also be terminated by the Contractor in the event of failure by the Participant to provide the necessary advance funding, as agreed in Article III.

In the event of termination by either Party, each Party shall be responsible for its share of the costs incurred through the effective date of termination, as well as its share of the costs incurred after the effective date of termination, and which are related to the termination.

The confidentiality, use, and/or non-disclosure obligations of this CRADA shall survive any termination of this CRADA.

## ARTICLE XXXI:  QUALITY ASSURANCE

A.  Contractor will, without a being contractually bound to do so, endeavor to collaborate with the Participant for the joint work under this CRADA that will if applicable, at time of delivery to the Participant, be free from defect in workmanship and conform to quality standard ASME-NQA-1-2008, 1a 2009 Addenda. Additional and/or modified quality assurance requirements for the collaborative effort to be performed under this CRADA and the Statement of Work may be detailed further in Appendix A Statement of Work if need be and as may be mutually agreed to by the Participant and the Contractor, subject to DOE review and approval.

B.  Contractor will maintain any and all licenses and permits as may be required for it to collaborate with Participant under this CRADA. Contractor shall not engage subcontractors ("Sub-tier Contractors") to directly and substantially contribute or perform any of the collaborative efforts to be undertaken by the Contractor and the Participant within the Statement of Work without the Participant's written consent, and to the extent such Sub-tier Contractors are engaged with Participant's written permission, such will be reimbursable under this CRADA.

C.  To the extent not in conflict with Contractor's DOE Contract, applicable law, or this CRADA, Contractor will incorporate quality standard ASME-NQA-1-2008, 1a 2009 Addenda as  provision in its subcontracts with Subcontractors approved under paragraph (c) of this Article XXXI, including any applicable technical and quality requirements as specified in Appendix A.  Furthermore, at a minimum, any contributions to the Contractor from such an approved subcontractor will in effect preferably meet the intent of quality standard ASME-NQA-1-2008, 1a 2009 Addenda.

D.  The Participant may request access, and/or access by its designee, to portions of Contractor's facilities and records directly relating to quality assurance standards for the collaborative work to be performed under this CRADA and Statement of Work for audit purposes.  Such access will be subject to, and at the discretion of, Contractor and DOE.  Participant acknowledges approval may not be granted, depending on the circumstances. If granted, Participant or Participant's designees must meet and comply with all applicable laws, BEA and INL rules including, without limitation, those rules pertaining to security, environmental, safety, and health requirements.

11-CR-19

BATTELLE ENERGY ALLIANCE, LLC:          TERRAPOWER, LLC:

BY: _____          BY: _____

PRINTED NAME: Steven T. McMaster        PRINTED NAME:  Eben W. Frankenberg

TITLE: Director, Technology Deployment   TITLE:  Executive Vice President

DATE: ___9/22/2011___                    DATE: ___10/3/11___


Reviewed:

BEA Legal   22 SEPT 2011

TD CM   GWS   9/22/11

Template v. 3/20/2009

# APPENDIX A
# STATEMENT OF WORK
## TP-1 Metallic Fuel and Materials Development
## CRADA NO. 11-CR-19

## I.    BACKGROUND AND PURPOSE

### Overview

TerraPower (Participant) aims to develop a sustainable and economic nuclear energy system while greatly reducing proliferation risks and creating new options for converting low-level waste into vast energy resources.  This CRADA will contribute to the Participant's understanding of metallic fuel behavior, which is a key technology option of our traveling wave reactor (TWR) design.  Tasks will leverage Contractor's specific expertise in metallic fuel irradiation behavior, fabrication and fast reactor structural materials.

Participant will provide 100% of the funding necessary for Contractor and Participant to perform the tasks identified as Phase 1 of this CRADA, to be completed in FY12.  This SOW may be changed in accordance with Article XXIX, Paragraph C, to reflect changes in tasks and related costs, schedules, etc., or to introduce a new Phase.

### Points of Contact:

| Contractor: | Participant: |
|---|---|
| Gary Hoggard | Bruce Hilton |
| Experiment Manager | Group Leader, Fuels and Materials Development, Testing and Qualification |
| Battelle Energy Alliance, LLC | TerraPower, LLC |
| 2525 N. Fremont Avenue | 11235 S.E. 6th Street, Suite A-200 |
| Idaho Falls, ID 83415-3695 | Bellevue, WA 98004 |
| E-mail: gary.hoggard@inl.gov | E-mail: bhilton@terrapower.com |
| Telephone:  (208) 526-1345 | Telephone: (425) 495-8665 |
| Facsimile:  (208) 526-0990 | Facsimile:  (425) 467-2350 |
| Cell:  (208) 881-8765 | Cell:  (208) 521-4966 |

## II.   SCOPE OF WORK

### Introduction

Phase 1 will include review and exchange of prior fast reactor experimental data, irradiation testing and post irradiation examination (PIE) on DOE owned nuclear fuel, fuel and component fabrication evaluations, and development of scientific models of irradiation behavior.  Results of activities are envisioned to be shared and exchanged between the Parties to enhance the research activities to be performed under this CRADA.  Such data is not subject to the terms and conditions of this CRADA.

Template v. 3/20/2009

11-CR-19

**Irradiation Testing and Postirradiation Examination**
The TWR has some unique irradiation conditions that differentiate it from the typical commercial scale sodium cooled fast reactor design. ███████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████ The DOE has similar objectives in developing advanced fuel concepts that will achieve higher burnup, and materials that will perform acceptably at higher fluence damage levels.

There have not been any tests conducted that incorporate all these specific design parameters.  However, the Contractor and a predecessor, [the University of Chicago, the Management and Operating contractor of the Argonne National Laboratory-West (ANL-W)] have tested many of these design variables in the Experimental Breeder Reactor-II (EBR-II), the Fast Flux Test Facility (FFTF) and the Advanced Test Reactor (ATR).  Due to changes in DOE missions and programmatic funding, some irradiation tests have limited or no PIE data.  There is mutual interest for Contractor and Participant to review the existing archive data of these experiments, and to perform additional PIE to address specific fuel performance questions.  Table 1 summarizes a current list of archive experiments (Expt.) that are identified as being of interest to Participant.  Please note that the list may be revised based on additional archive experiments being identified during the initial data investigation phase of this CRADA.

Table 1:  Archive Irradiation Tests with Design Parameters of Interest





Notes:
1. If any documents or materials provided to Participant under this CRADA by Contractor are marked as Applied Technology (AT), Participant shall adhere to all required and appropriate regulations and protocols for the review, management, and as applicable, eventual release of such documents by Participant.
2. X496 and the MFF series experiments are currently undergoing PIE funded by DOE's Fuel Cycle Research and Development program and therefore information from these is not Protected CRADA Information
3. Acronyms:
- Expt. No. – Experiment number
- Fuel/Clad – Fuel/Cladding
- No, of Rods in SA – Number of Rods in subassembly
- S. Den. % - Smeared Density %
- Cal OD , mm – Cladding Outside Diameter, millimeters
- Wall, mm – Wall thickness, millimeters
- Plen/Fuel vol. ratio – Plenum/fuel volume ratio
- LHGR Peak, kW/m – Linear heat generation rate, kilowatts per meter
- PICT,C – Peak inner cladding temperature, degrees C
- Peak burnup at % – Peak burnup atom %
- Fluence
- IFR – Integral Fast Reactor
- MFF – FFTF Series III Driver Metal Fuel Fabrication Qualification Tests

Tasks in the Irradiation Testing and PIE area are structured to obtain data and information from irradiation experiments conducted under historical and DOE research and development programs not performed under this CRADA.

**Characterization**
The Contractor will provide characterization data of as-built U-10Zr fuel rods, including the uranium alloy slug, the HT-9 cladding tube and end cap weld region of one unirradiated EBR-II rod and one unirradiated FFTF MFF rod.

**Mechanistic Model Development**
Participant is very interested in advancing the fundamental understanding of metallic fuel irradiation behavior that would support engineering design, and provide validation data for model development. Some of the technical issues of interest are:

- Swelling mechanism – incubation period and fission damage threshold; low power behavior, and effects of irradiation history on end of life behavior; contribution from open porosity and closed porosity as function of burnup and temperature

- Fission gas release mechanism(s) – dependence on temperature, swelling, and burnup
- Sodium behavior – time evolution during irradiation including logging into fuel porosity, displacement during fission gas-driven swelling, migration of Cs and other fission products into the sodium
- Fundamental fuel properties for compositions of interest (currently U-Zr binary in the range 2-10 wt.% – properties needed to inform the above mechanistic understanding)
- HT9 cladding and duct irradiation behavior and dependence on fabrication processing, microstructure, fluence or damage level (displacements per atom) and irradiation conditions (e.g., flux, temperature)

Because there is little or no data for tests with all these irradiation conditions, Participant has relied on an external fuel performance computer code to predict behavior for different fuel designs. Participant is developing advanced, engineering fuel performance modeling computer codes that will be used as design tools, and guide in their technology development program. The Contractor, in support of DOE programs, is developing advanced modeling and simulation capabilities applied to fuel performance modeling. In this CRADA, the Participant and the Contractor will develop benchmark data sets from the PIE that can be used by both the Contractor and the Participant fuel performance modeling development activities. These data sets will include prior irradiation tests from EBR-II, and FFTF, and subject to DOE programmatic and Contractor approval, AFC-2E test data that is currently being generated or which may be generated under DOE's Fuel Cycle Research and Development (FCRD) Program, may also be made available to Participant and Contractor for the work to be performed under this CRADA.



**Tasks:**

**Phase 1**
Initially, Phase 1 will include:

1. Contractor will provide prior fast reactor experiment data to the Participant in an electronic format and both Parties will review prior fast reactor experiment data currently in Contractor's possession at INL. This includes collecting, scanning/digitizing historical experiment data on selected EBR-II, FFTF and AFC-2E non-minor actinide (MA) experiments with follow-on review of available data to determine additional PIE on selected EBR-II and FFTF experiments that may be needed. Pacific Northwest National Laboratory may have additional FFTF data that may need to be obtained through a separately funded task to this CRADA (or otherwise) if the Participant requires this data. The Parties will develop plans and

Contractor will develop cost estimates for performing additional irradiations and/or PIE on selected EBR-II and FFTF experiments.

2. Contractor will characterize (see Tables 2 and 3 below) as-built (unirradiated) archive DOE-owned U-10Zr fuel rods (i.e., one EBR-II rod and one FFTF MFF rod). This includes characterization of the uranium alloy slug, the HT-9 cladding tube and endcap weld region in the final assembled condition after sodium settling and bonding process steps.

3. Both Parties will participate in the development of mechanistic models of metallic fuel irradiation behavior that can be implemented in advanced fuel performance modeling computer codes and development of appropriate path-forwards for modeling development. Both Parties will evaluate the irradiation history for irradiation tests and develop benchmark data sets from the PIE. Both Parties will evaluate EBR-II and FFTF and ATR operating history data to enable PIE fuel rod detailed calculations.

4. Contractor will provide project management for planning and CRADA modifications for follow-on tasks. Participant will provide input as needed. It is recognized by both Parties that many activities may evolve once this CRADA is in place and that initial notional schedules and costs identified herein may change. An initial project management task will be to develop a Project Execution Plan (PEP) that details out the activities and establishes baseline costs and schedules.

Phase 1 non-project management tasks are summarized in Table 4 below and a notional schedule is summarized in Figure 1.

Participant and Contractor will participate in quarterly workshops to discuss specific topics of irradiation behavior mechanisms describing metallic alloy fuel performance. All technical workshops will cover topics and be at a location and time mutually agreed to by both Parties, subject to available funding hereunder.

Material characterization will be performed by the Contractor primarily at INL's Materials and Fuel Complex (MFC), Hot Fuel Examination Facility and Analytical Laboratory. Data collection and reviews will be performed by the Contractor at INL facilities in Idaho Falls, ID and at Participant's main office in Bellevue, WA. Participant will assign at least one staff member to this project. Contractor will arrange that the assigned Participant staff, subject to meeting BEA and DOE security, export compliance, environmental, safety, and health requirements as are applicable, be granted Building Access Only (BAO) privileges to the INL offices and facilities of BEA's discretion, and subject to DOE approval. Participant will be responsible for completing all training requirements for such access, and subject to available funding under this CRADA.

Table 2: Characterization of U-10Zr

| Characterization Exam of U-10Zr (R = Required, O = Option) | | | | |
|---|---|---|---|---|
| Test No. | Chemical composition and isotopics | Class | Comments | Method / Objective |
| | | | | ICP-MS, ICP-AES |
| | Bulk Chemical (isotopic) composition | R | | (TIMS) |
| | Radial elemental composition profile | R | U, Zr, Impurities | EPMA |
| Test No. | Microstructure Examination | Class | Comments | Method / Objective |

11-CR-19

| Test No. | | Class | Comments | Method / Objective |
|---|---|---|---|---|
| | Grain size and distribution | R | Transverse + Longitudinal | SEM/TEM |
| | Grain morphology | R | | SEM/TEM |
| | Phase characterization | R | | SEM/TEM |
| Test No. | Thermal and physical properties testing | Class | Comments | Method / Objective |
| | Dimensional - Diameter, Ovality, Length | O | | XRD |
| | Phase identification Bulk | R | Transverse + Longitudinal | m-XRD |
| | Phase identification Radial Profile | O | | m-hardness |
| | Hardness – radial profile | R | | Archemedies |
| | Density – Immersion (Pycnometry) | R (O) | | XRD |
| Test No. | Mechanical properties testing | Class | Comments | Method / Objective |
| | Yield Strength (YS), Ultimate Tensile Strength (UTS), Uniform Elongation (UE), Total Elongation (TE), Young's Modulus (E) | R | RT, 600˚C (O:370, 675˚C). Historical data is acceptable. | |

Notes:
1. U-Zr fuel specimens from 3 axial locations (0.05, 0.50, 0.95 L/Lo of fuel column)
2. Acronyms
   - ICP-MS - Inductively Coupled Plasma-Mass Spectroscopy
   - ICP-AES - Inductively Coupled Plasma, Atomic Emission Spectrometry
   - TIMS - Thermal Ionization Mass Spectrometry
   - EPMA - Electron Probe Micro-Analyzer
   - SEM - Scanning Electron Microscope
   - TEM - Transmission Electron Microscope
   - XRD - X-Ray Diffraction
   - m-XRD - Micro X-Ray Diffraction
   - m-Hardness - Micro Hardness

Table 3:  Characterization of HT9

| Characterization Exam of HT9 (R = Required, O = Option) | | | | |
|---|---|---|---|---|
| Test No. | Chemical composition and isotopics | Class | Comments | Method / Objective |
| | | | | ICP-MS, ICP-AES |
| | Bulk Chemical (isotopic) composition | R | | (TIMS) |
| | Radial elemental composition profile | O | | EPMA |
| Test No. | Microstructure Examination | Class | Comments | Method / Objective |
| | Grain size and distribution | R | | SEM/TEM |
| | Grain morphology | R | | SEM/TEM |
| | Phase characterization (Ferrite / Martensite %) | R | | SEM/TEM |
| | Precipitate Analysis - size distribution and chemistry | R | | SEM/TEM |
| Test No. | Thermal and physical properties testing | Class | Comments | Method / Objective |
| | Dimensional - Diameter, Ovality, Length | O | | |
| | Phase identification Bulk | R | | XRD |
| | Phase identification Thru-wall Profile | R | Thru wall Profile | m-XRD |
| | Hardness – | R | Thru wall Profile | m-hardness |
| | Density – Immersion (Pycnometry) | R (O) | | Archemedies |

Notes:
1. HT9 specimens from 2 locations (0.50 L/Lo of fuel column or adjacent) and 0.75 L/Lo of jacket, i.e., mid plenum)
2. HT9 welded lower and upper endcaps

Table 4:  Summary of Initial Tasks

| Task No. | Task Summary | Contractor Role | Participant Role |
|---|---|---|---|
| | **Irradiation Testing and PIE** | | |
| 1.01 | Collect and archive available experiment data on EBR-II X-experiments and FFTF IFR-1 and MFF tests. | Lead | Support |
| 1.02 | Review the archived available data on EBR-II X-experiments and FFTF IFR-1 and MFF tests (see Table 1). | Joint Performance | Joint Performance |
| 1.03 | Identify additional PIE that is needed and develop PIE plan | Support | Lead |
| 1.04 | Develop cost estimate of PIE plan. | Lead | Support |
| | | | |
| | **Characterization** | | |
| 2.01 | Characterize as-built (unirradiated) archive U-10Zr / HT-9 fuel rods (i.e., one EBR-II rod and one FFTF MFF rod). This includes fuel slugs and cladding as-supplied and after final assembly. | Sole Performer | |
| | | | |
| | **Mechanistic Model Development** | | |
| 3.01 | Develop mechanistic models of metallic fuel irradiation behavior | Joint Performance | Joint Performance |
| 3.02 | Evaluate PIE tailored neutronics calculations of the X423 test and develop benchmark datasets from PIE. | Joint Performance | Joint Performance |
| 3.03 | Evaluate EBR-II operating history data to enable PIE fuel rod detailed calculations. | Joint Performance | Joint Performance |

## III.   REPORTS AND OTHER DELIVERABLES

| Task No. | Task Summary | Responsible Party | Description | Generated Information Obligations (Party) | Performance Month Due From CRADA Execution |
|---|---|---|---|---|---|
| | **Irradiation Testing PIE** | | | | |
| 1.01 | Provide electronic copies of archive experimental data (i.e., high resolution scans, 300 dpi) | Contractor | EBR-II, AFC-2E & irradiation conditions | None Anticipated | 2 – 3 |
| 1.03 | Issue PIE plan to address Participant's highest priority technical questions. | Participant | EBR-II & FFTF | Protected CRADA (Participant, Contractor) | 8 |
| 1.04 | Issue cost estimate of PIE plan proposed by Participant | Contractor | EBR-II & FFTF | Protected CRADA (Participant, Contractor) | 12 |
| | | | | | |
| | **Characterization** | | | | |
| 2.01 | Issue report on characterization of fuel | Contractor | U- | Protected | 12 |

Template v. 3/20/2009

| | | | 10Zr/HT9 Fuel rod (EBR-II & FFTF) | CRADA (Participant) | |
|---|---|---|---|---|---|
| | slugs and cladding of archive U-10Zr / HT-9 fuel rods. | | | | |
| | | | | | |
| | **Modeling** | | | | |
| 3.01 | Participate in quarterly workshops on mechanistic models of metallic fuel irradiation behavior | Contractor / Participant | N/A | None Anticipated | 3,6,9,12 |
| 3.02 | Provide benchmark datasets from PIE. | Contractor / Participant | EBR-II, FFTF, AFC-2E & irradiation conditions | None Anticipated | 10 |
| 3.03 | Provide EBR-II operational history that supports PIE fuel rod detailed calculations of selected experiments. | Contractor | EBR-II PIE fuel rod calculations | None Anticipated | 12 |

Note:  Protected CRADA Information is to be assigned only to Generated Information as defined in this CRADA and not Contractor's existing data.



Figure 1: Notional Schedule



Template v. 3/20/2009

# APPENDIX B
## BACKGROUND INTELLECTUAL PROPERTY
## TP-1 Metallic Fuel and Materials Development
## CRADA NO. 11-CR-19

Contractor Background Intellectual Property

- U.S. Patent Application No. 12/175,122, filed July 17, 2008, entitled "Casting Methods," having BEA Attorney Docket No. BA-289

- U.S. Patent Application No. 12/702,077, filed February 8, 2010, entitled "Dopants for High Burnup in Metallic Nuclear Fuels," having BEA Attorney Docket No. BA-418

- U.S. Patent Application No. 12/893,503, filed September 29, 2010, entitled "Nuclear Fuel Bodies Having Shell and Core Regions, Nuclear Reactors Including Such Nuclear Fuel Bodies, and Related Methods," having BEA Attorney Docket No. BA-470

Participant Background Intellectual Property

- TerraPower Disclosures

    o Refractory cladding in direct contact with fuel and Method of manufacturing (Disclosure #1984)

    o Cladding and fuel utilizing compressible material therein (Disclosure #1986)

    o Nuclear fuel in the form of foam (Disclosure #1911)

    o Nuclear reactor fuel having gradated material composition (Disclosure #2186)

    o Fuel structured for anisotropic swelling under reactor conditions (Disclosure #3238)

    o U.S. Patent Application No. US 2009-0252283 A1, filed April 8, 2008, entitled "Nuclear Fission Reactor Fuel Assembly Adapted to Permit Expansion of the Nuclear Fuel Contained Therein"

    o IV Docket # 0707-032-027-00000, Structured Nuclear Fuel

- Copyright existing in Fuel performance computational code, ALCHEMY

    o The ALCHEMY fuel performance code was developed to predict fuel element deformation, constituent migration in the fuel, and cladding wastage as a function of burnup, power levels, coolant temperatures and fluence. ALCHEMY includes modules for modeling the deformation behavior of the fuel and clad, the release of gas from the fuel, the transport of gas through the plenum and sodium, the flow of bond sodium, heat conduction through the fuel, sodium and clad, and the transport of chemical species through the fuel and clad. Its intended use is for the interpretation of existing fuel element test data, modeling of potential future experiments, and the evaluation of fuel element behavior in new core designs.

# EXHIBIT B

# STEVENSON-WYDLER (15 USC 3710)
## COOPERATIVE RESEARCH AND DEVELOPMENT
## AGREEMENT (hereinafter CRADA) No. 12-CR-24

## BETWEEN

## Battelle Energy Alliance, LLC (BEA)

## under its U.S. Department of Energy Contract

## No.  DE-AC07-05ID14517 (hereinafter Contractor)

## AND

## TerraPower, LLC

## (hereinafter Participant), both being

## hereinafter referred to singularly as "Party" and jointly as "Parties"

### ARTICLE I:  DEFINITIONS

A.   "Government" means the Federal Government of the United States of America and agencies thereof.

B.   "DOE" means the Department of Energy, an agency of the Federal Government.

C.   "Contracting Officer" means the DOE employee administering the Contractor's DOE contract.

D.   "Generated Information" means information produced in the performance of this CRADA.

E.   "Proprietary Information" means information which embodies (i) trade secrets or  (ii) commercial or financial information which is privileged or confidential under the Freedom of Information Act (5 U.S.C. 552(b)(4)), either of which is developed at private expense outside of this CRADA and which is marked as Proprietary Information.

F.   "Protected CRADA Information" means Generated Information which is marked as being Protected CRADA Information by a Party to this CRADA and which would have been Proprietary Information had it been obtained from a non-Federal entity.

G.   "Subject Invention" means any invention of the Contractor or Participant conceived or first actually reduced to practice in the performance of work under this CRADA.

Template v. 3/20/2009
7/3/12

H.  "Intellectual Property" means Patents, Trademarks, Copyrights, Mask Works, Protected CRADA Information, and other forms of comparable property rights protected by Federal Law and foreign counterparts, except trade secrets.

I.  "Trademark" means a distinctive mark, symbol, or emblem used in commerce by a producer or manufacturer to identify and distinguish its goods or services from those of others.

J.  "Service Mark" means a distinctive word, slogan, design, picture, symbol, or any combination thereof, used in commerce by a person to identify and distinguish its services from those of others.

K.  "Mask Work" means a series of related images, however fixed or encoded, having or representing the predetermined, three-dimensional pattern of metallic, insulating, or semiconductor material present or removed from the layers of a semiconductor chip product and in which series the relation of the images to one another is that each image has the pattern of the surface of one form of the semiconductor chip product.

L.  "Background Intellectual Property" means the Intellectual Property identified by the Parties in Appendix B, Background Intellectual Property, which was in existence prior to or is first produced outside of this CRADA, except that in the case of inventions in those identified items, the inventions must have been conceived outside of this CRADA and not first actually reduced to practice under this CRADA to qualify as Background Intellectual Property.

M.  "Foreign Interest" is defined as any of the following:

(1)  A foreign government or foreign government agency;

(2)  Any form of business enterprise organized under the laws of any country other than the United States or its possessions;

(3)  Any form of business enterprise organized or incorporated under the laws of the United States, or a State or other jurisdiction within the United States, which is owned, controlled, or influenced by a foreign government, agency, firm, corporation or person; or

(4)  Any person who is not a U.S. citizen.

N.  "Foreign ownership, control, or influence (FOCI)" means the situation where the degree of ownership, control, or influence over a participant by a Foreign Interest is such that a reasonable basis exists for concluding that compromise of classified information or special nuclear material, as defined in 10 CFR Part 710, may result.

## ARTICLE II:  STATEMENT OF WORK

Appendix A, Statement of Work, is an integral part of this CRADA.

## ARTICLE III:  TERM, FUNDING AND COSTS

A.  The effective date of this CRADA shall be the latter date of (1) the date on which it is signed by the last of the Parties, (2) the date on which it is approved by DOE, or (3) the date on which the advance funding referred to in Article III.E is received by the Contractor.  The work to be performed under this CRADA shall be complete within six years from the effective date.

Template v. 3/20/2009
7/3/12

B. The Participant's estimated contribution is $643,951 funds-in and $650,000 in-kind for FY 2012, $1,979,485 funds-in and $500,000 in-kind for FY 2013, $447,545 funds-in and $200,000 in-kind for FY 2014, $1,152,312 funds-in and $100,000 in-kind for FY 2015, $1,189,372 funds-in and $100,000 in-kind for FY 2016, $1,186,574 funds-in and $100,000 in-kind for FY 2017, and $0 funds-in and $100,000 in-kind for FY 2018.  The Government's estimated contribution from DOE's Fuel Cycle Technologies (FCT) program for currently planned AFC-3 experiments, which is provided through the Contractor's contract with DOE, is $2,477,000 in-kind for FY 2012, $2,742,000 in-kind for FY 2013, $2,825,000 in-kind for FY 2014, $2,909,000 in-kind for FY 2015, $2,997,000 in-kind for FY 2016, and $3,086,000 in-kind for FY 2017 and $0 in-kind for FY 2018, subject to available funding and includes the following:

- Nuclear material to be used in experiments

- ███████████████████████████████

- Irradiation vehicle design

- Irradiation vehicle hardware

- Shipment of unirradiated experiments from MFC to ATR

- Configuration and insertion of experiments in ATR (excluding activities associated with intermediate post-irradiation examination (PIE) of experiments, if performed)

- Irradiation unit charges

- Removal from ATR and canal operations for loading the shipping cask (excluding activities associated with intermediate PIE of experiments, if performed)

- As-run/projection analyses

- Shipment of experiments from ATR to HFEF after irradiation is completed (excluding activities associated with intermediate PIE of experiments, if performed)

- Removal of experiments from the shipping cask into the hot cells (excluding activities associated with intermediate PIE of experiments, if performed)

- Disposition of irradiated experiments and materials

C. Neither Party shall have an obligation to continue or complete performance of its work at a contribution in excess of its estimated contribution as contained in Article III B, above, including any subsequent amendment.

D. Each Party agrees to provide at least 30 days notice to the other Party if the actual cost to complete performance will exceed its estimated contribution.

E. The Participant shall provide Contractor sufficient advance funds to maintain approximately a 90-day advance of funds during the entire period of work.  No work will begin before the receipt of a cash advance.  Failure of the Participant to provide the necessary advance funding is cause for termination of the CRADA.

Template v. 3/20/2009
7/3/12

F.  The Contractor shall invoice the Participant monthly, and provide funding status monthly to allow adequate advancement of funds, and cost allocation. Upon termination or completion of the term of this CRADA, Contractor shall reconcile final costs, and return any remaining funds to Participant.

## ARTICLE IV:  PERSONAL PROPERTY

All tangible personal property produced or acquired under this CRADA shall become the property of the Participant or the Government, depending upon whose funds were used to obtain it. Such property is identified in Appendix A, Statement of Work. Personal Property shall be disposed of as directed by the owner at the owner's expense. All jointly funded property shall be owned by the Government.

## ARTICLE V:  DISCLAIMER

THE GOVERNMENT, THE PARTICIPANT, AND THE CONTRACTOR MAKE NO EXPRESS OR IMPLIED WARRANTY AS TO THE CONDITIONS OF THE RESEARCH OR ANY INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT MADE OR DEVELOPED UNDER THIS CRADA, OR THE OWNERSHIP, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE RESEARCH OR RESULTING PRODUCT. NEITHER THE GOVERNMENT, THE PARTICIPANT, NOR THE CONTRACTOR SHALL BE LIABLE FOR SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES ATTRIBUTED TO SUCH RESEARCH OR RESULTING PRODUCT, INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT MADE OR DEVELOPED UNDER THIS CRADA.

## ARTICLE VI:  LIABILITY

Except to the extent of any liability resulting from any willful misconduct or negligent acts or omissions of the Government or the Contractor, the Participant indemnifies the Government and the Contractor for all damages, costs and expenses, including attorney's fees, arising from personal injury or property damage occurring as a result of the making, using, or selling of a product, process, or service by or on behalf of the Participant, its assignees, or licensees, which was derived from the work performed under this CRADA. In respect to this article, neither the Government nor the Contractor shall be considered assignees or licensees of the Participant, as a result of reserved Government and Contractor rights. The indemnity set forth in this paragraph shall apply only if the Participant shall have been informed as soon and as completely as practical by the Contractor and/or the Government of the action alleging such claim and shall have been given an opportunity, to the maximum extent afforded by applicable laws, rules, or regulations, to participate in and control its defense, and the Contractor and/or the Government shall have provided all reasonably available information and reasonable assistance requested by the Participant. No settlement for which the Participant would be responsible shall be made without the Participant's consent unless required by final decree of a court of competent jurisdiction.

## ARTICLE VII:  OBLIGATIONS AS TO PROPRIETARY INFORMATION

A.  Each Party agrees to not disclose Proprietary Information provided by another Party to anyone other than the CRADA Participant and Contractor without written approval of the providing Party, except to Government employees who are subject to the statutory provisions against disclosure of confidential information set forth in the Trade Secrets Act (18 U.S.C. 1905). For avoidance of doubt, Contractor will disclose Proprietary Information under this exception only as needed to meet the requirements of its contract with DOE.

Template v. 3/20/2009
7/3/12

B. If Proprietary Information is orally disclosed to a Party, it shall be identified as such, orally, at the time of disclosure and confirmed in a written summary thereof, appropriately marked by the disclosing Party, within 30 days as being Proprietary Information.

C. All Proprietary Information in tangible form shall be returned to the disclosing Party or destroyed with a certificate of destruction submitted to the disclosing Party upon termination or expiration of this CRADA, or during the term of this CRADA upon request by the disclosing Party.

D. All information marked as Proprietary Information shall be protected by the recipient as Proprietary Information for a period of five years from the effective date of disclosure under this CRADA, unless, as shown by the recipient, such Proprietary Information becomes publicly known without the fault of the recipient, comes into recipient's possession from a third party without an obligation of confidentiality on the recipient, is independently developed by recipient's employees who did not have access to such Proprietary Information, is released by the disclosing Party to a third party without restriction, or is released for disclosure with the written consent of the disclosing Party.

E. If any documents or materials provided to Participant under this CRADA by Contractor are marked as Applied Technology (AT), Participant shall adhere to all required and appropriate regulations and protocols for the review, management, and as applicable, eventual release of such documents by Participant.

### ARTICLE VIII:   OBLIGATIONS AS TO PROTECTED CRADA INFORMATION

A. Each Party may designate as Protected CRADA Information any Generated Information produced by its employees which meets the definition of Article I.F and, with the agreement of the other Party (which shall not be unreasonably withheld in light of DOE's programmatic interests under this CRADA), so designate any Generated Information produced by the other Party's employees which meets the definition of Article I.F. All such designated Protected CRADA Information shall be appropriately marked. The Parties anticipate that no Protected Information will be produced in the course of the CRADA.

B. For a period of five years from the date Protected CRADA Information is produced, pursuant to 15 U.S.C. 3710 a(c)(7)(B), the Parties agree not to further disclose such information and to use the same degree of care and discretion, but no less than reasonable care and discretion, to avoid disclosure, publication, or dissemination of such information to a third party, as the Party employs for similar protection of its own information which it does not desire to disclose, publish, or disseminate except:

(1) as necessary to perform this CRADA;

(2) as provided in Article XI [REPORTS AND ABSTRACTS];

(3) as requested by the DOE Contracting Officer to be provided to other DOE facilities solely for Government use only at those DOE facilities with the same protection in place;

(4) to existing or potential licensees, affiliates, customers, or suppliers of the Parties in support of commercialization of the technology with the same protection in place. Disclosure of Participant's Protected CRADA Information under this subparagraph shall only be done with the Participant's consent; or

(5) as mutually agreed by the Parties in advance.

C.  The obligations of paragraph B above shall end sooner for any Protected CRADA Information which shall become publicly known without fault of either Party, shall come into a Party's possession without breach by that Party of the obligations of paragraph B above, or shall be independently developed by a Party's employees who did not have access to the Protected CRADA Information.

## ARTICLE IX:  RIGHTS IN GENERATED INFORMATION

The Parties agree that they shall have no obligations of nondisclosure or limitations on their use of, and the Government shall have unlimited rights in, all Generated Information produced and information provided by the Parties under this CRADA, except for (a) information which is marked as being Copyrighted (subject to Article XIII) or as Protected CRADA Information (subject to Article VIII B) or as Proprietary Information (subject to Article VII D), or (b) information that discloses an invention which may later be the subject of a U.S. or foreign Patent application.

## ARTICLE X:  EXPORT CONTROL

A.  THE PARTIES UNDERSTAND THAT, TO THE EXTENT MATERIALS AND INFORMATION RESULTING FROM THE PERFORMANCE OF THIS CRADA ARE SUBJECT TO EXPORT CONTROL LAWS, EACH PARTY IS RESPONSIBLE FOR ITS OWN COMPLIANCE WITH SUCH LAWS.

B.  The Parties acknowledge that to the extent the activities covered by this Agreement are subject to U.S. export control laws, (i) transactions with certain persons, and (ii) the exportation of certain types and levels of technologies and services, are prohibited or restricted. These laws include, without limitation, the Arms Export Control Act, the Export Administration Act, the International Emergency Economic Powers Act, and the Atomic Energy Act and regulations issued pursuant to these, including the Export Administration Regulations (EAR)(15 CFR Parts 730-774), the International Traffic in Arms Regulations (ITAR) (22 CFR Parts 120-130), and the Nuclear Regulatory Commission and Department of Energy export regulations (10 CFR Parts 110 and 810).

C.  Export licenses or other authorizations from the U.S. Government may be required for the export of goods, technical data or services under this Agreement. The Parties acknowledge that export control requirements may change and that the export of goods, technical data or services from the U.S. without an export license or other appropriate governmental authorization may result in criminal liability.

D.  Each Party is responsible for its own compliance with laws and regulations governing export controls and acknowledges that it can contact the U.S. Departments of Commerce, State, Energy and Treasury for guidance as to applicable licensing requirements and other restrictions.

E.  The Participant has a continuing obligation to provide the Contractor written notice of any changes in the nature and extent of foreign ownership, control, or influence over the Participant which would affect the Participant's answers to the previously completed FOCI certification.

## ARTICLE XI:  REPORTS AND ABSTRACTS

A.  The Parties agree to produce the following deliverables:

(1) an initial abstract suitable for public release at the time the CRADA is approved by DOE;

Template v. 3/20/2009
7/3/12

(2) other abstracts (final when work is complete, and others as substantial changes in scope and dollars occur);

(3) a final report, upon completion or termination of this CRADA, to include a list of Subject Inventions;

(4) reserved;

(5) other topical/periodic reports, when the nature of research and magnitude of dollars justify; and

(6) computer software in source and executable object code format as defined within the Statement of Work or elsewhere within the CRADA documentation.

*Each of the above-identified deliverables shall include the project identification number as described in DOE's Research and Development (R&D) Tracking System Data and Process Guidance Document (http://www.osti.gov/rdprojects/guidance.jsp).*

B. The Parties acknowledge that the Contractor has the responsibility to provide the above information at the time of its completion to the DOE Office of Scientific and Technical Information.

C. The Participant agrees to provide the above information to the Contractor to enable full compliance with paragraph B of this article.

D. The Parties acknowledge that the Contractor and DOE have a need to document the long-term economic benefit of the cooperative research to be conducted under this CRADA. Therefore, the Participant shall respond to the Contractor's reasonable requests, during the term of this CRADA and for a period of 5 years thereafter for pertinent information.

## ARTICLE XII:  PRE-PUBLICATION REVIEW

A. The Parties anticipate that their employees may wish to publish technical developments and/or research findings generated in the course of this CRADA.  On the other hand, the Parties recognize that an objective of this CRADA is to provide business advantages to the Participant.  In order to reconcile publication and business concerns, the Parties agree to a review procedure as follows:

(1) Each Party ("Submitter") shall submit to the other Party ("Recipient"), in advance, proposed written and oral publications pertaining to work under the CRADA.  Proposed oral publications shall be submitted to the Recipient in the form of a written presentation synopsis and a written abstract;

(2) Recipient shall provide a written response to the Submitter within 30 days, either objecting or not objecting to the proposed publication.  The Submitter shall consider all objections of the Recipient and shall not unreasonably refuse to incorporate the suggestions and meet the objections of the Recipient.  The proposed publication shall be deemed not objectionable, unless the proposed publication contains Proprietary Information, Protected CRADA Information, export controlled information or material that would create potential statutory bars to filing the United States or corresponding foreign Patent applications, in which case express written permission shall be required for publication.  In the event an objection is raised because of a potential statutory bar, the Recipient shall file its Patent application within ninety (90) days of making such objection, after which time the Submitter is free to publish.

Template v. 3/20/2009
7/3/12

B. The Parties agree that neither will use the name of the other Party or its employees in any promotional activity, such as advertisements, with reference to any product or service resulting from this CRADA, without prior written approval of the other Party.

## ARTICLE XIII:  COPYRIGHTS

A. The Parties may assert Copyright in any of their Generated Information.  Assertion of Copyright generally means to enforce or give an indication of an intent or right to enforce such as by marking or securing Federal registration.

B. Allocation of rights to Copyrights in Generated Information will be negotiated by the Parties.

C. For Generated Information, the Parties acknowledge that the Government has for itself and others acting on its behalf, a royalty-free, nontransferable, nonexclusive, irrevocable worldwide Copyright license to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the Government, all Copyrightable works produced in the performance of this CRADA, subject to the restrictions this CRADA places on publication of Proprietary Information and Protected CRADA Information.

D. For all Copyrighted computer software produced in the performance of this CRADA, the Party owning the Copyright will provide the source code, an expanded abstract as described in Appendix A, the executable object code and the minimum support documentation needed by a competent user to understand and use the software to DOE's Energy Science and Technology Software Center, P.O. Box 1020, Oak Ridge, TN 37831.  The expanded abstract will be treated in the same manner as Generated Information in paragraph C of this article.

E. The Contractor and the Participant agree that, with respect to any Copyrighted computer software produced in the performance of this CRADA, DOE has the right, at the end of the period set forth in paragraph B of Article VIII hereof and at the end of each 2-year interval thereafter, to request the Contractor and the Participant and any assignee or exclusive licensee of the Copyrighted software to grant a nonexclusive, partially exclusive, or exclusive license to a responsible applicant upon terms that are reasonable under the circumstances, provided such grant does not cause a termination of any licensee's right to use the Copyrighted computer software.  If the Contractor, or the Participant or, any assignee, or exclusive licensee refuses such request, the Contractor and the Participant agree that DOE has the right to grant the license if DOE determines that the Contractor, the Participant, assignee, or licensee has not made a satisfactory demonstration that it is actively pursuing commercialization of the Copyrighted computer software.

Before requiring licensing under this paragraph E, DOE shall furnish the Contractor/Participant written notice of its intentions to require the Contractor/Participant to grant the stated license, and the Contractor/Participant shall be allowed 30 days (or such longer period as may be authorized by the cognizant DOE Contracting Officer for good cause shown in writing by the Contractor/Participant) after such notice to show cause why the license should not be required to be granted.

The Contractor/Participant shall have the right to appeal the decision by DOE to the grant of the stated license to the Invention Licensing Appeal Board as set forth in paragraphs (b)-(g) of 10 CFR 781.65, "Appeals."

F. The Parties agree to place copyright and other notices, as appropriate for the protection of copyright, in human readable form onto all physical media, and in digitally encoded form in the header of

Template v. 3/20/2009
7/3/12

machine-readable information recorded on such media such that the notice will appear in human-readable form when the digital data are off loaded or the data are accessed for display or printout.

## ARTICLE XIV: REPORTING INVENTIONS

A.  The Parties agree to disclose to each other each Subject Invention which may be patentable or otherwise protectable under the Patent Act. The Parties agree that the Contractor and the Participant will disclose their respective Subject Inventions to DOE and each other within 2 months after the inventor first discloses the Subject Invention in writing to the person(s) responsible for Patent matters of the disclosing Party.

B.  These disclosures should be in sufficiently complete technical detail to convey a clear understanding, to the extent known at the time of disclosure, of the nature, purpose, and operation of the Subject Invention. The disclosure shall also identify any known actual or potential statutory bars, i.e., printed publications describing the Subject Invention or the public use or "on sale" of the Subject Invention in this country. The Parties further agree to disclose to each other any subsequent known actual or potential statutory bar that occurs for a Subject Invention disclosed but for which a Patent application has not been filed. All Subject Invention disclosures shall be marked as confidential under 35 U.S.C. 205.

## ARTICLE XV: TITLE TO SUBJECT INVENTIONS

Wherein DOE has granted the Participant and the Contractor the right to elect to retain title to their respective Subject Inventions, and wherein the Participant has the option to choose an exclusive license, for reasonable compensation, for a pre-negotiated field of use to the Contractor's Subject Inventions,

A.  Each Party shall have the first option to elect to retain title to any Subject Invention made by its employees and that election shall be made: (1) for the Participant, within 12 months of disclosure of the Subject Invention to DOE or (2) for the Contractor, within 12 months of disclosure of the Subject Invention to DOE. If a Party elects not to retain title to any Subject Invention of its employees, the other Party shall have the second option to elect to retain title to such Subject Invention. DOE shall retain title to any Subject Invention which is not retained by any Party.

   For Subject Inventions conceived or first actually reduced to practice under this CRADA, which are joint Subject Inventions made by the Contractor and the Participant, title to such Subject Inventions shall be jointly owned by the Contractor and the Participant.

B.  The Parties acknowledge that DOE may obtain title to each Subject Invention reported under Article XIV for which a Patent application or applications are not filed pursuant to Article XVI and for which any issued Patents are not maintained by any Party to this CRADA.

C.  The Parties acknowledge that the Government retains a nonexclusive, nontransferable, irrevocable, paid-up license to practice or to have practiced for or on behalf of the United States every Subject Invention under this CRADA throughout the world. The Parties agree to execute a Confirmatory License to affirm the Government's retained license. For avoidance of doubt, this license would be only for Government purposes or research, pursuant to 15 U.S.C. section 3710a.

D.  During the term of this CRADA and for a period of 6 months after the termination or completion of the CRADA, the Participant shall have the opportunity, pursuant to 15 U.S.C. 3710a, to obtain a license to the Contractor Subject Inventions. In particular, the Participant shall have the option to

Template v. 3/20/2009
7/3/12

obtain, up to and including, an exclusive license to Contractor Subject Inventions within a defined field of use on agreed-upon reasonable terms and conditions, including the payment of negotiated license fees and royalties.

## ARTICLE XVI:  FILING PATENT APPLICATIONS

A.  The Parties agree that the Party initially indicated as having an ownership interest in any Subject Invention ("Inventing Party") shall have the first opportunity to file U.S. and foreign Patent applications.  If the Participant does not file such applications within 1 year after election, or if the Contractor does not file such applications within the filing time specified in its prime contract, the other Party to this CRADA exercising an option pursuant to Article XV may file Patent applications on such Subject Inventions.  If a Patent application is filed by the other Party ("Filing Party"), the Inventing Party shall reasonably cooperate and assist the Filing Party, at the Filing Party's expense, in executing a written assignment of the Subject Invention to the Filing Party and in otherwise perfecting the Patent application, and the Filing Party shall have the right to control the prosecution of the Patent application.  The Parties shall agree between themselves as to who will file Patent applications on any joint Subject Invention.

B.  The Parties agree that DOE has the right to file patent applications in any country if neither Party desires to file a patent application for any Subject Invention.  Notification of negative intent shall be made in writing to the DOE Contracting Officer within 3 months of the decision of the non-Inventing Party to not file a patent application for the Subject Invention pursuant to Article XV or not later than sixty days prior to the time when any statutory bar might foreclose filing of a U.S. patent application.

C.  The Parties agree to include within the beginning of the specification of any U.S. Patent applications and any patent issuing thereon (including foreign Patents) covering a Subject Invention, the following statement: "This invention was made under a CRADA (12-CR-24) between TerraPower, LLC and Battelle Energy Alliance, LLC under Contract No. DE-AC07-05ID14517, operated by the United States Department of Energy. The U.S. Government has certain rights in the invention."

D.  A Party electing title or filing a Patent application in the United States or in any foreign country shall advise the other Party and DOE if it no longer desires to continue prosecution, pay maintenance fees, or retain title in the United States or any foreign country.  The other Party and then DOE will be afforded the opportunity to take title and retain the Patent rights in the United States or in any such foreign country.

## ARTICLE XVII:  TRADEMARKS

The Parties may seek to obtain Trademark/Service Mark protection on products or services generated under this CRADA in the United States or foreign countries. [The ownership and other rights relating to this Trademark shall be as mutually agreed to in writing by the Parties.] The Parties hereby acknowledge that the Government shall have the right to indicate on any similar goods or services produced by or for the Government that such goods or services were derived from and are a DOE version of the goods or services protected by such Trademark/Service Mark with the Trademark and the owner thereof being specifically identified. In addition, the Government shall have the right to use such Trademark/Service Mark in print or communications media.

## ARTICLE XVIII:  MASK WORKS

Reserved

Page 10 of 34

## ARTICLE XIX:  COST OF INTELLECTUAL PROPERTY PROTECTION

Each Party shall be responsible for payment of all costs relating to Copyright, Trademark, and Mask Work filing; U.S. and foreign patent application filing and prosecution; and all costs relating to maintenance fees for U.S. and foreign Patents hereunder which are solely owned by that Party. Government/DOE laboratory funds contributed as DOE's cost share to a CRADA cannot be given to the Participant for payment of the Participant's costs of filing and maintaining patents or filing for Copyrights, Trademarks, and Mask Works.  With respect to jointly owned Intellectual Property, the costs associated in protecting such jointly owned Intellectual Property will be shared by the Parties as mutually agreed.

## ARTICLE XX:  REPORTS OF INTELLECTUAL PROPERTY USE

The Participant agrees to submit, for a period of 3 years from the date of termination or completion of this CRADA and upon request of DOE, a nonproprietary report no more frequently than annually on efforts to utilize any Intellectual Property arising under the CRADA.

## ARTICLE XXI:  DOE MARCH-IN RIGHTS

The Parties acknowledge that DOE has certain march-in rights to any Subject Inventions in accordance with 48 CFR 27.304-1(g) and 15 U.S.C. 3710a(b)(1)(B) and (C).

## ARTICLE XXII:  U.S. COMPETITIVENESS

The Parties agree that a purpose of this CRADA is to provide substantial benefit to the U.S. economy.

A.  In exchange for the benefits received under this CRADA, the Participant therefore agrees to the following:

    (1) Products embodying Intellectual Property developed under this CRADA shall be substantially manufactured in the United States, and

    (2) Processes, services, and improvements thereof which are covered by Intellectual Property developed under this CRADA shall be incorporated into the Participant's manufacturing facilities in the United States either prior to or simultaneously with implementation outside the U.S.  Such processes, services, and improvements, when implemented outside the United States shall not result in reduction of the use of the same processes, services, or improvements in the United States.

    (3) The requirements under subsections (A.1) and (A.2) above may possibly be waived by DOE upon a showing by the Participant or its assignee that reasonable but unsuccessful efforts have been made to negotiate licenses with potential licensees that would be likely to manufacture substantially in the United States, or that under the circumstances domestic manufacture is not commercially practicable.

B.  Contractor agrees to a U.S. Industrial Competitiveness clause in accordance with its prime contract with respect to any licensing and assignments of its Intellectual Property arising from this CRADA, except that any licensing or assignment of its Intellectual Property rights to the Participant shall be in accordance with the terms of paragraph A of this article.

Template v. 3/20/2009
7/3/12

## ARTICLE XXIII:  ASSIGNMENT OF PERSONNEL

A.  Each Party may assign personnel to the other Party's facility as part of this CRADA to participate in or observe the research to be performed under this CRADA.  Such personnel assigned by the assigning Party shall not during the period of such assignments be considered employees of the receiving Party for any purpose.

B.  The receiving Party shall have the right to exercise routine administrative and technical supervisory control of the occupational activities of such personnel during the assignment period and shall have the right to approve the assignment of such personnel and/or to later request their removal by the assigning Party.

C.  The assigning Party shall bear any and all costs and expenses with regard to its personnel assigned to the receiving Party's facilities under this CRADA.  The receiving Party shall bear facility costs of such assignments.

D.  Participant's personnel may desire access to facilities at the Idaho National Laboratory (INL) for the purposes described in this CRADA Statement of Work.  Access to such INL facilities and use thereof shall comply with all applicable laws and INL rules including, without limitation, those pertaining to security, environmental, safety and health requirements.

## ARTICLE XXIV:  FORCE MAJEURE

No failure or omission by the Contractor or the Participant in the performance of any obligation under this CRADA shall be deemed a breach of this CRADA or create any liability if the same shall arise from any cause or causes beyond the control of the Contractor or the Participant, including but not limited to the following, which, for the purpose of this CRADA, shall be regarded as beyond the control of the Party in question: Acts of God, acts or omissions of any government or agency thereof, compliance with requirements, rules, regulations, or orders of any governmental authority or any office, department, agency, or instrumentality thereof, fire, storm, flood, earthquake, accident, acts of the public enemy, war, rebellion, insurrection, riot, sabotage, invasion, quarantine, restriction, transportation embargoes, or failures or delays in transportation.

## ARTICLE XXV:  ADMINISTRATION OF THE CRADA

The Contractor enters into this CRADA under the authority of its prime contract with DOE.  The Contractor is authorized to and will administer this CRADA in all respects unless otherwise specifically provided for herein.  Administration of this CRADA may be transferred from Contractor to DOE or its designee with notice of such transfer to the Participant, and the Contractor shall have no further responsibilities except for the confidentiality, use, and/or nondisclosure obligations of this CRADA.

## ARTICLE XXVI:  RECORDS AND ACCOUNTING FOR GOVERNMENT PROPERTY

The Participant shall maintain records of receipts, expenditures, and the disposition of all Government property in its custody related to this CRADA, for a period of three years after the termination or expiration of this CRADA.

Template v. 3/20/2009
7/3/12

## ARTICLE XXVII:  NOTICES

Any communications required by this CRADA, if given by postage prepaid first class U.S. Mail or other verifiable means addressed to the Party to receive the communication, shall be deemed made as of the day of receipt of such communication by the addressee, or on the date given if by verified facsimile.  Address changes shall be given in accordance with this Article and shall be effective thereafter.  All such communications, to be considered effective, shall include the number of this CRADA.

The addresses, telephone numbers and facsimile numbers for the Parties are as follows:

| For Contractor: | For Participant: |
|---|---|
| Agreements Administrator | J. Greg Field |
| Technology Deployment | Manager, Project and Supplier Development |
| Battelle Energy Alliance, LLC | TerraPower, LLC |
| 2525 North Fremont Avenue | 330 120th NE Avenue, Suite 100 |
| P.O. Box 1625, M.S. 3805 | Bellevue, WA 98005 |
| Idaho Falls, ID  83415-3805 | |
| Telephone: (208) 526-6141 | Telephone: (425) 283-4740 |
| Facsimile: (208) 526-0876 | Facsimile: (425) 516-8879 |

## ARTICLE XXVIII:  DISPUTES

The Parties shall attempt to amicably resolve all disputes arising under or as a result of this CRADA. Neither Party will be prevented from resorting to a judicial proceeding if (1) good faith efforts to resolve the dispute have been unsuccessful or (2) interim relief from a court is necessary to prevent serious injury. To the extent that there is no applicable U.S. Federal law, this CRADA and performance thereunder shall be governed by the law of the State of Idaho.  For the avoidance of doubt, any provision of this CRADA that is substantially based on any U.S. Federal agency regulation or Federal statute shall be construed and interpreted according to the federal common law as enunciated and applied by federal judicial bodies, boards of contract appeals, and quasi-judicial agencies of the Federal government.  Any and all litigation involving disputes, claims, or either Party's rights and duties under or arising as a result of this CRADA shall be brought in a court of competent jurisdiction in the State of Idaho.

## ARTICLE XXIX:  ENTIRE CRADA AND MODIFICATIONS

A.  This CRADA with its appendixes contains the entire agreement between the Parties with respect to the subject matter hereof, and all other prior representations or agreements relating hereto have been merged into this document and are thus superseded in totality by this CRADA.  This CRADA shall not be effective until approved by DOE.

B.  Any agreement to materially change any terms or conditions of this CRADA or the appendixes shall be valid only if the change is made in writing, executed by the Parties hereto, and approved by DOE.

C.  Modification to this CRADA for purposes of mutually changing the Appendixes may be issued by Amendment to this CRADA, subject to and executed as set forth in paragraph B above.

Template v. 3/20/2009
7/3/12

## ARTICLE XXX:  TERMINATION

This CRADA may be terminated by either Party upon 90 days written notice to the other Party.  This CRADA may also be terminated by the Contractor in the event of failure by the Participant to provide the necessary advance funding, as agreed in Article III.

In the event of termination by either Party, each Party shall be responsible for its share of the costs incurred through the effective date of termination, as well as its share of the costs incurred after the effective date of termination, and which are related to the termination.

The confidentiality, use, and/or non-disclosure obligations of this CRADA shall survive any termination of this CRADA.

## ARTICLE XXXI:  QUALITY ASSURANCE

A. Contractor will perform work under this CRADA in accordance with Contractor's DOE approved 10 CFR Part 830.120 Quality Assurance Program, which includes Quality Standard ASME-NQA-1-2000.

B. Contractor will maintain any and all licenses and permits as may be required for it to collaborate with Participant under this CRADA.

C. To the extent possible and not in conflict with Contractor's Prime Contract with DOE, Contractor's Quality Assurance Program, applicable law, or this CRADA, the Contractor will, for items or services affecting quality of a high or medium risk, use suppliers qualified and listed on the INL Qualified Suppliers List (QSL).  For items or services affecting quality of a low risk, Contractor will flow down applicable ASME-NQA-1-2000 requirements via contract and verify contract compliance using at least one of the following means: program review; inspection; analysis; or other recognized means.

D. The Participant may request access, and/or access by its designee, to portions of Contractor's facilities and records directly relating to quality assurance standards for the collaborative work to be performed under this CRADA for audit purposes.  Such access will be subject to, and at the discretion of Contractor or DOE.  Participant acknowledges approval may not be granted, depending on the circumstances.  If granted, Participant or Participant's designee's must meet and comply with all applicable laws, and Contractor rules including, without limitation, those rules pertaining to security, environmental, safety, and health requirements.

## ARTICLE XXXII:  ACKNOWLEDGEMENT

The Government, the Participant, and the Contractor recognize and acknowledge that entering into this CRADA does not constitute endorsement by the Government or the Contractor of the Participant or the Participant's concepts for nuclear power reactors, small modular reactors, or nuclear reactor fuel designs.

Template v. 3/20/2009
7/3/12

12-CR-24

Battelle Energy Alliance, LLC:

By: _____
*Deputy Director of Technology*
*Deployment, for:*
Printed Name: Steven T. McMaster

Title: Director, Technology Deployment

Date: ___7/3/12___

TerraPower, LLC:

By: _____

Printed Name:  Eben W. Frankenberg

Title:  Executive Vice President

Date: ___7/23/12___

Reviewed:

BEA Legal _EB for SRC 7/3/12_

TD CM _CWS 7/3/12_

Template v. 3/20/2009
7/3/12

# APPENDIX A
# STATEMENT OF WORK
# CRADA 12-CR-24 Experiments
# CRADA NO. 12-CR-24

## I.   BACKGROUND AND PURPOSE

**Overview**

Participant is developing new nuclear fuel systems for use in a commercial-scale travelling wave reactor (TWR) consisting of low smeared density annular slugs of either pure or lightly doped uranium that are mechanically-bonded to a ferritic-martensitic steel clad, such as HT9. To protect the clad against attack from fission products, barrier coatings will be employed between the fuel and the clad. These coatings will potentially be applied to the outside of the annular uranium slugs, on the interior of clad tubes, or a combination of both.

The proposed fuel system has many similarities to the annular metallic fuel designs that the Contractor is pursuing as part of DOE's funded Fuel Cycle Technologies (FCT) program. These designs employ low smeared density annular fuel using either transuranic (TRU)-Zr or TRU-Mo (although uranium molybdenum (U-Mo) or uranium zirconium (U-Zr) alloys are being tested as surrogates to investigate some fuel behaviors not expected to be sensitive to addition of the transuranic elements), and are also expected to use barriers to protect the clad against fission product attack. The similarities between the two development efforts suggest that an integrated test program between the participant and DOE's FCT program could be of benefit to both organizations.

In performance of this CRADA, the Contractor and Participant will jointly develop irradiation experiments to be included with the currently planned DOE FCT program's advanced fuel cycle (AFC)-3 experiment. Seven experiment capsules containing various fuel 'slugs' will be fabricated, installed in the AFC-3 test trains, and irradiated in the Advanced Test Reactor (ATR) along with other AFC-3 experiment capsules. Following irradiation, the experiments will undergo post irradiation examination (PIE) at Idaho National Laboratory's (INL) PIE facilities. Interim and final reports will be prepared and published by Contractor.

Contractor and Participant will jointly develop experiment specifications and determine the best method to fabricate and or coat the fuel slugs. Technical assistance and laboratory capabilities available at other DOE facilities (i.e., Y-12 at Oak Ridge) may be required to help fabricate the fuel slugs. If DOE facilities and capabilities, in addition to INL facilities, are necessary to fabricate the fuel slugs, the Participant will execute separate agreements with the Management and Operating Contractor at these other DOE facilities for any work to be performed and will manage the contracts with the other facilities. However, the Contractor will coordinate the fabrication efforts. DOE, through the Contractor, will provide the cladding material and any nuclear material (uranium, depleted or enriched) needed to fabricate the fuel slugs. The nuclear material will remain DOE property and will be dispositioned as appropriate by the Contractor.

Template v. 3/20/2009
7/3/12

12-CR-24

**Points of Contact:**

| Contractor: | Participant: |
|---|---|
| Douglas Toomer | J. Greg Field |
| Manager, Industry Programs | Manager, Project and Supplier Development |
| Battelle Energy Alliance, LLC | TerraPower, LLC |
| 2525 N. Fremont Avenue | 330 120th NE Avenue, Suite 100 |
| Idaho Falls, ID 83415-3870 | Bellevue, WA 98005 |
| E-mail:  douglas.toomer@inl.gov | E-mail:  gfield@terrapower.com |
| Telephone:  (208) 526-3009 | Telephone:  (425) 283-4740 |
| Facsimile:  (208) 526-4563 | Facsimile:  (425) 467-2350 |
| Cell: (208) 520-0106 | Cell:  (425) 516-8879 |
|  |  |
| Gary Hoggard | Philip Schloss |
| Experiment Manager | Technical Representative |
| Battelle Energy Alliance, LLC | TerraPower, LLC |
| 2525 N. Fremont Avenue | 330 120th NE Avenue, Suite 100 |
| Idaho Falls, ID 83415-3695 | Bellevue, WA 98005 |
| E-mail:  gary.hoggard@inl.gov | Email:  pschloss@terrapower.com |
| Telephone:  (208) 526-1345 | Telephone:  (425) 677-2865 |
| Facsimile:  (208) 526-0990 | Facsimile:  (425) 467-2350 |
| Cell: (208) 881-8765 | Cell: (314) 591-5506 |

## II.  SCOPE OF WORK

### FUEL CONCEPTS

Although the basic Participant fuel element design was discussed above, there are many variants in the concept that involve different ways to apply barrier coatings between the fuel and the clad.



Template v. 3/20/2009
7/3/12

12-CR-24



**Figure 1:** Schematic of annular fuel design variants

Template v. 3/20/2009
7/3/12



**Figure 2:** Top sleeve design detail view

## PROPOSED TEST MATRIX

There are four major concerns associated with the annular fuel design: (1) the development and performance of barrier coatings to prevent fission product attack of the clad; (2) maintaining adequate heat transfer from mechanically-bonded, low smeared density fuel; (3) gas release at low smear densities; and (4) the irradiation behavior of pure or lightly doped uranium (here, the phrase "lightly doped" should be taken to mean the addition of small amounts of elements such as iron, silicon, or aluminum that are known to reduce the amount of cavitation and swelling exhibited by uranium at low burnups).  The test matrix for the ATR (Table 1 1) is intended to address these performance concerns as well as evaluate the three fuel concepts shown in Figure 1.

**Table 1:** ATR Test Matrix

| PHASE I [1] |
|---|
|  |

---

[1] For contingency of delay in coating development schedule, an uncoated rodlet may be substituted into the test matrix
[2] Individual fuel slugs are notionally 0.75" in height
[3] Refer to Figure 3 3 for configuration of coating masking

Template v. 3/20/2009
7/3/12



**PHASE II**



Details of the test matrix are described as follows:



---
[4] All other fuel slugs will be lightly doped with small additions of Fe and Si
Page 20 of 34

12-CR-24

*(2)*

*(3)*

*(4)*

*(5)*

*(6)*



Template v. 3/20/2009
7/3/12



**Figure 3:** Cross section schematic of fuel slug showing masking of coatings

## MAJOR TASK DESCRIPTIONS

### Task 1:  Test Design and Analysis

Contractor will lead the design of the irradiation experiment, will select the test positions in the ATR that meet the experiment objectives, and will perform any required safety analyses necessary to support insertion of the experiment capsules into the ATR.  The analyses will include nuclear, thermal, and structural evaluations.  Contractor's standard suite of verified and validated computer codes will be used to calculate burn-up, fission density, gas generation, fluence, and linear heat generation rates, as typically done for ATR experiments.  An important output from the nuclear analysis will be the fuel enrichment levels that provide the desired linear power for the test.

Contractor will select the design and dimensions of the test rodlet and capsule, using the AFC-3 drop-in capsule design to the maximum extent practical.  The Participant proposed test matrix includes configurations of interest that are outside the scope of the previous DOE funded AFC-3 safety analysis (i.e., top sleeve and compositionally-graded fuel column concepts), so additional analyses will be performed as required to evaluate the acceptability of such configurations.

Page 22 of 34

Participant will be responsible for developing the test matrix and test objectives; however, Contractor will assist as requested by the Participant. Key parameters for the test matrix include the test smeared densities, burn-up, fuel cladding chemical interaction (FCCI) barrier configuration, lanthanide additions, and fuel-to-clad fit type. Contractor and Participant will jointly develop mutually accepted experiment specifications.

**Task 2: Annular Fuel Fabrication Development**

This task includes all the major development activities necessary to support fabrication of the test samples by Contractor. Various aspects of the fabrication will be demonstrated during this development phase using suitable surrogate materials such as depleted uranium (fuel) and alloy 422 (clad tube).



Contractor and TAMU are jointly developing, under a separate agreement, █████████████ deposition technology for the deposition of barrier coatings on the inside of clad tube. This barrier technology will be employed in many of the experiments to be performed under this CRADA;



**Task 3:  Annular Fuel Experiment Fabrication, Assembly, and Inspection**



Template v. 3/20/2009
7/3/12



**Table 2:** As-Built Characterization Measurements

| Test No. | As-Built Characterization | Comments | Method | Need Date |
|---|---|---|---|---|
| | Bulk Chemical and isotopic composition | Assess bulk composition<br><br>25 pieces from top and bottom of cast fuel* | ICP-MS or TIMS, ICPMS-MC (rsd ±3-5%)** | 2 weeks prior to shipping to Y12<br><br>Remainder Prior to ATR Insertion |
| | Metallography* | 29 fuel mounts<br>11 longitudinal<br>18 transverse | Scanning Electron Microscopy (SEM) preferred (or optical microscope). Electron backscatter diffraction (EBSD) or x-ray diffraction (XRD), multi collector (mc)-XRD | After ATR<br><br>Insertion |
| | Microhardness | 29 fuel mounts<br>Fuel & barriers (when applicable) | | After ATR<br><br>Insertion |

Template v. 3/20/2009
7/3/12

| | | | | 2 weeks prior to shipping to Y-12 for heat treatment |
| | Radial elemental composition profile | 29 fuel mounts X-ray maps to determine distribution of Si and Fe | | 2 weeks prior to ATR insertion |
| | | | | Remainder after ATR insertion |
| | Thermal diffusivity - Fuel | 3 fuel mounts (100%U, 67%U, 33%U) | Laser Flash Thermal Diffusivity (LFTD) or Scanning Thermal Diffusivity Microscope (STDM) | After ATR Insertion |

*Increased number of metallography samples relative to other AFC-3 tests is justified by addition of liners and multiple coatings on the fuel slug or cladding inner surface.

**Thermal Ionisation Mass Spectrometer (TIMS)
Inductively Coupled Plasma-Mass Spectrometer (ICPMS)
Multi Collector (MC)

## URANIUM QUANTITIES

The following table presents the estimated quantities of enriched and non-enriched uranium necessary to support the work described herein.

**Table 3:** Estimated Enriched and Non-Enriched Uranium Quantities

| Purpose/Assumptions | Enrichment | Estimated Quantity (grams) |
|---|---|---|
| | | |

Template v. 3/20/2009
7/3/12

| Annular Slugs for Contractor Development Activities. 50 depleted uranium slugs of the prototypic geometry. | Depleted | 190 |
|---|---|---|

### Task 4: Procurement and Fabrication of Non-Fuel Components

Contractor will review the existing stock of ███████████ end caps, end plugs, capsules, baskets, and any other non fuel components for application in these ATR tests. If the existing stock of non-fuel components is insufficient to meet the material requirements for conducting the tests, Contractor will procure or fabricate the necessary material and the Participant will provide, through this CRADA, the funding needed to obtain the necessary material.



### Task 5: Insertion and Irradiation in the ATR

This task involves the insertion of the subject test specimens by the Contractor into the ATR and the irradiation of the specimens, including any activities associated with reloads or cycle outages. Contractor will coordinate with the ATR Operations staff (and with other AFC-3 experiments) to insert the experiments into the assigned positions during a scheduled ATR outage. Furthermore, Contractor will manage the experiment during irradiation and coordinate with the ATR Operations staff to ensure that the experiment objectives are met; it is recognized that test objectives may be modified by the Contractor depending on changing priorities or reactor operations. Contractor will keep Participant apprised of irradiation progress and any off-nominal conditions that are experienced during the experiment.

### Task 6: As-Run Irradiation Analysis

A continuous record of operating power in each ATR lobe is maintained by the Contractor's ATR operations staff throughout the cycles including any adjustments required. Contractor will use this information to calculate "as-run" irradiation parameters (specifically including burn-up) and expected performance of the experimental assembly for each cycle and after the irradiation is complete. These calculations will be documented in a report that will be provided to Participant.

### Task 7: Post-Irradiation Examinations and Disposition of the Experiment

Contractor will coordinate with the Contractor's ATR Operations staff the experiment assembly removal from the reactor and the transport of the irradiated capsule for post-irradiation examination (PIE). After Contractor has prepared a PIE plan that has been agreed to by the Participant, Contractor will perform the PIE on the annular fuel experiments. The PIE of interest includes those described in Table 4.

Template v. 3/20/2009
7/3/12

12-CR-24

**Table 4:** Post-Irradiation Examination for Subject ATR Experiments

| Capsule Non-destructive Examinations | Comments | Method | Schedule |
|---|---|---|---|
| | | | |

Template v. 3/20/2009
7/3/12



Template v. 3/20/2009
7/3/12



*These examinations cannot currently be performed at INL on highly radioactive fuel materials, so are not included in the PIE tasks definitely to be performed.  However, work is underway to put these capabilities in place and may become available before this work is completed; if so, performing these examinations will be revisited.

**Increased number of metallography samples justified by addition of liners and multiple coatings on the fuel slug or cladding inner surface.

**Table 5:** Intermediate PIE for Subject ATR Experiments*

| Test No. | Intermediate PIE | Comments | Method |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

*Pending results of the "Intermediate Non-destructive PIE Study" that identifies an acceptable means of transporting irradiated capsules from ATR to the Hot Fuels Examination Facility (HFEF), and back again.

Contractor and Participant will interpret the PIE results in the context of the as-run data and the Contractor will issue a PIE report.  All conclusions, calculations, rationale, and supporting raw data will be compiled in the report that is subject to Participant peer review and comment prior to formal issuance.

With respect to disposition of the experiment (capsule, basket, and fueled rodlets), Contractor will identify the appropriate waste disposal path and will be responsible for proper disposition of all DOE materials.

Template v. 3/20/2009
7/3/12

**Task 8:  Dissemination of Information from AFC-3 Experiments**

Contractor will disseminate to Participant the information (Experiment Design Documents, Final PIE Reports, etc.) from the on-going other AFC-3 experiments of relevant fuel forms.  Examples include the following:

- Irradiation performance of annular fuel geometry compared to solid cylindrical slug geometry (e.g., U-10Zr and U-10Mo slug and annular)

- Effects of lower smeared density on fission gas release

- Irradiation performance of cladding coatings and liners

- AFC-3 Materials Capsule diffusion couple results of single component / multi-component / engineered alloys specimens representative of metallic uranium alloy fuel, bred in plutonium up to 12 wt.%, rare earth and other fission product elements and ferritic-martensitic stainless steels and constituents and FCCI barrier candidates

**Task 9:  Intermediate Non-destructive PIE Study**

Contractor will evaluate the feasibility to non-destructively determine fission gas release and radial location of the rare earth elements at HFEF between ATR cycles for the irradiation experiments.  Based on the results of this evaluation, Participant may identify the PIE measurements of interest and request the Contractor to prepare a white paper "Intermediate Non-destructive PIE Study" to evaluate:

- Options for shipment using both in-commerce and out-of-commerce routes

- Shipping container alternatives (GE-100, GE-2000, INL owned casks, etc.)

- Turn-around time (time from pulling the experiment out of the ATR, allowing it to cool off if necessary, transporting to HFEF, performing the non-destructive PIE, transporting back to the ATR, and reinserting in reactor)

- Cost for the various transportation and the intermediate PIE measurement options

An internal INL report assessing the shipping container alternatives and providing a recommended preferred alternative(s), with justifications and the actions and costs required to implement the preferred alternative(s), will be developed by the Contractor to support this task.

**Task 10:  Project Plan and Schedule**

Contractor will provide project management support for this CRADA.  A detailed project plan and schedule that supports the experiment objectives will be prepared to help coordinate and manage the activities associated with the irradiation experiment.  The schedule will capture the major activities, milestones, and any decision points.  Participant should be involved in the creation of the project plan and schedule and will provide input related to the development activities at Y-12.  The plan and schedule will be updated as necessary and those updates will be provided to Participant as they are available.

Template v. 3/20/2009
7/3/12

## III.   REPORTS, DATA AND OTHER DELIVERABLES

The key deliverables associated with this scope of work are presented below in Table 6.  The target completion dates labeled as TBD will be identified during the development of the detailed project schedule (Task 10) and agreed to by the Participant Technical Representative and Contractor.

**Table 6:** Project Deliverables and Target Completion Dates

| TASK | DELIVERABLES/MILESTONES | RESPONSIBLE PARTY | TARGET COMPLETION DATE |
|---|---|---|---|
| 1 | 1.   Neutronic, Thermal, and Structural Analyses | Contractor and Participant | TBD* |
| 1 | 2.   Experiment Specification | Contractor and Participant | TBD* |
| 2 & 3 | 3.   As-built Experiment Information (dimensions, chemistry, composition uniformity, etc.) | Contractor and Participant | TBD* |
| 3, 4 & 5 | 4.   Fabrication and Insertion of Subject Experiments in ATR | Contractor and Participant | Spring 2013 |
| 6 | 5.   As-Run Irradiation Analyses | Contractor and Participant | TBD* |
| 7 | 6.   PIE Plan | Contractor and Participant | TBD* |
| 7 | 7.   PIE Results and Report | Contractor and Participant | TBD* |
| 8 | 8.   AFC-3 Experiment Information | Contractor and Participant | As-Built Data Packages and/or published Final Reports  Informal interim briefings will be made by the Contractor as information relevant to Participant concepts |

| | | | emerge |
|---|---|---|---|
| 9 | 9.   Intermediate Non-destructive PIE Study | Contractor and Participant | 2 mo. prior to insertion of experiments |
| 10 | 10.  Project Plan with Schedule/Baseline | Contractor and Participant | 2 mo. after the effective date of this CRADA |

TBD* -  To be determined based upon overall schedule for AFC-3 experiments.

Where applicable, the deliverables will be submitted electronically to Participant through secure pathways.  Participant and Contractor will determine the proper pathways at a later date.

## MEETINGS AND REPORTING

Generally, communication will be handled electronically or by teleconference.  In addition to regular day-to-day communication, scheduled bi-weekly teleconferences will be held, as necessary, to communicate progress and discuss technical issues related to the work. Project performance (schedule status and costs) will be reported on a monthly basis.  Furthermore, as the work progresses, comprehensive program review meetings (2 per year) will be held in person at locations agreed upon by the Contractor and Participant, as necessary.

Template v. 3/20/2009
7/3/12

# APPENDIX B
## BACKGROUND INTELLECTUAL PROPERTY
## CRADA 12-CR-24 Experiments
## CRADA NO. 12-CR-24

Contractor Background Intellectual Property

- None

Participant Background Intellectual Property

- None

Template v. 3/20/2009
7/3/12

**EXHIBIT C**

# MODIFICATION NO. 1 TO

## STEVENSON-WYDLER (15 USC 3710) COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT (hereinafter CRADA) No. 12-CR-24

## BETWEEN

## Battelle Energy Alliance, LLC (BEA) under its U.S. Department of Energy Contract No. DE-AC07-05ID14517 (hereinafter Contractor)

## AND

## TerraPower, LLC (hereinafter Participant), both being hereinafter referred to singularly as "Party" and jointly as "Parties"

WHEREAS, both PARTIES desire to modify CRADA No. 12-CR-24, the Parties hereby agree to incorporate the following changes;

1. The effective date of this CRADA No. 12-CR-24 Modification 1 shall be the latter most dated signature below.

2. Replace the last sentence of Article III (Term, Funding and Costs), Paragraph A with the following:

   The work to be performed under this CRADA shall be complete within nine years from the effective date.

3. Delete in its entirety Article III (Term, Funding and Costs), Paragraph B and replace with the following:

   B. The Participant's estimated contribution is $57,987 funds-in and $650,000 in-kind for FY 2012, $1,182,805 funds-in and $500,000 in-kind for FY 2013, $1,811,963 funds-in and $300,000 in-kind for FY 2014, $4,207,175 funds-in and $300,000 in-kind for FY 2015, $1,528,882 funds-in and $200,000 in-kind for FY 2016, $3,332,089 funds-in and $200,000 in-kind for FY 2017, $1,239,960 funds-in and $200,000 in-kind for FY 2018, $3,265,182 funds-in and $200,000 in-kind for FY 2019, and $607,345 funds-in and $100,000 in-kind for FY 2020. The Government's estimated contribution from DOE's Fuel Cycle Technologies (FCT) program, which is provided through the Contractor's contract with DOE, is $1,000,000 in-kind prior to FY 2012, $2,477,000 in-kind for FY 2012, $2,742,000 in-kind for FY 2013, $2,825,000 in-kind for FY 2014, $2,909,600 in-kind for FY 2015, $2,997,000 in-kind for FY 2016, $3,086,000 in-kind for FY 2017, $2,721,000 in-kind for FY 2018, $2,803,000 in-kind for FY 2019, $2,887,000 in-kind for FY 2020 subject to available funding and includes the following:

- Nuclear material to be used in all experiments
- ███████████████████████████████████
- Advanced Fuel Cycle – Outboard A (AFC-OA) irradiation vehicle design
- AFC-OA irradiation vehicle hardware
- Shipment of unirradiated AFC-4 experiments from the Materials and Fuels Complex (MFC) to the Advanced Test Reactor (ATR)
- Configuration and insertion of AFC-4 experiments in ATR
- AFC-4 irradiation unit charges
- AFC-4 removal from ATR and canal operations for loading the shipping cask
- AFC-4 as-run/projection analyses
- Procurement of a GE-100 shipping cask
- Shipment of AFC-4 experiments from ATR to the Hot Fuel Examination Facility (HFEF) after irradiation is completed
- Removal of AFC-4 experiments from the shipping cask into the hot cells
- Storage and ultimate disposition of all irradiated experiments and materials

4. Delete in its entirety Article XXXI (Quality Assurance), and replace with the following:

A. Contractor will perform work under this CRADA in accordance with Contractor's DOE approved 10 CFR Part 830.120 Quality Assurance Program, which includes Quality Standard ASME-NQA-1-2008 with the 2009 addenda.

B. Contractor will maintain any and all licenses and permits as may be required for it to collaborate with Participant under this CRADA.

C. To the extent possible and not in conflict with Contractor's Prime Contract with DOE, Contractor's Quality Assurance Program, applicable law, or this CRADA, the Contractor will for items or services affecting quality of a high, medium, or low risk use suppliers qualified and listed on the INL Qualified Suppliers List (QSL). For items or services affecting quality of a low risk that are provided by the non-qualified suppliers, Contractor will flow down applicable ASME-NQA-1-2008 with the 2009 addenda requirements as described in the TerraPower QAPP (PLN-4553) and verify contract compliance using at least one of the following means: program review; inspection; analysis; or other recognized means.

D. The Participant may request access, and/or access by its designee, to portions of Contractor's facilities and records directly relating to quality assurance standards for the collaborative work to be performed under this CRADA for audit purposes. Such access will be subject to, and at the discretion of Contractor or DOE. Participant acknowledges approval may not be granted, depending on the circumstances. If granted, Participant or Participant's designee's must meet and comply with all applicable laws, and Contractor rules including, without limitation, those rules pertaining to security, environmental, safety, and health requirements.

5. As a result of continued planning efforts conducted under the original Statement of Work (Appendix A) to better define the activities in the Statement of Work, delete the original Statement of Work in its entirety and replace the Statement of Work with the accompanying revised Statement of Work (Appendix A).

6. All other terms and conditions remain the same.

Accepted and agreed to:

Battelle Energy Alliance, LLC:

By: _____

Printed Name: Dana M. Storms

Title: Manager, Contracts Management

Date: _08/14/2014_

TerraPower, LLC:

By: _____

Printed Name:  Douglas A. Adkisson

Title:  Senior Vice President, Operations

Date: _9/11/14_

# APPENDIX A
# STATEMENT OF WORK
# CRADA 12-CR-24 Experiments
# CRADA NO. 12-CR-24

## I.  BACKGROUND AND PURPOSE

### Overview

Participant is developing new nuclear fuel systems for use in a commercial-scale travelling wave reactor (TWR) consisting of low smeared density (SD) annular slugs of either pure or lightly doped uranium (U) that are mechanically-bonded to a ferritic-martensitic steel cladding, such as HT-9. To protect the cladding against attack from fission products, barriers will be employed between the fuel and the cladding. These barriers will potentially be applied to the outside of the annular U slugs, on the interior of cladding tubes, or a combination of both by an outside vendor independent of this CRADA.

The proposed fuel system has many similarities to the annular metallic fuel designs that the Contractor is pursuing as part of DOE's funded Fuel Cycle Technologies (FCT) program. These designs employ low SD annular fuel using either transuranic (TRU) zirconium (Zr) or TRU-molybdenum (Mo) [although U-Mo or U-Zr alloys are being tested as surrogates to investigate some fuel behaviors not expected to be sensitive to addition of the TRU elements], and are also expected to use barriers to protect the cladding against fission product attack. The similarities between the two development efforts suggest that an integrated experiment program between the Participant and DOE's FCT program could be of benefit to both organizations.

In performance of this CRADA, the Contractor and Participant will jointly develop irradiation experiments to be included with the currently planned DOE FCT program's Advanced Fuel Cycle (AFC) experiments. Nine experiment capsules containing rodlets with various fuel 'slugs' will be fabricated, installed in the AFC-Outboard A (AFC-OA) test trains, and irradiated in the Advanced Test Reactor (ATR). These experiments are designated AFC-4 (B, D, and E).

In performance of this CRADA, the Contractor and Participant will also jointly develop irradiation experiments that will require new test train designs for use in ATR small-B positions. These experiments will be similar to the AFC-OA design [fuel slugs in rodlets encapsulated by capsules placed in cadmium (Cd) shroud baskets], but with larger diameters and longer fuel columns. Six experiment capsules containing rodlets with various fuel slugs will be fabricated, installed in a newly designed small-B position test train, and irradiated in ATR. These experiments are designated Large Diameter Fuel – 1A (LDF-1A). One of the LDF-1A capsules may be replaced with an instrumented experiment designated LDF-1B. One experiment capsule containing a single rodlet with various fuel slugs will be conceptually designed for an ATR small-B position for possible future fabrication and irradiation in ATR. This experiment is designated LDF-2A. The scope beyond completing the LDF-1B and LDF-2A conceptual design is not included in this CRADA, but may be added in future modifications if requested by Participant.

Idaho National Laboratory (INL) shipments of irradiated experiments from ATR to the Hot Fuels Examination Facility (HFEF) have historically been accomplished using the General Electric Model 2000 (GE 2000) Type B shipping container. Contractor concerns regarding the future availability and leasing and handling costs associated with the GE 2000 cask have warranted an evaluation of alternative shipping options. Use of the General Electric Model 100 (GE 100) was determined to be the preferred alternative for AFC and LDF-1A experiments. Pursuant to this CRADA Contractor and Participant will jointly establish the GE 100 for shipments of irradiated experiments from ATR to HFEF. Contractor has procured the GE 100 as a part of the FCT program. MFC and ATR procedures and training and the transportation plan will be developed at the expense of the Participant.

Pursuant to this CRADA Contractor is evaluating means for shipping irradiated experiments from ATR to HFEF for nondestructive examinations (NDE) such as neutron radiography and then returning the same experiment to ATR for further irradiation. This is referred to as "Intermediate NDE" in this statement of work (SOW); however performance of the actual intermediate NDE tasks is not included in the scope of this CRADA.

Following irradiation, the AFC-4 and LDF-1A experiments will undergo post irradiation examination (PIE) at INL PIE facilities. Interim and final PIE reports will be prepared and issued by Contractor.

Contractor and Participant will jointly develop experiment specifications and determine the best method to fabricate the fuel slugs. Technical assistance and laboratory capabilities available at other DOE facilities (i.e., Y-12 at Oak Ridge) may be required to help fabricate the fuel slugs. If DOE facilities and capabilities, in addition to INL facilities, are necessary to fabricate the fuel slugs, the Participant will execute separate agreements with the Management and Operating Contractor at these other DOE facilities for any work to be performed and will manage the contracts with the other facilities. However, the Contractor will coordinate the fabrication efforts. DOE, through the Contractor, will provide the cladding material for AFC-OA experiments and any nuclear material (U, depleted or enriched) needed to fabricate the fuel slugs for all experiments. HT-9 cladding material for

the LDF-1A experiment will be provided by the Participant. The nuclear material will remain DOE property and will be dispositioned as appropriate by the Contractor.

**Points of Contact:**

| Contractor: | Participant: |
|---|---|
| Douglas Toomer | J. Greg Field |
| Manager, Industry Programs | Manager, Project and Supplier Development |
| Battelle Energy Alliance, LLC | TerraPower, LLC |
| 2525 N. Fremont Avenue | 330 120th NE Avenue, Suite 100 |
| Idaho Falls, ID 83415-3870 | Bellevue, WA 98005 |
| E-mail: douglas.toomer@inl.gov | E-mail: gfield@terrapower.com |
| Telephone: (208) 526-3009 | Telephone: (425) 283-4740 |
| Facsimile: (208) 526-4563 | Facsimile: (425) 467-2350 |
| Cell: (208) 520-0106 | Cell: (425) 516-8879 |
| | |
| Doug Porter | Bob Mulford |
| Technical Lead | Technical Point of Contact |
| Battelle Energy Alliance, LLC | TerraPower, LLC |
| 2525 N. Fremont Avenue | 330 120th NE Avenue, Suite 100 |
| Idaho Falls, ID 83415-3695 | Bellevue, WA 98005 |
| E-mail: douglas.porter@inl.gov | Email: rmulford@terrapower.com |
| Telephone: (208) 533-7659 | Telephone: (425) 691-4087 |
| Facsimile: (208) 533-7863 | Facsimile: (425) 467-2350 |
| Cell: (208) 351-1718 | Cell: (314) 935-5640 |

## II.  SCOPE OF WORK

### PROPOSED EXPERIMENT MATRICES

There are four major performance issues associated with the annular fuel design that require assessment by irradiation testing: (1) the development and performance of barriers to prevent fission product attack of the cladding; (2) maintaining adequate heat transfer from mechanically-bonded, low SD fuel; (3) fission gas release at low SD; and (4) dimensional stability of the fuel (i.e., swelling) of alloyed metallic U. The experiments that follow are intended to assess these performance issues.





**Table 1:** AFC-4 Experiment Matrix



12-CR-24 Mod 1



Note 1: Based on ATR northwest lobe nominal power of 18 MW.

Details of the AFC-4 experiment matrix are described as follows:



12-CR-24 Mod 1



I2-CR-24 Mod 1







The proposed experiment matrix for LDF-1 is provided in Table 2.

**Table 2:** LDF-1 Experiment Matrix



| LDF-1A | | | | | | |
|---|---|---|---|---|---|---|
| | 1A-1 | 1A-2 | 1A-3 | 1A-4 | 1A-5 | 1A-6 |

12-CR-24 Mod 1



Note 1: Adjust LHGR as required (and as feasible) such that cladding temperature and central fuel temperature track together (target conditions to be provided by Participant).
Note 2: Based on ATR southeast lobe nominal power of 23 MW.

Details of the LDF-1 experiment matrix are described as follows:





12-CR-24 Mod 1



**Table 3:** LDF-2 Experiment Matrix



Details of the LDF-2A experiment matrix are described as follows:



## III.    MAJOR TASK DESCRIPTIONS

### Task 1:  Experiment Design and Analysis

Contractor will lead the design of the irradiation experiments, will select the experiment positions in the ATR that meet the experiment objectives, and will perform any required safety analyses necessary to support insertion of the experiment capsules into the ATR.  The analyses will include nuclear, thermal, and structural evaluations.  Contractor's standard suite of verified and validated computer codes will be used to calculate burn-up, fission density, gas generation, fluence, and LHGRs, as typically done for ATR experiments.  An important output from the nuclear analysis will be the fuel slug enrichment levels that provide the desired LHGR for the experiment.

Contractor will select the AFC-4 design and dimensions of the experiment rodlet and capsule, using the AFC-OA drop-in capsule design to the maximum extent practical. The Participant proposed experiment matrix (Table 1) includes configurations of interest that are outside the scope of the previous DOE funded AFC-OA safety analysis (i.e., FCCI barrier and Cs getter concepts), so additional analyses will be performed as required to evaluate the acceptability of such configurations.

Participant will be responsible for developing the experiment matrix and experiment objectives; however, Contractor will assist as requested by the Participant. Key parameters for the experiment matrix include the experiment SD, burn-up, FCCI barrier configuration, and cladding temperature.

Contractor will design the LDF-1A experiment test train for the ATR small-B position per Participant experiment requirements provided in this SOW. Contractor will complete conceptual designs for the LDF-1B and LDF-2 experiments for the ATR small-B position per the Participant experiment requirements provided in this SOW. Subsequent requirements will be documented in design documents such as Functional and Operational Requirements (F&ORs) or Technical and Functional Requirements (T&FRs) pursuant to Contractor's experiment design laboratory wide procedures. Contractor and Participant will jointly develop mutually accepted experiment specifications for LDF-1A.

**Task 2: Annular Fuel Fabrication Development**

This task includes all the major development activities necessary to support fabrication of the experiment specimens by Contractor. Various aspects of the fabrication will be demonstrated during this development phase using suitable surrogate materials such as depleted U (DU) and alloy 422 (cladding tube).



12-CR-24 Mod 1



### Task 3:  Annular Fuel Experiment Fabrication, Assembly, and Inspection



Table 4: As-Built Characterization Measurements



12-CR-24 Mod 1



**Table 5:** Estimated Enriched and Non-Enriched U Quantities



12-CR-24 Mod 1



**Task 4:  Procurement and Fabrication of Non-Fuel Components**



**Task 5:  Insertion and Irradiation in the ATR**



**Task 6:  As-Run Irradiation Analysis**





## Task 7:  PIE and Disposition of the Experiment



**Table 6:** PIE for Subject ATR Experiments





Schedule for the completion of PIE activities will be determined on a fiscal year (FY) basis pursuant to the MFC Annual Mission Plan (AMP). Project Management will propose to MFC completion of all activities desired by Participant in each respective FY AMP.

Contractor and Participant will interpret the PIE results in the context of the as-run data and the Contractor will issue a PIE report. All conclusions, calculations, rationale, and supporting raw data will be compiled in the report that is subject to Participant review and comment prior to formal issuance.

With respect to disposition of the experiment (capsule, basket, and fueled rodlets), Contractor will identify the appropriate waste disposal path and will be responsible for proper disposition of all DOE materials. TRU waste associated with subject experiments will be

12-CR-24 Mod 1

packaged at HFEF and transferred to the Radioactive Material Storage Facility at MFC pursuant to this CRADA at Participant expense. Storage and ultimate disposition of said waste will be a government in-kind contribution for this collaboration.

### Task 8: Dissemination of Information from AFC Experiments

Contractor will disseminate to Participant the information (Experiment Design Documents, Final PIE Reports, etc.) from the on-going other AFC experiments of relevant fuel forms. Examples include the following:

- Irradiation performance of 
- 
- 
- 

### Task 9: Intermediate NDE Study

Contractor will evaluate the feasibility to non-destructively determine fission gas release and radial location of the rare earth elements at HFEF between ATR cycles for the irradiation experiments. Based on the results of this evaluation, Participant may identify the NDE of interest and request the Contractor to prepare a white paper "Intermediate Non-destructive Examination Study" to evaluate:

- Options for shipment using both in-commerce and out-of-commerce routes
- Shipping container alternatives (GE-100, GE-2000, INL owned casks, etc.)
- Turn-around time (time from pulling the experiment out of the ATR, allowing it to cool off if necessary, transporting to HFEF, performing the NDE, transporting back to the ATR, reinserting in reactor, and continuing irradiation)
- Cost for the various transportation and the intermediate NDE options

### Task 10: Project Plan and Schedule

Contractor will provide project management support for this CRADA, modifications to this CRADA, and new agreements related to this CRADA. A detailed project plan and schedule that supports the experiment objectives will be prepared to help coordinate and manage the activities associated with the irradiation experiments. The schedule will capture the major activities, milestones, and any decision points. Participant will provide input related to the activities performed by other vendors or DOE Laboratories associated with this project. The plan and schedule will be updated as necessary and those updates will be provided to Participant as they are available.

## IV. REPORTS, DATA AND OTHER DELIVERABLES

The key deliverables associated with this scope of work are presented below in Table 7. The target completion dates labeled as TBD will be identified during the development of the detailed project schedule and agreed to by the Participant Technical Representative and Contractor.

12-CR-24 Mod 1

**Table 7:** Project Deliverables and Target Completion Dates

| TASK | DELIVERABLES/MILESTONES | RESPONSIBLE PARTY | TARGET COMPLETION DATE |
|---|---|---|---|
| 1 | 1.  AFC-OA Programmatic and ATR Safety Basis Neutronic, Thermal, and Structural Analyses | Contractor | TBD |
| 1 | 2.  AFC-OA Test Matrices and Experiment Life-Cycle Requirements | Participant | Prior to U-235 enrichment calculations |
| 1 | 3.  LDF-1A/B and 2 Test Matrices and Experiment Life-Cycle Requirements | Participant | Prior to Conceptual Design Review |
| 1 | 4.  LDF-1A Test Train Design Documents (Neutronic, Thermal, and Structural Analyses; Fabrication and Inspection Plan; and Drawings) | Contractor | December 2014 |
| 1 | 5.  Experiment Specifications | Contractor | Prior to experiment fabrication |
| 2 & 3 | 6.  As-built Experiment Information (dimensions, chemistry, composition uniformity, etc.)[1] | Contractor | Prior to experiment insertion in ATR |
| 5 | 7.  Insertion of AFC-4B in ATR | Contractor | Complete |
| 5 | 8.  Insertion of AFC-4D in ATR | Contractor | ATR Cycle 158 A Outage (12/16/14[3]) |
| 5 | 9.  Insertion of AFC-4E in ATR | Contractor | ATR Cycle 160A Outage (07/10/15[3]) |
| 5 | 10. Insertion of LDF-1A in ATR | Contractor | ATR Cycle 160A Outage (07/10/15[3]) |
| 6 | 11. As-Run Irradiation Analyses | Contractor | Prior to experiment shipment to HFEF |
| 7 | 12. PIE Plans | Contractor with Participant input | Prior to beginning of planned last ATR cycle |
| 7 | 13. PIE Results and Reports[1] | Contractor | TBD[2] |
| 8 | 14. AFC Experiment Information[1] | Contractor | As-Built Data Packages and/or published Final Reports Informal interim briefings will be made by the Contractor as information relevant to Participant concepts emerge |
| 9 | 15. Intermediate Non-destructive PIE Study | Contractor | Complete |

12-CR-24 Mod 1

| 10 | 16. Project Plan with Schedule/Baseline | Contractor | 2 mo. after the effective date of this CRADA and Modifications |
|----|------------------------------------------|------------|----------------------------------------------------------------|

Note 1: Results from examinations and analyses may be provided to the Participant in the form of electronic and/or hard copies of images, spreadsheets, and summary paragraphs after their accuracy has been checked by the assigned Principle Investigator and they are approved for release by Contractor's export control procedures. These may be provided prior to approval of final reports as requested by Participant. Such results will be considered preliminary until they are published in a final report approved by Contractor Management.

Note 2: To be determined based upon overall schedule for the experiments. Deliverables associated with PIE pending inclusion in the MFC AMP for the respective FY.

Note 3: Dates based upon Advanced Test Reactor FY14 Integrated Strategic Operational Plan Rev. 2 03/31/14 and are subject to change due to ATR operability and DOE requirements.

Where applicable, the deliverables will be submitted electronically to Participant through secure pathways such as Participant's Accellion secure file sharing site or overnight Federal Express of encrypted jump drives. Participant and Contractor will determine the proper pathways on a case-by-case basis.

## V.  MEETINGS AND REPORTING

Generally, communication will be handled electronically or by teleconference. In addition to regular day-to-day communication, scheduled bi-weekly teleconferences will be held, as necessary, to communicate progress and discuss technical issues related to the work. Project performance (schedule status and costs) will be reported on a monthly basis. Furthermore, as the work progresses, comprehensive program review meetings will be held in person at locations agreed upon by the Contractor and Participant, as necessary.

## VI.  ACRONYMS

| AFC-OA | Advanced Fuel Cycle Outboard A |
|--------|--------------------------------|
| AMP | Annual Mission Plan |
| ASME | American Society of Mechanical Engineers |
| ATR | Advanced Test Reactor |
| BEA | Battelle Energy Alliance |
| C | Celsius |
| cc | Cubic Centimeter |
| Cd | Cadmium |
| cm | Centimeter |
| CRADA | Cooperative Research and Development Agreement |
| Cs | Cesium |
| DOE | United States Department of Energy |
| DU | Depleted Uranium |
| EBR-II | Experimental Breeder Reactor II |
| EPMA | Electron Probe Micro-Analyzer |

12-CR-24 Mod 1

| f | Fissions |
|---|---|
| F&OR | Functional and Operational Requirements |
| FCCI | Fuel Cladding Chemical Interaction |
| FCT | Fuel Cycle Technologies |
| FFTF | Fast Flux Test Facility |
| FY | Fiscal Year |
| GASR | Gas Assay, Sample, and Recharge System |
| GE | General Electric |
| He | Helium |
| HFEF | Hot Fuel Examination Facility |
| ICP-MS | Inductively Coupled Plasma-Mass Spectroscopy |
| ICP-OES | Inductively Coupled Plasma-Optical Emission Spectroscopy |
| ID | Inner Diameter |
| INL | Idaho National Laboratory |
| LDF-1A | Large Diameter Fuel 1A Experiment |
| LDF-1B | Large Diameter Fuel 1B Experiment (instrumented) |
| LDF-2A | Large Diameter Fuel 2A Experiment |
| LFTD | Laser Flash Thermal Diffusivity |
| LHGR | Linear Heat Generation Rate |
| MC | Multi-Collector |
| MFC | Materials and Fuels Complex |
| Mo | Molybdenum |
| MWD | Megawatt Days |
| Na | Sodium |
| NDE | Nondestructive Examination |
| NQA | Nuclear Quality Assurance |
| NRAD | Neutron Radiography Reactor |
| OD | Outer Diameter |
| PIE | Post-irradiation Examination |
| PGS | Precision Gamma Scanner |
| QSL | Qualified Suppliers List |
| RSD | Relative Standard Deviation |
| SD | Smeared Density |
| SEM | Scanning Electron Microscopy |
| SOW | Statement of Work |

| T&FR | Technical and Functional Requirements |
| TIMS | Thermal Ionization Mass Spectrometry |
| TRU | Transuranic |
| TWR | Traveling Wave Reactor |
| U | Uranium |
| VEM | High Resolution Visual Examination |
| W | Watt |
| XRD | X-ray Diffraction |
| Zr | Zirconium |

**EXHIBIT D**

# THE CHALLENGE OF
## NUCLEAR FUEL RELIABILITY

by Taylor Moore



# The Story in Brief

The current fleet of U.S. nuclear power plants produces some of the country's most economical electric power, largely because of the relatively low cost of nuclear fuel. But new operating strategies aimed at enhancing plant and fuel performance have also led to increased fuel failures in recent years—a problem that threatens nuclear's cost competitiveness. In response, EPRI has restructured its nuclear fuel reliability activities to more-effectively pursue mitigation techniques and identify root causes for the industry's toughest fuel problems. The collaborative, inter-national effort—involving nuclear plant operators, fuel manufacturers, and fuel service providers—seeks to better quantify operating margins, provide insights leading to advanced fuel designs, and eliminate fuel failures. The ultimate goal is zero fuel defects.

The relatively low and stable cost of uranium is one of the key factors that make the nation's current fleet of 103 operating nuclear power plants economically competitive with other sources of electricity. The cost of fuel as a percentage of total production cost is about 25% for nuclear, while ranging from 70% to 90% for coal- and gas-fired generation.

Throughout the history of commercial nuclear power, fuel-cycle economics have continually improved as fuel manufacturers have introduced advanced, more highly enriched and higher-burnup fuel and as nuclear plant operators have come to use increasingly longer fuel cycles. Since the 1990s, both burnup and cycle length have increased by more than 50%. These increases have allowed nuclear plants to operate more efficiently and produce more electricity. The gains have saved nuclear plant operators—and con-

sumers of the electricity—more than $1 billion a year through increased power production and reduced costs for spent-fuel storage and eventual disposal. The operating changes have also resulted in more-efficient use of uranium resources.

But the long-term performance and reliability of precision-engineered and precision-manufactured commercial fuel—operating several years inside a light water reactor core under high temperature and pressure as well as intense radiation—can directly affect a nuclear plant's cost of producing electricity. Fuel failures can jeopardize the competitive advantage of nuclear power's low production cost through lost generation, increased inspection and repair costs, and the premature discharge of fuel assemblies, which alone can be substantial (the replacement cost of the fuel in a single plant is on the order of $150 million to $200 million). Fuel failures can also

contribute to increased plant background radiation, which impacts plant outage operations, where minimizing worker exposure is a primary concern. (After all, nuclear fuel cladding is the first of three engineered barriers designed to prevent the environmental release of radioactive fission products.)

That is not to say fuel failures pose a plant safety issue; their number and extent remain well within accepted safety and licensing limits. The primary impact remains economic: fuel failures affect both the operating cycle and such downstream issues as spent fuel storage, transportation, and disposal. Fuel failures can also influence public acceptance of nuclear power.

Considering that a typical reactor contains more than half a million fuel rods, defect-free operation is a real challenge, and the fuel's operating environment adds to the challenge. With peak temperatures higher than 1000°C, the fuel is by far the highest-temperature component in the steam supply system. The fuel is also subjected to the highest radiation fields, where neutrons passing through the cladding literally knock atoms out of their way. At the end of a fuel rod's life, most atoms in the cladding have been displaced once or twice, and the cladding microstructure can be substantially changed. Despite the challenging environment, the industry continues to expect, and strive for, zero defects.

## Problems Arise

After the performance of commercial nuclear fuel had trended upward for 20 years, signs that it was on the decline began to appear in the late 1990s, first in some pressurized water reactors (PWRs) and more recently in some boiling water reactors (BWRs). Fuel failures increased significantly from 2001 through 2004, with more than one-third of the U.S. nuclear fleet experiencing at least one fuel defect. The increase in fuel failures is thought to result primarily from the operating regimes adopted to boost plant performance: higher enrichment, longer







*A steady increase in fuel enrichment, burnup, and operating cycles over the last 15 years has enhanced the economics of BWRs. But these operating changes, along with modifications to the water chemistry environment, have also led to an increase in fuel failures. PWRs have experienced similar problems.*

fuel cycles, higher burnup, low neutron leakage, new core reload strategies, and plant upratings.

But other factors contribute to fuel reliability problems as well. For example, as the plants themselves have aged, they have experienced a number of materials-related problems, such as stress corrosion cracking, in piping and components in the reactor vessel, primary cooling system, and other areas of the plants. Operators have generally modified a plant's water chemistry to control or limit such corrosion and cracking: the addition of lithium to the PWR primary coolant can raise its pH, the addition of zinc can reduce the plant's corrosion source term, and additions of noble metals can alter the coolant's electrochemical potential to inhibit stress corrosion cracking. Many of these changes, initiated to improve balance-of-plant performance, may further increase demands on the fuel.

Explains Chuck Welty, director of EPRI's nuclear materials and chemistry department, "As the industry strives to address degradation and aging in other components exposed to primary coolant, it is important to consider alternative water chemistry regimes. But it is also essential that the impact of any proposed changes on fuel performance be fully understood." Rosa Yang, technical executive for EPRI's Fuel Reliability Program, agrees: "While the industry has been increasingly pushing fuel to higher enrichment, higher burnup, and longer operating times, we have also been operating fuel in continually changing water chemistry environments that have turned out in some cases to have unpredicted, unintended consequences on fuel performance. To develop effective solutions to fuel reliability problems, we have to consider the interactive effects of all the variables involved—fuel design, duty cycle, coolant chemistry, crud buildup, and so on."

The buildup of corrosion products on the fuel cladding surface has proven to be particularly significant for both BWRs and PWRs. The high temperature of the cladding surface attracts impurities and chemical additives in the reactor coolant that deposit on the fuel rod surface in a process not unlike what occurs in a tea kettle. The deposits on a fuel rod, known as crud, can be tenacious, insulative compounds capable of increasing the local clad temperature and accelerating clad corrosion—sometimes to the point of fuel failure.

The difficulties in quantifying such effects have contributed to a number of surprises. Some of these are actual fuel failures, such as corrosion failures in BWRs, power change–induced failures and crud-induced failures in both BWRs and PWRs, and severe degradation of failed fuel in a few plants. Other surprises have been operational difficulties, such as unanticipated changes in the power profile of some PWR cores—known as axial offset anomaly (AOA)—as a result of crud deposits on fuel. Both BWRs and PWRs have also experienced difficulties with control rod insertion as a result of fuel assembly or fuel channel deformation.

"These surprises have been recognized by the industry and EPRI as having the potential for adverse cost impacts, since they could result in plant deratings, operational restrictions, or unscheduled outages for repairs," notes Yang. Several recent fuel failure events at U.S. nuclear plants have cost between $40 million and $80 million each, not including the long-term effects of plant contamination. According to Yang, the most recent data reported by utilities on fuel performance suggest that the downward trend of the previous four years is leveling off, but it is not yet clear that an actual reversal is in sight.

## New Emphasis on Reliability

In 2003, under the leadership of Jack Skolds, former chief nuclear officer at Exelon Corporation—the largest U.S. nuclear power plant operator—a group of industry chief nuclear officers made a number of recommendations for reversing the downward trend in fuel reliability. These recommendations were presented to the chairmen of the nuclear industry's



Fuel failure is not a matter of damage to the fuel pellets themselves, but rather involves cracking of the metal cladding that surrounds them, as seen at the right in this cross-section. A crack in the cladding allows radioactive material to leak from the fuel rods into the reactor coolant.

Materials Executive Oversight Group and EPRI's Fuel Reliability Program—the lead industry fuel R&D organization. The overarching efforts are part of the larger Industry Materials Initiative, which includes fuel reliability in its scope, since water chemistry and corrosion mitigation strategies can affect primary system components and fuel in different ways. "Our fundamental focus is on enabling the industry to optimally balance fuel performance and reliability," says Yang. "Plant operators have a lot to gain by pushing the fuel," she adds, "but if the fuel fails, they stand to lose a lot as well."

To avoid recurring fuel failures, the EPRI program leverages extensive capabilities for fuel failure root-cause investigations, ranging from nondestructive examination of fuel in plant storage pools to transporting fuel to heavily shielded, remotely operated laboratories known as hot cells for destructive examination. A shortage of suitable hot cell capabilities in the United States has in some cases led to the shipment of failed fuel overseas, extending an already long turnaround time for results and analysis. The program is pursuing possibilities for new collaboration with the Idaho National Labora-





*The buildup of corrosion products, known as crud, on fuel rod exteriors (top) can distort normal heat distribution in the reactor core and accelerate corrosion and failure of the rods themselves (bottom).*

tory (INL)—now managed for the U.S. Department of Energy under a team contract, led by Battelle Energy Alliance LLC, that includes EPRI—for upgrading certain INL hot cell facilities that are being adapted for use by the nuclear industry. DOE has designated INL as the center of the U.S. R&D effort for the renaissance of nuclear power.

In fact, such collaboration is at the heart of virtually all aspects of the research effort. EPRI's Fuel Reliability Program is currently supported by all U.S. utility members and more than half a dozen major international nuclear utility organizations, including Electricité de France, UNESA in Spain, Sweden's Vattenfall, Tokyo Electric Power Company, Taiwan Power Company, and Kernkraftwerk Leibstadt and Kernkraftwerk Mühleberg in Switzerland. The international collaboration brings nuclear plant operators and fuel manufacturers together in a highly leveraged, integrated effort focused on quantifying operating margins, providing insight for fuel designs with enhanced performance, and eliminating fuel failures. The ultimate goal of the industry is zero fuel defects.

The program is working with the Institute of Nuclear Power Operations (INPO) to implement a time-critical fuel failure database, called FRED, to capture timely fuel performance and reliability data. The web-accessed database is the industry's first comprehensive fuel performance and reliability information resource; now in beta testing, it will be fully online by the end of this year. FRED provides nuclear utilities and fuel suppliers with an accurate, comprehensive, and up-to-date database on fuel performance and reliability.

## Sharing Responsibility

Fuel vendors participate directly in the Fuel Reliability Program, which works closely with them to ensure that fuel performs as advertised—a goal that has become more elusive in the current business climate. Years of oversupply in the increasingly competitive and global fuel marketplace, combined with a reduction in the number of fuel assemblies purchased due to higher burnup capabilities of current designs, have depressed prices for nuclear fuel. This, in turn, has reduced spending for R&D and led to the introduction of some new fuel designs that have undergone less-than-adequate testing. While some believe the vendors should pay all the costs of ensuring fuel reliability, most recognize that this expectation is probably not realistic, given current fuel prices. In addition, some fuel performance factors, such as the water chemistry conditions under which the fuel is operated, are clearly more the responsibility of plant operators than of fuel vendors.

EPRI works both sides of the vendor-customer relationship. The costs of most joint efforts are shared equally with the appropriate vendor, giving EPRI members the opportunity to focus both their own resources and those of a vendor in an area of direct benefit to utilities. For vendors, the interaction provides the opportunity to address important areas that might not be addressed otherwise. The Fuel Reliability Program currently has

multimillion-dollar efforts under way with all of the vendors supplying fuel in the United States to confirm the margins of existing designs, demonstrate a new fuel design, or resolve a failure root cause.

Another focus of the EPRI model is to better characterize fuel duty/water chemistry interaction so that vendors get the data they need to improve fuel designs and utilities get the data they need to operate the fuel efficiently and fine-tune plant water chemistry. "Zero defects in nuclear fuel can be reached only through teamwork and integration," notes Yang, "and EPRI's role is to bring all of the necessary capabilities and resources together to ensure that vendors and plant operators can work effectively toward the common goal." Such teamwork extends down to the individual plant level to foster understanding between the fuel and water chemistry experts, who sometimes operate in a state of naturally opposing tension with each other.

## Challenges and Successes

Despite continuing, evolving technical challenges to achieving zero-defect nuclear fuel performance, EPRI's Fuel Reliability Program has had some notable successes—R&D efforts that have helped tip the balance in favor of higher performance without sacrificing reliability.

"When fuel failures occur, it's important to fully understand their root causes in order to avoid future failures of the same type," points out Kurt Edsinger, senior project manager in the Fuel Reliability Program. "Unfortunately, root-cause investigations typically require destructive analysis of fuel elements in hot cells, and transporting fuel from nuclear power plants to hot cells adds to the time and expense of investigations. Still, if you can identify the root cause of a failure and take actions that minimize or eliminate future problems, it's well worth the cost."

In a recent example involving failed fuel from a BWR, the effort paid off in just this way. The hot cell analysis, expedited by EPRI for a fast turnaround, revealed a



Fuel assemblies inserted here

Transducers

*An EPRI-patented fuel cleaning technology allows utilities to remove crud from fuel assemblies during a routine reload outage. In this process, a complete assembly is placed in each of two canisters, which contain high-energy ultrasonic transducers that loosen the crud by the repeated formation and collapse of tiny bubbles. The technology, which received the prestigious R&D 100 Award in 2005, will have been applied at a dozen nuclear plants worldwide by the end of the year.*

manufacturing defect on the fuel pellet surface that was creating an additional stress on the zirconium alloy cladding, leading to a failure mechanism known as pellet-cladding interaction. As a result of this finding, which could not have been made except through destructive examination in a hot cell, all fuel vendors have changed their manufacturing practices, improving the quality of fuel pellets industrywide and benefiting all fuel users by effectively eliminating a common fuel failure mode. EPRI's involvement facilitated a rapid feedback loop that helped avoid costly operating restrictions on fuel and led to a quick return to economical operation.

Sometimes innovation comes through the use of existing technology in new ways. Entergy, Areva, and EPRI shared the Nuclear Energy Institute's (NEI's) 2005 "Best of the Best" Top Industry Practice (TIP) Award for developing an advanced technique for fuel crud sampling and analysis at Entergy's 966-MW River Bend nuclear plant in St. Francisville, Louisiana. The team developed new remote tools and procedures to obtain small flakes of corrosion deposits on fuel and developed advanced methods to analyze the flakes. The technique, based on other EPRI and vendor work on PWR fuel, revealed detailed information about the nature of fuel corrosion products that

was previously available only through the expensive and time-consuming route of destructive hot cell examinations. The ability to collect the information from the poolside results in a quicker analysis that allows plants to adjust water chemistry and correct fuel problems in time for the next operating cycle.

Several other successes have come out of research to reduce AOA, where crud buildup on fuel cladding surfaces causes uneven heating of the reactor core. The situation is exacerbated by boron, which is added to the coolant to control power levels but which also becomes concentrated and deposited within thick crud deposits. The boron depresses power locally, shifting power from high-crud regions to lower-crud regions. Utilities are faced with the choice between reducing overall reactor power, which is economically undesirable, and finding a way to better control crud.

The initial approach for PWR utilities to avoid AOA was through conservative reload management, which translated to the purchase of additional fuel. More-advanced approaches, based on EPRI-led research, use higher coolant pH levels and zinc injection to reduce crud transport and make use of the AOA analytic code BOA (Boron-Induced Offset Anomaly) developed by EPRI and Westinghouse. Notes Jeff Deshon, a project manager in the Fuel Reliability Program, BOA is a valuable software tool many utilities use to assess AOA risk; BOA can predict a specific core design's likely onset of AOA, as well as the extent and location of crud deposits. A major revision to the code is expected soon. Another strategy that has been investigated includes using boric acid specifically enriched with the boron's neutron-absorbing isotope so that the overall concentration of the element can be reduced.

While such mitigation techniques represent important advances, an EPRI-patented ultrasonic fuel-cleaning (UFC) technology attacks the problem more directly. In this process, the complete fuel

assembly is placed in a canister surrounded by high-energy ultrasonic transducers that loosen the crud by the repeated formation and collapse of tiny bubbles. The crud is then swept out of the canister and captured in specially designed filters. It takes only about 4–6 minutes to clean each assembly, so the entire batch of reloaded fuel can easily be cleaned during a routine outage. Removing the crud by UFC has been proven beneficial in two areas—increasing the margin to AOA by reducing the crud available for boron hideout, and reducing plant dose rates from the overall decrease in crud inventory.

UFC technology has now been licensed to a number of service providers for PWR applications, although the technology has also been qualified and demonstrated for use in BWRs. EPRI and four of its member companies—AmerenUE, Exelon Corp., South Texas Project Nuclear Operating Co., and Dominion Engineering, Inc.—were given *R&D Magazine's* prestigious R&D 100 Award in 2005 for the UFC technology. By the end of 2005, the technology will have been applied at 12 plants worldwide.

Not all success stories are purely technical. The Fuel Reliability Program has been extremely valuable as the industry focal point for interaction with the NRC and other regulators regarding potential safety implications of fuel behavior under postulated design-basis accidents. EPRI's industrywide perspective and support have helped to avoid regulatory "ratcheting" to the most conservative, restrictive interpretations and assumptions for experimental results or regulatory criteria. The program participates in experimental efforts sponsored by nuclear regulators in the United States and overseas, and it sponsors additional separate-effects experiments and independent analyses. Results of these efforts have prevented the NRC from backfitting the criteria for avoiding reactivity-initiated accidents (RIA) for the currently licensed burnup limit of 62 gigawatt-days per metric ton of uranium. The program has also submitted a topical report proposing a new RIA criterion for high-burnup fuel. The report is currently under review by the NRC.

Currently, the regulatory issue of greatest concern involves the criteria for loss-of-coolant accidents (LOCAs) for fuel at mid-to-high burnup levels. Under postulated LOCA conditions, the temperature





*The most reliable way to determine the root cause of a fuel failure is through destructive examination of the failed rod in a hot cell—a huge, heavily shielded laboratory where technicians manipulate test samples by the use of robotic arms. The limited number of such facilities in this country has meant long turnaround times for hot cell examination and analysis. EPRI is pursuing a collaborative effort with the Idaho National Laboratory to upgrade its hot cell facilities and streamline the process of fuel failure analysis.*

# Technical Working Groups Get the Job Done

EPRI's Fuel Reliability Program is managed through technical working groups that proactively identify high-priority and emerging issues related to fuel performance, water chemistry, and root-cause analysis of failed or defective fuel—along with cost-effective strategies for resolving them—and fuel-related regulatory issues.

Like all other technical programs in the nuclear industry's broad-based industry Materials Initiative, the Fuel Reliability Program conducted an in-depth gap analysis to identify and prioritize critical knowledge gaps and to target R&D plans to bridge them. "As a result of the gap analysis, important new areas have been added to the program's overall scope," notes Kurt Edsinger, an EPRI senior project manager and manager of one of four working groups addressing the key technical areas of focus.

"Newly added areas address the response of BWR fuel to water chemistry changes and the lifetime of reactivity control elements," says Edsinger. "The gap analysis particularly recognized that issues related to BWR crud deposits and their effects on fuel performance could substantially benefit from a dedicated working group structure similar to what was already in place for PWRs, where fuel performance, chemistry, and core design experts are working as a team." The PWR Fuel and Crud Control Working Group addresses PWR performance issues related to AOA, particularly issues related to crud, and proactively identifies issues arising from new water chemistry regimes (for example, high pH and zinc injection).

Activities to establish fuel performance design margins and investigate fuel failures, both of which rely heavily on hot cell investigations, are managed by the Fuel Performance and Reliability Working Group.

The working group on fuel regulatory issues involves EPRI, fuel vendors, and utility experts who serve as the industry focal point, through NEI, for interaction with the NRC Regulatory Office to resolve generic fuel licensing issues and maintain regulatory stability.

The Fuel Reliability Program also collaborates with the NRC's Office of Research and other regulatory agencies worldwide to jointly conduct safety-related fuel research—for example, research involving reactivity-initiated accidents and loss-of-coolant accidents.

of the fuel increases rapidly, and even though a number of fuel rods would be expected to fail, the overall core geometry must be maintained to allow adequate cooling. The program is cosponsoring a series of LOCA-related experiments at Argonne National Laboratory jointly with the NRC, as well as other experiments to evaluate the adequacy of current LOCA criteria for currently licensed burnups and beyond.

## Commitment to Progress

"The Fuel Reliability Program is a good example of where EPRI has worked closely with industry organizations and regulatory agencies both in the United States and internationally to address complex technical issues," notes Yang. "The industrywide nature of the program has allowed for more-effective use of funds through the pooling of resources from U.S. and international utilities. Fuel vendors participate directly to ensure the availability of robust fuel designs for defect-free operation, while NEI and INPO support the program in a liaison role. As a result, we

have been able to respond to an industry challenge—that is, increased fuel failure rates—quickly and comprehensively."

Nevertheless, the challenges ahead remain formidable, and EPRI's utility-driven Fuel Reliability Program was formed with a clear understanding among its sponsors that resolving many of the key issues and achieving the program objectives will require an extended multi-phase, multi-year effort. "This is tough, painstaking technical work, and changing a problem situation sometimes takes longer than we initially anticipate," says Joe Sheppard, chief executive and chief nuclear officer for the twin-unit South Texas Project and chairman of the Fuel Reliability Program's executive committee. "We are making progress, albeit never as fast as we would want."

Sheppard points out that it can take as long as three years from the time a fuel rod develops a defect—and is removed during the next refueling outage, cools sufficiently in a plant's spent fuel pool for shipment to a hot cell, and can be examined and analyzed—until the time results

are reported to a utility as to the root-cause mechanism of the failure. The Fuel Reliability Program's utility managers and executives have high hopes that the developing relationship with INL will help to reduce that turnaround time and speed up the feedback loop on performance data, Sheppard notes.

"The challenges we're tackling require innovative, groundbreaking R&D," adds Sheppard, "for which it's not always evident at the start how widespread the benefits will be. An example is the ultrasonic fuel cleaning technology originally developed to address AOA in PWRs but now being commercially developed for dose-reduction application in BWRs—an unanticipated, ancillary benefit. Sometimes with R&D, you have to bet on the come: you'll run down a few blind alleys, but the flip side is that you'll often get more benefits than you had planned."

*Background information for this article was provided by Rosa Yang (ryang@epri.com), Kurt Edsinger (kedsinger@epri.com), and Chuck Welty (cwelty@epri.com).*



*FIG 2.2. Average discharge burnups [2.3].*

the average burnup for light water reactor types has doubled. The main change implemented to achieve this increase in burnup has been to increase the $^{235}U$ enrichment of fuel, typically from 2.5% to around 4.5%, with a current maximum of 4.95%.

Burnup increase has been least marked in reactor types which use natural uranium as fuel, and while the two remaining Magnox stations are near final closure, PHWR vendors and reactor operators are investigating and starting to use slightly enriched uranium (SEU), which will enable them to double or triple average burnup.

It was noted above that the main change required in nuclear fuel to obtain high burnup is an increase in fuel enrichment, but that alone is not sufficient. Nuclear fuel operates in a demanding environment of high radiation fields, high temperatures and high coolant flow. Early fuel designs were adequate for initial low burnups, when fuel was in a reactor for a limited time; but as burnup has increased, it has been necessary to improve fuels in many ways. The properties of materials change with time when exposed to the intense radiation fields inside a reactor, and proper account of these changes must be made.

Another way to improve the cost competitiveness of nuclear power plants has been to increase their nominal power. Over the last years, numerous plants have increased their nominal power; about 5% for PWRs and up to 20% for BWRs. These new operating conditions have resulted in greater demands on fuel.

Fuel reliability also impacts the economics of nuclear generation. Indeed, fuel failures can increase plant operation costs in many areas, such as:

— *Losses of power production*

Severe fuel failures can sometimes create a need for mid-cycle outage to replace the failed fuel. Fuel failure can also impact outage duration due to time required for additional fuel inspection, potential delays to repair failed fuel, and necessary air or cooling activity treatment before containment entry and primary circuit opening. In BWRs, reactor power is generally reduced to perform power suppression testing by inserting control rods adjacent to the failed assemblies. Once the defect location has been identified, one or more controls rods may be permanently inserted to reduce local power in the region of the defect assembly and thereby suppress secondary degradation. Ramp rate limitations are also often imposed to limit additional degradation of failed fuel. Economic evaluation requires knowledge of the large spectrum of cost parameters impacted by fuel failures (see Refs 2.4, 2.5).

— *Fuel cycle costs*

Fuel inspection, repair or reconstitution increase fuel cycle costs. Failed fuel assemblies are repaired or definitively discharged according to the cost or complexity of repair. In this last case, they are replaced by fresh fuel assemblies or partially burned fuel assemblies stored in the spent fuel pit. These changes require core reanalysis, lead to non-optimized core design and result in a loss of fuel usage. Failed fuel assemblies or rods may also require specific storage conditions or canisters.

— *Increase in operational costs due to higher coolant activity levels and potential contamination of plant system and components*

Although the vast majority of workers' exposure stems from activation products, fuel failures can also contribute to increasing the component coming from fission products, see Ref. [2.6]. In particular, fuel failures increase potential hazards from gaseous iodine releases. There is also an increased risk of alpha contamination in cases of severe fuel degradation and fuel wash-out. In this area, the economic consequences of fuel failure are more severe in BWRs than in PWRs; steam generators in PWRs have a beneficial effect, acting as radiation barriers between primary and secondary circuits. In BWRs, severe secondary degradation may lead to unacceptable dose rates in the turbine building, forcing the utility to an anticipated shutdown of the reactor before the end of the cycle. Higher coolant activity also requires more extensive treatment of radioactive waste and adds cost to the waste disposal of resins, filters and evaporator concentrates.

These cost increases are difficult to quantify, and depend on many parameters, such as severity of the failures, number of failures, exposure of failed fuel assemblies, and impact on plant operation. Not all fuel failures have the same economic impact. For example, some failures occurring in third burned fuel assemblies at the end of a cycle can have a low impact, while a single failure occurring at the beginning of a cycle with severe fuel degradation and fuel wash-out can require a mid-cycle outage for fuel replacement and have a high adverse cost impact due to outage and production loss. The sensitivity of plant operating costs to these parameters varies greatly, but the major adverse effect on cost is due to events that result in a loss of energy production, such as derates or necessary shutdowns due to high coolant activity.

Some examples of costs related to fuel failures are given in Refs [2.1, 2.7]. A single failed BWR rod can cost more than US $1 000 000 (2004) in outage time, fuel and power replacement costs. Failures affecting the larger fraction of a reload — such as crud or corrosion failures — can easily run into the tens of millions of dollars. In one recent example, a utility incurred more than $50 000 000 in costs related to fuel failures.

Besides rod failures, fuel assembly related concerns such fuel assembly bow and its consequences on incomplete control rod insertion (IRI) or axial offset anomaly (AOA), can also have an adverse economic impact on nuclear power generation. In one case, a severe axial offset anomaly (AOA) caused one PWR unit to operate at reduced power for the final six months of an operating cycle. AOA has caused other unites to operate with less efficient core designs at an expense ranging from $500 000 to $2 000 000 per fuel cycle [2.7]. In another potentially problematic area, the cost of BWR control blade interference due to channel bow can easily be in the millions of dollars (channel replacement costs, critical path time to rechannel, non-optimized core designs, etc.) [2.7].

### 2.1.2. Safety

Fuel cladding is a key barrier to containing fission products and it is essential that this barrier is robust and stays intact. Fuel failures represent degradation of this barrier. They contribute to increasing plant background radiation, which impacts plan outage and increases workers' exposure. They also contribute to the release of radioactive fission products to the environment. Fuel performance should be sufficient to limit radiological waste release to the environment, and to cope with ALARA issues. In addition, the presence of fuel failure in a reactor does not raise confidence in the nuclear power industry and can influence public acceptance of nuclear power.

Nuclear fuel should be sufficiently robust not only to allow it to operate normally without incident, but so that it can withstand any transient or accident that could occur in a plant in a manner that ensures safety is not compromised. This is supported through a licensing process that oversees not only operation, but also checks that

# EXHIBIT E

US 20140185733A1

(19) **United States**
(12) **Patent Application Publication**   (10) Pub. No.: **US 2014/0185733 A1**
Povirk et al.                             (43) Pub. Date:        **Jul. 3, 2014**

(54) NUCLEAR FUEL ELEMENT

(71) Applicants:Gary Povirk, Bellevue, WA (US);
James M. Vollmer, Kirkland, WA (US);
Ryan N. Latta, Bellevue, WA (US);
Grant Helmreich, Bellevue, WA (US);
Phillip Schloss, Bellevue, WA (US)

(72) Inventors: Gary Povirk, Bellevue, WA (US);
James M. Vollmer, Kirkland, WA (US);
Ryan N. Latta, Bellevue, WA (US);
Grant Helmreich, Bellevue, WA (US);
Phillip Schloss, Bellevue, WA (US)

(21) Appl. No.: 13/794,633

(22) Filed:     Mar. 11, 2013

Related U.S. Application Data

(60) Provisional application No. 61/747,073, filed on Dec. 28, 2012.

Publication Classification

(51) Int. Cl.
    *G21C 3/04*        (2006.01)
(52) U.S. Cl.
    CPC .......................................... *G21C 3/04* (2013.01)
    USPC ........................................................ **376/417**

(57)              **ABSTRACT**

Disclosed embodiments include fuel assemblies, methods of making a fuel element, and methods of using a fuel element.





FIG. 1a





**FIG. 1b**

Case 4:16-cv-00226-DCN   Document 71-1   Filed 04/29/19   Page 102 of 123



**FIG. 2a**



**FIG. 2b**



**FIG. 3**



**FIG. 4**



FIG. 5a              FIG. 5b

Case 4:16-cv-00226-DCN   Document 71-1   Filed 04/29/19   Page 106 of 123



601
┌─────────────────────────┐
│ Providing a nuclear fuel │
│ and cladding layer       │
└─────────────────────────┘

602
┌─────────────────────────────┐
│ Disposing a first layer of a liner │
│ exterior to the nuclear fuel │
└─────────────────────────────┘

603
┌──────────────────────────────┐
│ Disposing a second layer of a │
│ liner interior to the cladding layer │
└──────────────────────────────┘

**FIG. 6a**

604
┌─────────────────────────┐
│ Disposing the second layer │
│ over the first layer     │
└─────────────────────────┘

**FIG. 6b**

605
┌─────────────────────────┐
│ Bonding the first layer and │
│ the second layer         │
└─────────────────────────┘

**FIG. 6c**

606
┌─────────────────────────┐
│ Swaging at least two of the │
│ nuclear fuel, the liner, and the │
│ cladding                 │
└─────────────────────────┘

**FIG. 6d**

607
┌────────────────────────────────┐
│ Performing on the nuclear fuel at least │
│ one of  casting, extruding, pilgering, │
│ tube welding, and seamless-welding │
└────────────────────────────────┘

**FIG. 6e**

Patent Application Publication     Jul. 3, 2014   Sheet 8 of 9         US 2014/0185733 A1



**FIG. 7**



**FIG. 8**



901 ┐
Providing a fuel assembly
including a plurality of fuel
elements

902 ┐
Generating energy using
the fuel assembly

903 ┐
Mitigating interatomic diffusion
between components of the
fuel elements

**FIG. 9a**

904 ┐
Liner includes at least a first
liner layer including a first region
and a second liner layer including
a second region

**FIG. 9b**

905 ┐
Generating energy is carried out at
a temperature of at least 300°C

**FIG. 9c**

906 ┐
After generating energy, the first region
is substantially free of elements from
the cladding layer, and the second
region is substantially free of elements
form the nuclear fuel

**FIG. 9d**

907 ┐
At least one of the fuel elements is
substantially free of sodium between
the nuclear fuel and the cladding

**FIG. 9e**

1

## NUCLEAR FUEL ELEMENT

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]   This application claims the benefit of U.S. Provisional Application No. 61/747,073, filed Dec. 28, 2012, which is incorporated herein by reference in its entirety.

### BACKGROUND

[0002]   The present patent application relates to fuel elements and methods related to same.

### SUMMARY

[0003]   Disclosed embodiments include fuel elements, fuel ducts, fuel assemblies, and methods of making and using same.

[0004]   The foregoing is a summary and thus may contain simplifications, generalizations, inclusions, and/or omissions of detail; consequently, those skilled in the art will appreciate that the summary is illustrative only and is not intended to be in any way limiting. In addition to any illustrative aspects, embodiments, and features described herein, further aspects, embodiments, and features will become apparent by reference to the drawings and the following detailed description. Other aspects, features, and advantages of the devices and/or processes and/or other subject matter described will become apparent in the teachings set forth herein.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0005]   The skilled artisan will understand that the drawings primarily are for illustrative purposes and are not intended to limit the scope of the inventive subject matter described herein. The drawings are not necessarily to scale; in some instances, various aspects of the inventive subject matter disclosed herein may be shown exaggerated or enlarged in the drawings to facilitate an understanding of different features. In the drawings, like reference characters generally refer to like features (e.g., functionally similar and/or structurally similar elements).

[0006]   FIGS. 1a-1b provide partial-cutaway perspective views in schematic form of an illustrative (a) nuclear fuel assembly and (b) fuel element in one exemplary embodiment.

[0007]   FIGS. 2a-2b provide partial schematic illustration of a fuel element in (a) perspective view (b) cross-sectional view in one exemplary embodiment.

[0008]   FIG. 3 provides partial schematic illustration of a fuel element in an alternative illustrative embodiment.

[0009]   FIG. 4 provides a schematic illustration of interatomic diffusion among the different components of a fuel element in one exemplary embodiment.

[0010]   FIGS. 5a-5b illustrate schematics of a fuel assembly with a separator 51 between a first fuel element 52 and second fuel element 53 in one exemplary embodiment; (a) shows that all of the components are in contact with one another; (b) shows that the components are not in contact with one another (for illustration purpose).

[0011]   FIGS. 6a and 6b-6e, respectively, provide a flow chart of a process of making a fuel element and illustrative details of the process in one exemplary embodiment.

[0012]   FIG. 7 provides a flow chart of a process of making a nuclear fuel in one exemplary embodiment.

[0013]   FIG. 8 provides a flow chart of a process of making a nuclear fuel in one alternative illustrative embodiment.

[0014]   FIGS. 9a and 9b-9e, respectively, provide a flow chart of a process of using a fuel assembly and illustrative details of the process in one exemplary embodiment.

### DETAILED DESCRIPTION

Introduction

[0015]   In the following detailed description, reference is made to the accompanying drawings, which form a part hereof. In the drawings, the use of similar or the same symbols in different drawings typically indicates similar or identical items, unless context dictates otherwise.

[0016]   The illustrative embodiments described in the detailed description, drawings, and claims are not meant to be limiting. Other embodiments may be utilized, and other changes may be made, without departing from the spirit or scope of the subject matter presented here.

[0017]   One skilled in the art will recognize that the herein described components (e.g., operations), devices, objects, and the discussion accompanying them are used as examples for the sake of conceptual clarity and that various configuration modifications are contemplated. Consequently, as used herein, the specific exemplars set forth and the accompanying discussion are intended to be representative of their more general classes. In general, use of any specific exemplar is intended to be representative of its class, and the non-inclusion of specific components (e.g., operations), devices, and objects should not be taken as limiting.

[0018]   The present application uses formal outline headings for clarity of presentation. However, it is to be understood that the outline headings are for presentation purposes, and that different types of subject matter may be discussed throughout the application (e.g., device(s)/structure(s) may be described under process(es)/operations heading(s) and/or process(es)/operations may be discussed under structure(s)/process(es) headings; and/or descriptions of single topics may span two or more topic headings). Hence, the use of the formal outline headings is not intended to be in any way limiting.

Overview

[0019]   By way of overview, provided in one embodiment is an article, comprising: an annular nuclear fuel; a liner disposed exterior to the annular nuclear fuel; and a cladding layer disposed exterior to the liner. The liner may include a first region disposed adjacent the nuclear fuel and including a first material, and a second region disposed adjacent the cladding layer and including a second material that is different from the first material.

[0020]   Provided in another embodiment is a nuclear fuel element, comprising: a nuclear fuel; a liner disposed exterior to the nuclear fuel, the liner including a first layer contacting the nuclear fuel and a second layer, and a cladding layer disposed exterior to the liner, the cladding layer including at least one material chosen from a metal, a metal alloy, and a ceramic, the cladding contacting the second layer of the liner.

[0021]   Provided in another embodiment is a nuclear fuel element, comprising: first and second nuclear fuels, each of the first and second nuclear fuels having a first end and a second end; and a cladding layer disposed exterior to at least one of the first and second nuclear fuels; and a separator disposed between a first end of one of the first and second

US 2014/0185733 A1

Jul. 3, 2014

2

nuclear fuels and a second end of the other of the first and second nuclear fuels; the separator including a first region contacting the first end of one of the first and second fuel elements and a second region contacting the second end of the other of the first and second fuel elements.

[0022]   Provided in another embodiment is a method of making a nuclear fuel assembly, comprising: providing an annular nuclear fuel and a cladding layer exterior to the nuclear fuel; disposing a first layer of a liner exterior to the nuclear fuel, the first layer contacting the nuclear fuel; and disposing a second layer of the liner interior to the cladding layer, the second layer contacting the cladding layer.

[0023]   Provided in another embodiment is a method of using a fuel assembly, the method comprising: providing a fuel assembly comprising a plurality of fuel elements, the fuel elements including: an annular nuclear fuel; a liner disposed exterior to the annular nuclear fuel; and cladding disposed exterior to the liner; generating energy using the fuel assembly; and mitigating interatomic diffusion between at least one of (i) the first material and the second material; (ii) the first material and the nuclear fuel; and (iii) the second material and the cladding layer. The liner may include a first region disposed adjacent the nuclear fuel and including a first material, and a second region disposed adjacent the cladding layer and including a second material that is different from the first material.

[0024]   Provided in another embodiment is a nuclear fuel element, comprising: an annular nuclear fuel; a liner disposed exterior to the annular fuel, the liner including a first layer contacting the nuclear fuel and a second layer, and a cladding layer disposed exterior to the liner, the cladding layer including at least one material chosen from a metal, a metal alloy, and a ceramic, the cladding layer contacting the second layer of the liner; and a transition layer disposed between the first layer and the second layer and having a thickness of less than or equal to about 2 to about 5 microns.

[0025]   Provided in another embodiment is an annular nuclear fuel, which is capable of high burn-up with multiple barriers disposed between the nuclear fuel and the fuel cladding and is manufactured with minimal need for thermal bonding materials.

### Fuel Assembly

[0026]   FIG. 1a provides a partial illustration of a nuclear fuel assembly 10 in accordance with one embodiment. The fuel assembly may be a fissile nuclear fuel assembly or a fertile nuclear fuel assembly. The assembly may include fuel elements (or "fuel rods" or "fuel pins") 11. FIG. 1b provides a partial illustration of a fuel element 11 in accordance with one embodiment. As shown in this embodiment, the fuel element may include a cladding material 13, a fuel 14, and, in some instances, at least one gap 15.

[0027]   A fuel may be sealed within a cavity by the exterior cladding material 13. In some instances, the multiple fuel materials may be stacked axially as shown in FIG. 1(b), but this need not be the case. For example, a fuel element may contain only one fuel material. In one embodiment, gap(s) 15 may be present between the fuel material and the cladding material, though gap(s) need not be present. In one embodiment, the gap is filled with a pressurized atmosphere, such as a pressurized helium atmosphere. In an additional embodiment, the gap may be filled with sodium.

[0028]   A fuel may contain any fissionable material. A fissionable material may contain a metal and/or metal alloy. In

one embodiment, the fuel may be a metal fuel. It can be appreciated that metal fuel may offer relatively high heavy metal loadings and excellent neutron economy, which is desirable for breed-and-burn process of a nuclear fission reactor. Depending on the application, fuel may include at least one element chosen from U, Th, Am, Np, and Pu. The term "element" as represented by a chemical symbol herein may refer to one that is found in the Periodic Table—this is not to be confused with the "element" of a "fuel element". In one embodiment, the fuel may include at least about 90 wt % U—e.g., at least 95 wt %, 98 wt %, 99 wt %, 99.5 wt %, 99.9 wt %, 99.99 wt %, or higher of U. The fuel may further include a refractory material, which may include at least one element chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, and Hf In one embodiment, the fuel may include additional burnable poisons, such as boron, gadolinium, or indium.

[0029]   In one embodiment, the metal fuel may be alloyed with about 3 wt % to about 10 wt % zirconium to dimensionally stabilize the alloy during irradiation and to inhibit low-temperature eutectic and corrosion damage of the cladding. A sodium thermal bond fills the gap that exists between the alloy fuel and the inner wall of the clad tube to allow for fuel swelling and to provide efficient heat transfer, which may keep the fuel temperatures low. In one embodiment, individual fuel elements 11 may have a thin wire 12 from about 0.8 mm diameter to about 1.6 mm diameter helically wrapped around the circumference of the clad tubing to provide coolant space and mechanical separation of individual fuel elements 56 within the housing of the fuel assemblies 18 and 20 (that also serve as the coolant duct). In one embodiment, the cladding 13, and/or wire wrap 12 may be fabricated from ferritic-martensitic steel because of its irradiation performance as indicated by a body of empirical data.

### Fuel Element

[0030]   A "fuel element", such as element 10 shown in FIGS. 1a-1b, in a fuel assembly of a power generating reactor may generally take the form of a cylindrical rod. The fuel element may be a part of a power generating reactor, which is a part of a nuclear power plant. Depending on the application, the fuel element may have any suitable dimensions with respect to the length and diameter. FIGS. 2a-2b provide different views of schematic illustrations of a fuel element. The fuel element may include a cladding layer 21, a fuel 22 disposed interior to the cladding layer. In the case of a nuclear reactor, the fuel may contain (or be) a nuclear fuel. In one embodiment, the nuclear fuel may be an annular nuclear fuel. Referring to FIGS. 2a-2b, in one embodiment, the fuel element may include a liner 23 disposed between the nuclear fuel 22 and the cladding layer 21. The liner may contain multiple layers (e.g., 231 and 232).

[0031]   The fuel may have any geometry. In one embodiment, the fuel has an annular geometry. In such an embodiment, a fuel in an annular form may allow a desirable level of fuel density to be achieved after a certain level of burn-up. Also, such an annular configuration may maintain compressive forces between the fuel and the cladding to promote thermal transport. The fuel may be tailored to have various properties, depending on the application. For example, the fuel may have any level of density. In one embodiment, it is desirable to have a high density of fuel, such as one as close to theoretical density uranium (in the case of a fuel containing

US 2014/0185733 A1

3

Jul. 3, 2014

uranium) as possible. In one embodiment, having a low level porosity may prevent formation of internal voids during irradiation.

[0032] The cladding material for the cladding layer may include any suitable material, depending on the application. In one embodiment, the cladding layer may include at least one material chosen from a metal, a metal alloy, and a ceramic. In one embodiment, the cladding may contain a refractory material, such as a refractory metal including at least one element chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf.

[0033] A metal alloy in a cladding layer may be, for example, steel. The steel may be chosen from a martensitic steel, an austenitic steel, a ferritic steel, an oxide-dispersed steel, T91 steel, T92 steel, HT9 steel, 316 steel, and 304 steel. The steel may have any type of microstructure. For example, the steel may include at least one of a martensite phase, a ferrite phase, and an austenite phase. In one embodiment, substantially all of the steel has at least one phase chosen from a martensite phase, a ferrite phase, and an austenite phase.

[0034] In some cases, particularly at high burn-ups, the elements of the fuel and the cladding may tend to diffuse, thereby causing un-desirable alloying and thus degrading the material of the fuel and the cladding (e.g., by de-alloying of the fuel and/or cladding layer or forming a new alloy with degraded mechanical properties). A liner may serve as a barrier layer between the fuel and the cladding material to mitigate such interatomic diffusion of the elements. For example, a liner may be employed to mitigate interatomic diffusion between the elements of the fuel and the cladding material to avoid, for example, degradation of the fuel and/or cladding material by foreign (and sometimes undesirable) elements. The liner may contain one layer or multiple layers—e.g., at least 2, 3, 4, 5, 6, or more layers. In the case where the liner contains multiple layers, these layers may contain the same or different materials and/or have the same or different properties. For example, in one embodiment, at least some of the layers may include the same material while some include different materials.

[0035] In one embodiment, the liner may include a first region disposed adjacent the fuel and a second region disposed adjacent the cladding material. The region in one embodiment may be a layer or a portion of a layer partially covering an underlying material. Referring to FIGS. 2a-2b, in one embodiment, a liner 23 may include at least two layers 231 and 232. A first region of the liner may be disposed in a first layer 231 and a second region of the liner may be disposed in a second layer 232. The first region may include a first material and the second region may contain a second material. The first material may be the same as or different from the second material. Additional region(s) and/or layers, including one (or more) between the first and second regions, may also be employed.

[0036] The first layer 231 and second layer 232 may each have a thickness; the thickness values may be the same as or different from each other. In one embodiment, the first layer 231 may have a thickness of at least about 20 microns—e.g., at least 30 microns, 40 microns, 60 microns, 80 microns, 100 microns, or larger. The second layer 232 may have a thickness of about 10 microns—e.g., at least 20 microns, 40 microns, 60 microns, 80 microns, 100 microns, or larger. Larger or smaller values are possible. The thickness of the first layer 231 and second layer 232 may be the same or different. The

first layer 564 may be thicker or thinner than the second layer 232, or they may have the same thickness.

[0037] Referring to FIG. 3, in one embodiment, the liner 23 of the fuel element 11 may include an additional transition layer 233 disposed between the first layer 231 and the second layer 232. The transition layer 233 may include at least one of metal, alloy, ceramic, and polymer. In one embodiment, the transition layer may include an epoxy or polymer. The transition layer may be thinner relative to the first and/or second layer. In one embodiment, the transition layer may have a thickness of less than or equal to about 1 to about 10 microns—e.g., about 2 to about 5 microns, about 3 to about 4 microns.

[0038] The respective material of the region (of the layer) may be chosen to have certain properties. For example, the first material (in the case that the first region is adjacent the fuel) may be chosen such that they are adapted to mitigate interatomic diffusion between the first material and the nuclear fuel. Referring to FIG. 4, the atoms 411 of the nuclear fuel 41 and the atoms 421 of the cladding layer 42 may tend to diffuse outwards (see arrows). Similarly, the atoms 4311 of the first layer 431 and the atoms 4321 of the second layer 432 (of the liner 43) may tend to diffuse outwards (see arrows).

[0039] As a result of the mitigation in this embodiment, very little, if any, compound may be formed with elements from the first layer and the fuel. Thus, region 44, which contains atoms 411 and 4311 in FIG. 4 may not exist, if at all; and if it exists, the thickness thereof would be very small, such as smaller than or equal to 20%—e.g., smaller than or equal to 10%, 5%, 2%, 1%, 0.5%, or smaller, of the thickness of the nuclear fuel and/or layer. In another embodiment, the first material and the second material may be chosen such that they are adapted to mitigate interatomic diffusion between the first layer 431 and second layer 432. Thus, region 45, which contains atoms 4311 and 4321 in FIG. 4 may not exist, if at all; and if it exists, the thickness thereof would be very small, such as the aforementioned range of region 44. In another embodiment, the second material may be chosen such that they are adapted to mitigate interatomic diffusion between the second layer 432 and the cladding layer 42. Thus, region 46, which contains atoms 4321 and 421 in FIG. 4 may not exist, if at all; and if it exists, the thickness thereof would be very small, such as the aforementioned range of region 44.

[0040] Mitigation herein may refer to reduction and/or prevention but need not refer to total elimination. In one embodiment, mitigation of interatomic diffusion may refer to prevention of such diffusion to an extent that minimal (or even no) diffusion may be observed. One result of such mitigation is minimal formation of a compound containing elements diffused from different components (generally) observed at the interface between the components. Although in some cases mitigation may describe a lack of presence of foreign elements, in some other instances mitigation may encompass a minimal presence of foreign elements in the material resulting from diffusion from another component (of the fuel element). Accordingly, in one embodiment, mitigation of interatomic diffusion herein may refer to having no significant amount of foreign elements. Thus, as shown in FIG. 4 in one embodiment, the first layer 431 is substantially free of atoms of elements diffused from the cladding 42 and a second layer 432 is substantially free of atoms of elements diffused from the fuel 42. In one embodiment, the fuel element is substantially free of sodium between the fuel 41 and the cladding layer 42.

US 2014/0185733 A1

Jul. 3, 2014

4

[0041]   The fuel elements described herein allow mitigation of interatomic diffusion among the different components of the fuel element. As shown in FIG. 4, in one embodiment, wherein at least one of (i) the first material in the first layer 431 and the second material in the second layer 432; (ii) the first material (in the first layer 431) and the nuclear fuel 41; and (iii) the second material (in the second layer 432) and the cladding layer 42 is substantially free of interatomic diffusion therebetween. In one embodiment, at least one of (i) the fuel 41 and the first layer 431 and (ii) the cladding layer 42 and the second layer 432 is substantially free of interatomic diffusion therebetween. The fuel elements described herein may exhibit substantially free of interatomic diffusion at a wide range of temperatures. For example, it may be observed at a temperature of greater than or equal to room temperature— e.g., at least 50° C., 95° C., 100° C., 150° C., 200° C., 250° C., 300° C., 350° C., 400° C., 450° C., 500° C., 550° C., 600° C., 650° C., 700° C., 750° C., 800° C. or higher.

[0042]   The first material in the first layer 431 and the second material in the second layer 432 (or more in the case that additional materials are present) may each have its own material properties, such as chemical properties, thermal properties, and the like. For example, the material may be selected because it is inert with respect to the component adjacent to it (fuel or cladding). For example, any of these materials may include at least one refractory material. A refractory material may include a refractory metal or alloy, which includes a material having at least one element chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf. In one embodiment, the first material includes the at least one element chosen from V and Cr. In one embodiment, the first material includes V. In another embodiment, the second includes the element Zr.

[0043]   In at least one embodiment, the fuel elements described need not contain sodium therein. Several pre-existing techniques employ Na in the fuel element to form a molten layer between the fuel and cladding to provide thermal contact between the fuel and cladding. However, sodium in these pre-existing techniques may parasitically absorb neutrons or scatter neutrons. The fuel elements described herein include the liner, which is in contact with both the cladding and the fuel, and thus need not contain sodium to promote such contact. Although sodium is not needed, sodium may still be employed in some embodiments of the fuel elements described herein.

[0044]   At least some of the components of the fuel elements may be bonded. The bonding may be physical (e.g., mechanical) or chemical. In one embodiment, the nuclear fuel, the liner, and the cladding are mechanically bonded. In one embodiment, the first layer and the second layer are mechanically bonded. The bonding techniques are described further below.

Fuel Element Separator

[0045]   The fuel elements described herein may additionally contain at least one separator between the nuclear fuels. For example, in one embodiment is a fuel element, the fuel element comprising: first and second nuclear fuels, each of the first and second nuclear fuels having a first end and a second end; and a cladding layer disposed exterior to at least one of the first and second nuclear fuels; and a separator disposed between a first end of one of the first and second nuclear fuels and a second end of the other of the first and second nuclear fuels. The separator may include a first region

contacting the first end of one of the first and second fuel elements and a second region contacting the second end of the other of the first and second fuel elements. The fuel element may be any of those described herein. In this one embodiment, a separator may be disposed between a first end of one of the first and second fuel elements and a second end of the other of the first and second fuel elements.

[0046]   Referring to FIG. 5, the separator 51 may have any configuration and composition. For example, the separator may be configured to be similar to the liner described herein. In other words, in the case wherein the different fuels 52 and 53 are arranged axially, the separator 51 may be adapted to mitigate expansion of the nuclear fuel in an axial direction. FIGS. 5a-5b illustrate schematics of a fuel element with a separator 51 between a first fuel 52 and second fuel 53. FIG. 5a shows all of the components when they are in contact with one another and FIG. 5b shows them not in contact (for illustration purpose). In this embodiment, the separator 51 may include a first region (e.g., in a first layer 511) contacting the first end 521 of one of the first and second fuel elements— in this example, it is the first fuel element 52. The separator 51 may include a second region (e.g., in a first layer 512) contacting the second end 431 of the other of the first and second fuel elements—in this example, it is the second fuel element 53. In one embodiment, the separate 51 is adapted to mitigate interatomic diffusion between the nuclear fuel and the cladding layer at at least one of the first end 521 of the first nuclear fuel 52 or the second end of the second nuclear fuel 53. More than a separator may be used, just as more than two fuels may be present in the fuel element. In one embodiment, the fuel element may have a second (or more) additional separator(s) disposed proximally over a bottom surface of the cylindrical fuel element. This additional separator may serve as an end cap of the fuel element.

[0047]   Similar to the liner described herein, the separator may include at least a first separator layer 511 including the first region and a second layer 512 including the second region. In one embodiment, the first region of the separator may include at least one material chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf. In another embodiment, the second region of the separator may include at least one material chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf.

Methods of Making/Using the Fuel Element

[0048]   The fuel element, and an fuel assembly including the fuel element, described herein may be manufactured by a variety of techniques. Referring to FIG. 6a, provided in one embodiment is a method of making an article, which may be a fuel element. The method may include providing a nuclear fuel and a cladding layer (step 601); disposing a first layer of a liner exterior an annular nuclear fuel, the first layer contacting the annular nuclear fuel (step 602); and disposing a second layer of the liner interior to the cladding layer, the second layer contacting the cladding (step 603). In one embodiment, the second layer may be disposed over the first layer. Disposing may involve plating (e.g., electroplating), vapor deposition (e.g., chemical or physical vapor deposition), or other suitable methods. For example, electrochemical coating may be employed.

[0049]   For example, a liner (which may be any of those described herein) may be disposed over the fuel, such as exterior to the fuel. In another embodiment, a first layer of the liner may be disposed over the fuel and a second layer of the

5

liner may be disposed over the cladding. The first layer and the second layer in this embodiment may subsequently be joined together, by, for example, bonding by heating. Other alternative orders of steps of forming the different components of the fuel element may also be employed, depending on the application.

[0050] Additional processing may be employed. Referring to FIG. 6b, the process may further comprise disposing a second layer over the first layer of the liner (step 604). Referring to FIG. 6c, the process may further comprise bonding the first layer and the second layer (step 605) of the liner. In one embodiment, the first and second layers of the liner, as well as the other components of the fuel element, may be bonded, as described above. The bonding may be chemical or physical bonding. An example of physical bonding may be mechanical bonding. In one embodiment, mechanical bonding may include swaging. Referring to FIG. 6d, swaging may be conducted for at least two of the annular fuel, the liner, and the cladding (step 606). In one embodiment, swaging is applied to all of these components of a fuel element. In one embodiment, the fuel, such as an annular fuel, may be coated by a liner by deposition, such as vapor deposition (physical or chemical vapor deposition), with a cladding swaged thereover. Referring to FIG. 6e, in one embodiment the method may further comprise performing on the annular nuclear fuel at least one process chosen from casting, extruding, pilgering, tube welding, and seamless-welding (step 607). In one embodiment, the layers of the liners may be co-extruded over the fuel. In another embodiment, the liner(s) and/or fuel may be slid into the cavity of the cladding to create contact and to make a fuel element.

[0051] The method may further comprise a method of making the fuel. Referring to FIG. 7, the fuel may be formed by pressing and/or sintering particles containing the fuel (which may be any of those described herein) into a desired shape (step 701)—e.g., a rod. The fuel may be additionally densified (step 702) to avoid internal voids and to increase the density to close to theoretical density of the fuel. After a rod-shape fuel is formed, the rod may be cast into a mold to form a final product (step 703). In this embodiment that involves casting, pressing and sintering need not be employed. The process of making the fuel may further involve at least one process chosen from casting, extruding, pilgering, tube welding, and seamless-welding. For example, in one embodiment, casting of the fuel may be employed directly within the fuel element internal to the liner and/or cladding.

[0052] In one embodiment, by changing the processing parameter, the microstructure, and thus the material properties, of the components of the fuel elements may be tailored. The processing parameter may refer to temperature, pressure, etc. Referring to FIG. 8, the methods of making a fuel element described herein may further comprise heating the nuclear fuel to a first temperature of at least a beta-transition temperature of the nuclear fuel (step 801); and cooling the annular nuclear fuel to a second temperature that is lower than the first temperature (step 802). The cooling from the beta-transition temperature may be sufficiently fast such that such cooling is considered a beta-quenching. In one embodiment, because the gamma transition temperature is higher than the beta-transition temperature, the temperature to which the fuel is heated may include (or even exceed) gamma-transition temperature. The temperature variation and the rates thereof may be carried out, for example, under a condition that promotes formation of equiaxed grains. In one embodiment, the

employment of beta-quenching may minimize formation of a preferred orientation in the grain and instead may promote grain isotropy, including at least radial isotropy. In one embodiment wherein the fuel contains grain preferred orientation after extrusion, subjecting the fuel to beta-quenching may minimize such preferred orientation and instead promote isotropy—e.g., uniform distribution of crystal phases.

[0053] The fuel element, and a fuel assembly including the fuel element, described herein may be employed in a variety of applications. For example, referring to FIG. 9a, provided in one embodiment is a method of using a fuel assembly. The method may comprise providing a fuel assembly comprising a plurality of fuel elements (step 901); the fuel elements may be any of the fuel elements described herein and cladding disposed exterior to the liner. The fuel assembly may be used to generate energy (step 902). The fuel assembly may be used to mitigate interatomic diffusion (step 903) between at least one of (i) the first material and the second material; (ii) the first material and the nuclear fuel; and (iii) the second material and the cladding layer. Referring to FIG. 9b, the liner may include at least a first liner layer including a first region and a second liner layer including a second region (as a part of step 904). In one embodiment, the liner may include a first region disposed adjacent the nuclear fuel and including a first material, and a second region disposed adjacent the cladding layer and including a second material that is different from the first material.

[0054] Depending on the application, the conditions in the steps involved in the methods may vary. For example, referring to FIG. 9c, the generation of energy may be carried out at a temperature of at least 300° C. (step 905)—e.g., at least 350° C., at least 400° C., at least 450° C., at least 500° C., or more. Referring to FIG. 9d, as a result of the mitigating ability of the liner of the fuel element described herein, in one embodiment after generating energy, the first region of the fuel is substantially free of elements from the cladding material, and the second region is substantially free of elements from the annular nuclear fuel (step 906). Referring to FIG. 9e, in one embodiment, the fuel is substantially free of sodium between the annular fuel and the cladding (as a part of step 907).

## Power Generation

[0055] As described above, the fuel assemblies described herein may be a part of a power or energy generator, which may be a part of a power generating plant. The fuel assembly may be a nuclear fuel assembly. In one embodiment, the fuel assembly may include a fuel, a plurality of fuel elements, and a plurality of fuel ducts, such as those described above. The fuel ducts may include the plurality of fuel elements disposed therein.

[0056] At least some of fuel assemblies described herein may include interstitial spaces among the plurality of the fuel ducts. The interstitial spaces may be defined as the space between the plurality of the fuel ducts. At least one of a coolant, inert gas, fuel material, and a monitoring device can be disposed in at least some of these interstitial spaces. The interstitial spaces may be empty or may include certain materials. For example, in the interstitial spaces may be at least one of a coolant, inert gas, and fuel material. The coolant and/or fuel material may be any of those described above. An inert gas may be any of those known in the art—e.g., nitrogen, a noble gas (e.g., argon, helium, etc). In some embodiments, the interstitial spaces may include an instrument, such as any of those described above that may be present in the interior of

the first hollow structure or the space between the first and second hollow structure. In one embodiment, the instrument is a monitoring device monitoring the operation conditions of the fuel assembly.

[0057]   The fuel assembly described herein may be adapted to produce a peak areal power density of at least about 50 MW/m$^2$—e.g., at least about 60 MW/m$^2$, about 70 MW/m$^2$, about 80 MW/m$^2$, about 90 MW/m$^2$, about 100 MW/m$^2$, or higher. In some embodiments, the fuel assembly may be subjected to radiation damage at a level of at least about 120 displacements per atom ("DPA") –e.g., at least about 150 DPA, about 160 DPA, about 180 DPA, about 200 DPA, or higher.

[0058]   All of the U.S. patents, U.S. patent application publications, U.S. patent applications, foreign patents, foreign patent applications and non-patent publications referred to in this specification and/or listed in any Application Data Sheet, are incorporated herein by reference in their entirety, to the extent not inconsistent herewith. In the event that one or more of the incorporated literature and similar materials differs from or contradicts this application, including but not limited to defined terms, term usage, described techniques, or the like, this application controls.

[0059]   With respect to the use of substantially any plural and/or singular terms herein, those having skill in the art can translate from the plural to the singular and/or from the singular to the plural as is appropriate to the context and/or application. The various singular/plural permutations are not expressly set forth herein for sake of clarity.

[0060]   The herein described subject matter sometimes illustrates different components contained within, or connected with, different other components. It is to be understood that such depicted architectures are merely exemplary, and that in fact many other architectures may be implemented which achieve the same functionality. In a conceptual sense, any arrangement of components to achieve the same functionality is effectively "associated" such that the desired functionality is achieved. Hence, any two components herein combined to achieve a particular functionality can be seen as "associated with" each other such that the desired functionality is achieved, irrespective of architectures or intermedial components. Likewise, any two components so associated can also be viewed as being "operably connected," or "operably coupled," to each other to achieve the desired functionality, and any two components capable of being so associated can also be viewed as being "operably couplable," to each other to achieve the desired functionality. Specific examples of operably couplable include but are not limited to physically mateable and/or physically interacting components, and/or wirelessly interactable, and/or wirelessly interacting components, and/or logically interacting, and/or logically interactable components.

[0061]   In some instances, one or more components may be referred to herein as "configured to," "configured by," "configurable to," "operable/operative to," "adapted/adaptable," "able to," "conformable/conformed to," etc. Those skilled in the art will recognize that such terms (e.g. "configured to") can generally encompass active-state components and/or inactive-state components and/or standby-state components, unless context requires otherwise.

[0062]   While particular aspects of the present subject matter described herein have been shown and described, it will be apparent to those skilled in the art that, based upon the teachings herein, changes and modifications may be made without

departing from the subject matter described herein and its broader aspects and, therefore, the appended claims are to encompass within their scope all such changes and modifications as are within the true spirit and scope of the subject matter described herein. It will be understood by those within the art that, in general, terms used herein, and especially in the appended claims (e.g., bodies of the appended claims) are generally intended as "open" terms (e.g., the term "including" should be interpreted as "including but not limited to," the term "having" should be interpreted as "having at least," the term "includes" should be interpreted as "includes but is not limited to," etc.). It will be further understood by those within the art that if a specific number of an introduced claim recitation is intended, such an intent will be explicitly recited in the claim, and in the absence of such recitation no such intent is present. For example, as an aid to understanding, the following appended claims may contain usage of the introductory phrases "at least one" and "one or more" to introduce claim recitations. However, the use of such phrases should not be construed to imply that the introduction of a claim recitation by the indefinite articles "a" or "an" limits any particular claim containing such introduced claim recitation to claims containing only one such recitation, even when the same claim includes the introductory phrases "one or more" or "at least one" and indefinite articles such as "a" or "an" (e.g., "a" and/or "an" should typically be interpreted to mean "at least one" or "one or more"); the same holds true for the use of definite articles used to introduce claim recitations. In addition, even if a specific number of an introduced claim recitation is explicitly recited, those skilled in the art will recognize that such recitation should typically be interpreted to mean at least the recited number (e.g., the bare recitation of "two recitations," without other modifiers, typically means at least two recitations, or two or more recitations). Furthermore, in those instances where a convention analogous to "at least one of A, B, and C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, and C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). In those instances where a convention analogous to "at least one of A, B, or C, etc." is used, in general such a construction is intended in the sense one having skill in the art would understand the convention (e.g., "a system having at least one of A, B, or C" would include but not be limited to systems that have A alone, B alone, C alone, A and B together, A and C together, B and C together, and/or A, B, and C together, etc.). It will be further understood by those within the art that typically a disjunctive word and/or phrase presenting two or more alternative terms, whether in the description, claims, or drawings, should be understood to contemplate the possibilities of including one of the terms, either of the terms, or both terms unless context dictates otherwise. For example, the phrase "A or B" will be typically understood to include the possibilities of "A" or "B" or "A and B."

[0063]   With respect to the appended claims, those skilled in the art will appreciate that recited operations therein may generally be performed in any order. Also, although various operational flows are presented in a sequence(s), it should be understood that the various operations may be performed in other orders than those which are illustrated, or may be performed concurrently. Examples of such alternate orderings may include overlapping, interleaved, interrupted, reordered,

incremental, preparatory, supplemental, simultaneous, reverse, or other variant orderings, unless context dictates otherwise. Furthermore, terms like "responsive to," "related to," or other past-tense adjectives are generally not intended to exclude such variants, unless context dictates otherwise.

[0064]   Those skilled in the art will appreciate that the foregoing specific exemplary processes and/or devices and/or technologies are representative of more general processes and/or devices and/or technologies taught elsewhere herein, such as in the claims filed herewith and/or elsewhere in the present application.

[0065]   While various aspects and embodiments have been disclosed herein, other aspects and embodiments will be apparent to those skilled in the art. The various aspects and embodiments disclosed herein are for purposes of illustration and are not intended to be limiting, with the true scope and spirit being indicated by the following claims.

[0066]   Any portion of the processes described herein may be automated. The automation may be accomplished by involving at least one computer. The automation may be executed by program that is stored in at least one non-transitory computer readable medium. The medium may be, for example, a CD, DVD, USB, hard drive, etc. The selection and/or design of the fuel element structure, including the assembly, may also be optimized by using the computer and/or a software program.

[0067]   The above-described embodiments of the invention can be implemented in any of numerous ways. For example, some embodiments may be implemented using hardware, software or a combination thereof. When any aspect of an embodiment is implemented at least in part in software, the software code can be executed on any suitable processor or collection of processors, whether provided in a single computer or distributed among multiple computers.

[0068]   Also, the technology described herein may be embodied as a method, of which at least one example has been provided. The acts performed as part of the method may be ordered in any suitable way. Accordingly, embodiments may be constructed in which acts are performed in any order different from that illustrated, which may include performing some acts simultaneously, even though shown as sequential acts in illustrative embodiments.

[0069]   All definitions, as defined and used herein, should be understood to control over dictionary definitions, definitions in documents incorporated by reference, and/or ordinary meanings of the defined terms.

[0070]   The indefinite articles "a" and "an," as used herein in the specification and in the claims, unless clearly indicated to the contrary, should be understood to mean "at least one."

[0071]   The phrase "and/or," as used herein in the specification and in the claims, should be understood to mean "either or both" of the elements so conjoined, i.e., elements that are conjunctively present in some cases and disjunctively present in other cases. Multiple elements listed with "and/or" should be construed in the same fashion, i.e., "one or more" of the elements so conjoined. Other elements may optionally be present other than the elements specifically identified by the "and/or" clause, whether related or unrelated to those elements specifically identified. Thus, as a non-limiting example, a reference to "A and/or B", when used in conjunction with open-ended language such as "including" can refer, in one embodiment, to A only (optionally including elements other than B); in another embodiment, to B only (optionally

including elements other than A); in yet another embodiment, to both A and B (optionally including other elements); etc.

[0072]   As used herein in the specification and in the claims, "or" should be understood to have the same meaning as "and/or" as defined above. For example, when separating items in a list, "or" or "and/or" shall be interpreted as being inclusive, i.e., the inclusion of at least one, but also including more than one, of a number or list of elements, and, optionally, additional unlisted items. Only terms clearly indicated to the contrary, such as "only one of or "exactly one of," or, when used in the claims, "consisting of," will refer to the inclusion of exactly one element of a number or list of elements. In general, the term "or" as used herein shall only be interpreted as indicating exclusive alternatives (i.e. "one or the other but not both") when preceded by terms of exclusivity, such as "either," "one of," "only one of," or "exactly one of." "Consisting essentially of," when used in the claims, shall have its ordinary meaning as used in the field of patent law.

[0073]   As used herein in the specification and in the claims, the phrase "at least one," in reference to a list of one or more elements, should be understood to mean at least one element selected from any one or more of the elements in the list of elements, but not necessarily including at least one of each and every element specifically listed within the list of elements and not excluding any combinations of elements in the list of elements. This definition also allows that elements may optionally be present other than the elements specifically identified within the list of elements to which the phrase "at least one" refers, whether related or unrelated to those elements specifically identified. Thus, as a non-limiting example, "at least one of A and B" (or, equivalently, "at least one of A or B," or, equivalently "at least one of A and/or B") can refer, in one embodiment, to at least one, optionally including more than one, A, with no B present (and optionally including elements other than B); in another embodiment, to at least one, optionally including more than one, B, with no A present (and optionally including elements other than A); in yet another embodiment, to at least one, optionally including more than one, A, and at least one, optionally including more than one, B (and optionally including other elements); etc.

[0074]   Any ranges cited herein are inclusive. The terms "substantially" and "about" used throughout this Specification are used to describe and account for small fluctuations. For example, they can refer to less than or equal to ±5%, such as less than or equal to ±2%, such as less than or equal to ±1%, such as less than or equal to ±0.5%, such as less than or equal to ±0.2%, such as less than or equal to ±0.1%, such as less than or equal to ±0.05%.

[0075]   In the claims, as well as in the specification above, all transitional phrases such as "including," "including," "carrying," "having," "containing," "involving," "holding," "composed of," and the like are to be understood to be open-ended, i.e., to mean including but not limited to. Only the transitional phrases "consisting of and "consisting essentially of shall be closed or semi-closed transitional phrases, respectively, as set forth in the United States Patent Office Manual of Patent Examining Procedures, Section 2111.03.

[0076]   The claims should not be read as limited to the described order or elements unless stated to that effect. It should be understood that various changes in form and detail may be made by one of ordinary skill in the art without departing from the spirit and scope of the appended claims. All embodiments that come within the spirit and scope of the following claims and equivalents thereto are claimed.

8

**1.** An article, comprising:

an annular nuclear fuel;

a liner disposed exterior to the annular nuclear fuel; and

a cladding layer disposed exterior to the liner;

wherein the liner includes a first region disposed adjacent the nuclear fuel and including a first material, and a second region disposed adjacent the cladding layer and including a second material that is different from the first material.

**2.** The article of claim 1, wherein the first material is adapted to mitigate interatomic diffusion between the first material and the annular nuclear fuel.

**3.** The article of claim 1, wherein the first material and the second material are adapted to mitigate interatomic diffusion between the first and second material.

**4.** The article of claim 1, wherein the second material is adapted to mitigate interatomic diffusion between the second material and the cladding.

**5.** The article of claim 1, wherein the nuclear fuel includes at least one fuel chosen from U, Th, Am, Np, and Pu.

**6.** The article of claim 1, wherein the nuclear fuel includes at least one refractory material chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf.

**7.** The article of claim 1, wherein the cladding layer includes at least one material chosen from a metal, a metal alloy, and a ceramic.

**8.** The article of claim 1, wherein the cladding layer includes a steel, substantially all of which has at least one phase chosen from a martensite phase, a ferrite phase, and an austenitic phase.

**9.** The article of claim 1, wherein the cladding layer includes at least one steel chosen from a martensitic steel, a ferritic steel, an austenitic steel, an oxide-dispersed steel, T91 steel, T92 steel, HT9 steel, 316 steel, and 304 steel.

**10.** The article of claim 1, wherein the nuclear fuel, the liner, and the cladding layer are mechanically bonded.

**11.** The article of claim 1, wherein the first region of the liner is disposed in a first layer and the second region of the liner is disposed in a second layer.

**12.** The article of claim 11, wherein the first layer and the second layer are mechanically bonded.

**13.** The article of claim 2, wherein at least one of the first material and the second material includes at least one material chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf.

**14.** The article of claim 1, wherein the nuclear fuel includes at least 90 wt % of U.

**15.** A power-generating reactor, including the article of claim 1.

**16.** A nuclear fuel element, comprising:

an annular nuclear fuel;

a liner disposed exterior to the nuclear fuel, the liner including a first layer contacting the nuclear fuel and a second layer, and

a cladding layer disposed exterior to the liner, the cladding layer including at least one material chosen from a metal, a metal alloy, and a ceramic, the cladding contacting the second layer of the liner.

**17.** The nuclear fuel element of claim 16, wherein the nuclear fuel includes at least one refractory material chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf.

**18.** The nuclear fuel element of claim 16, wherein the nuclear fuel includes at least 90 wt % of U.

**19.** The nuclear fuel element of claim 16, wherein the cladding layer includes at least one material chosen from Cr, C, Mo, Ni, Mn, V, W, Si, Cu, N, S, and P.

**20.** The nuclear fuel element of claim 16, wherein the cladding layer includes at least one steel chosen from a martensitic steel, a ferritic steel, an austenitic steel, an oxide-dispersed steel, T91 steel, T92 steel, HT9 steel, 316 steel, and 304 steel.

**21.** The nuclear fuel element of claim 16, wherein the first layer includes at least one material chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf.

**22.** The nuclear fuel element of claim 16, wherein the second layer includes at least one material chosen from Nb, Mo, Ta, W, Re, Zr, V, Ti, Cr, Ru, Rh, Os, Ir, Nd, and Hf.

**23.** The nuclear fuel element of claim 16, wherein the first layer has a thickness of about 20 microns.

**24.** The nuclear fuel element of claim 16, wherein the second layer has a thickness of about 10 microns.

**25.** The nuclear fuel element of claim 16, wherein at least one of (i) the nuclear fuel and the first layer and (ii) the cladding layer and the second layer is substantially free of interatomic diffusion therebetween at a temperature of greater than or equal to room temperature.

**26.** The nuclear fuel element of claim 16, wherein at least one of (i) the nuclear fuel and the first layer and (ii) the cladding and the second layer is substantially free of interatomic diffusion therebetween at a temperature greater than or equal to about 95° C.

**27.** The nuclear fuel element of claim 16, wherein the first layer and the second layer are substantially free of interatomic diffusion therebetween at a temperature of greater than or equal to 350° C.

**28.** The nuclear fuel element of claim 16, wherein the first layer and the second layer are substantially free of interatomic diffusion therebetween.

**29.** The nuclear fuel element of claim 16, further comprising a transition layer disposed between the first layer and the second layer and having a thickness of less than or equal to about 2 to about 5 microns.

**30.** The nuclear fuel element of claim 16, wherein the first layer is substantially free of atoms of elements diffused from the cladding.

**31.** The nuclear fuel element of claim 16, wherein the second layer is substantially free of atoms of elements diffused from the fuel.

**32.** The nuclear fuel element of claim 16, wherein the first layer and the second layer include different materials.

**33.** The nuclear fuel element of claim 16, wherein the nuclear fuel element is substantially free of sodium between the nuclear fuel and the cladding layer.

**34.** A power-generating reactor, including the nuclear fuel element of claim 16.

**35.** A power plant, including the nuclear fuel element of claim 16.

**36-60.** (canceled)

* * * * *

**EXHIBIT F**

INL and TerraPower Agreement Development Background
for Clarification of CRADA Generated Information

August 5, 2015

## Purpose:

This document provides background information associated with the planning and establishment of existing Cooperative Research and Development Agreements (CRADAs) between the Idaho National Laboratory (INL) and TerraPower, hereinafter referred to jointly as "Parties." This information may be used to infer the initial intent of both Parties to perform work pursuant to the nature of a CRADA and as examples to clarify the definition and boundaries of CRADA Generated Information. Recently, questions from both Parties have developed regarding the definition of Generated Information and what is considered to fall within a CRADA to the point where some work has been stopped, which is currently impacting TerraPower's irradiation testing schedule.

## Background:

The first Statement of Work associated with the development of an agreement between the Parties was drafted by TerraPower in March 2011 to propose INL helping them understand fast reactor metallic fuel behavior. The main objective was to "... *leverage Contractor's specific expertise in metallic fuel irradiation behavior, fabrication, and fast reactor structural materials*"[1] for the development of TerraPower's Traveling Wave Reactor (TWR) design.

Initially INL would provide TerraPower with prior fast reactor fuels experimental data [irradiation testing and post-irradiation examination (PIE) information] from historical DOE-owned Fast Flux Test Facility (FFTF) and Experimental Breeder Reactor II (EBR-II) experiments. This data was created in the 1980's and 1990's to support DOE in the development of fast reactor fuels. The Parties would then jointly evaluate the data to determine if additional PIE would be needed to complete the desired spectrum of parameters or "fill in the gaps" to support modeling of metallic fuel irradiation performance. "*There is mutual interest for Contractor and Participant to review the existing archive data of these experiments, and to perform additional PIE to address specific fuel performance questions.*"[2] The PIE plan for the additional PIE would be developed jointly by both Parties. In addition, TerraPower would fund INL to perform fresh fuel characterization of an FFTF and EBR-II fuel rod (uranium-alloy fuel inside a sealed cladding tube) for comparison to the PIE results and to evaluate historic metallic fuel fabrication techniques. "*Results of these activities are envisioned to be shared and exchanged between the Parties to enhance the research activities to be performed under this CRADA.*"[2]

Another notable activity would be INL's participation in Quarterly Workshops to include discussions on the previously noted historical fast reactor experiment data, fuel and component fabrication evaluations, and development of scientific models of irradiation behavior. The Workshops would also include: 1) discussions regarding planning for the other agreements

---

[1] CRADA No. 11-CR-19 between Battelle Energy Alliance, LLC and TerraPower, LLC; Appendix A Statement of Work "TP-1 Metallic Fuel and Materials Development," Section I. Background and Purpose

[2] CRADA No. 11-CR-19 between Battelle Energy Alliance, LLC and TerraPower, LLC; Appendix A Statement of Work "TP-1 Metallic Fuel and Materials Development," Section II. Scope of Work

INL and TerraPower Agreement Development Background
for Clarification of CRADA Generated Information

August 5, 2015

described in this document, 2) Transient Reactor Test Facility capabilities and transient testing, 3) INL PIE capabilities, and 4) INL plans and results associated with irradiation testing, PIE, and fuel cladding chemical interaction (FCCI) experiments.

While planning for a new agreement, both Parties discussed options for protecting Generated Information (archive experiment data not included). TerraPower proposed a list of deliverables, and INL noted the deliverables would need to be reviewed and considered for protection. Options regarding Protected CRADA Information, doing the work pursuant to a Work for Others (WFO) agreement (for longer protection), invention terms, and patent license agreements were discussed. INL also described TerraPower's obligations under the U.S. Competitiveness Clause. The Parties jointly determined that the appropriate agreement for this work would be a CRADA, and the original CRADA (No. 11-CR-19) to perform the previously noted activities was approved on October 3, 2011.

Also in October 2011, TerraPower began discussing performing irradiation testing experiments in the Advanced Test Reactor (ATR). They described conceptually what they wanted to test and the description was very close to that of experiments that had been, were being, and were planned to be performed by the Fuel Cycle Research and Development (FCRD) DOE program (i.e. the Advanced Fuel Cycle (AFC)-3/4 test series). *"The similarities between the two development efforts suggest that an integrated test program between the Participant and DOE's FCT program could be of benefit to both organizations."*[3] TerraPower requested to partner with the FCRD program to do additional experiments that were of interest to TerraPower. The TerraPower experiments would utilize the existing AFC - Outboard A experiment design and the FCRD program would provide the nuclear material and cladding for the experiment as well as pay for all associated irradiation charges and irradiated waste disposition costs. This would be a significant cost savings for TerraPower, and their experiment could be inserted in the reactor sooner. *"Contractor and Participant will jointly develop experiment specifications and determine the best method to fabricate and or coat the fuel slugs"*[3] (annular uranium-alloy). This would include development of fabrication methods associated with uranium-alloy addition and engagement of the Y-12 National Security Complex (Y-12) to develop the fuel slug heat treatment process to be used at INL for AFC-4B. The Parties then jointly developed a new CRADA (No. 12-CR-24) to include these experiments. CRADA 12-CR-24 was approved in July 2012, and *"The Parties anticipate that no Protected Information will be produced in the course of the CRADA."*[4]

TerraPower's conceptual design for experiments included barriers that were meant to protect the experiment cladding from FCCI which could damage the cladding during irradiation. TerraPower's original plan was to apply a barrier on the surface of the fuel slugs and they established an agreement with Y-12 to develop a method to apply barrier materials on the outer surface of fuel slugs to enable testing of the barrier concept.

---

[3] CRADA No. 12-CR-24 between Battelle Energy Alliance, LLC and TerraPower, LLC; Appendix A Statement of Work "CRADA 12-CR-24 Experiments," Section I. Background and Purpose

[4] CRADA No. 12-CR-24 between Battelle Energy Alliance, LLC and TerraPower, LLC; Article VIII: Obligations as to Protected CRADA Information; Paragraph A

INL and TerraPower Agreement Development Background
for Clarification of CRADA Generated Information

August 5, 2015

However, INL advised TerraPower that INL had already researched applying barriers to the surface of fuel slugs (e.g. the X492 experiment in EBR-II). The U.S. program abandoned work on an FCCI barrier applied to the fuel surface, believing it would not work since fuel swelling would quickly rupture the barrier. Therefore, INL was working on coating/lining the cladding inner surface. (U.S. work on claddings/liners on cladding inside diameter (ID) had begun during the Integral Fast Reactor (IFR) program of late 1980's and continues to this present time in the FCRD/AFC programs. In addition, as mentioned above, the IFR program cast fuel into thin zirconium (Zr) tubes (experiment X492) with the primary objective to eliminate quartz mold waste – the potential benefits in FCCI were a secondary goal; but the Argonne National Laboratory (ANL) in Chicago did make cladding with vanadium/vanadium-alloy (V/V-alloy) liners and ANL/Central Research Institute of Electric Power Industry worked on lining oxide dispersion strengthened (ODS) cladding (MA957) with Zr liners.)

INL development work for application of a barrier to the interior of the cladding was in progress at Texas A&M University (TAMU) pursuant to Standard Research Contract No. 00124068. With this understanding, TerraPower planned to use cladding with barriers from TAMU; however, the TAMU process development was not progressing to TerraPower's desired schedule. So, TerraPower established agreements with Veridiam and U. S. Photonics Inc. to develop a process to apply barriers on the inside of cladding. Under CRADA 12-CR-24, the FCRD program provided the cladding material for process development by Veridiam and U.S. Photonics. The FCRD provided cladding (with Veridiam and U.S. Photonics barriers) was used to fabricate the AFC-4B experiment that is currently in ATR. Both Parties jointly determined that material application on the fuel slugs by Y-12 to test the barrier concept was not necessary. In addition to the experiments developed pursuant to 12-CR-24, FCRD agreed to share other experiment results of relevant fuel forms with TerraPower; however, INL noted that some of the previous, on-going, and future barrier work information could not be shared due to other agreements (i.e., a CRADA with KAERI that included work on coatings).

In October 2012, TerraPower proposed to add a task to 11-CR-19 for INL to perform a technical assessment of possible fuel slug fabrication methods for TerraPower's prototype and commercial reactor plants. The task was added and INL performed the assessment. Based on this assessment, TerraPower proposed additional tasks for INL to procure (at TerraPower's expense) an extrusion press and develop a conceptual design for TerraPower's fuel slug fabrication facility. These tasks were also added to 11-CR-19 and, in January 2013, TerraPower proposed establishing a new CRADA (No. 13-CR-13) to install the extrusion press and other supporting equipment in the Experimental Fuels Facility (EFF) at the Materials and Fuels Complex (MFC) and develop fuel rod fabrication capabilities. The objective of 13-CR-13 was to "...*leverage the Contractor's specific expertise in metallic fuel fabrication and assist the Participant in meeting their fuel fabrication research objectives.*"[5] CRADA 13-CR-13 was approved May 31, 2013.

---

[5] CRADA No. 13-CR-13 between Battelle Energy Alliance, LLC and TerraPower, LLC; Appendix A Statement of Work "Fuel Fabrication and Test Pin Fabrication Development," Section I. Background and Purpose

INL and TerraPower Agreement Development Background
for Clarification of CRADA Generated Information

August 5, 2015

In December 2012, TerraPower introduced their plans to perform irradiation testing at the BOR-60 reactor at the Research Institute of Atomic Reactors in Russia. Another new CRADA (No. 13-CR-15) was proposed for actual fabrication of the BOR-60 experiments using those fabrication capabilities developed pursuant to 13-CR-13. The objective of 13-CR-15 was to "…*leverage Contractor's specific expertise in metallic fuel irradiation behavior, fuel fabrication, irradiation testing, post-irradiation examination, and fast reactor structural materials.* "[6] CRADA 13-CR-15 was approved May 14, 2013.

Tasks for INL support of technical discussions on welding and fabrication of ferritic-martensitic components to support TerraPower's Materials and Development and Irradiation Test Program and for fabrication of a BOR-60 materials irradiation test were also later added to 11-CR-19. All 11-CR-19 Generated Information associated with fresh fuel characterization and additional PIE and the fuel fabrication assessment and fuel fabrication facility conceptual design were designated Protected CRADA Information. It was later determined by INL, and TerraPower concurs, that the information should not be Protected CRADA Information, and the designation would be corrected in the next modification to the Statement of Work.

**Issues:**

1. Proprietary Information:

On March 5, 2015, both Parties met in Idaho Falls for a Quarterly Review Meeting. At this meeting TerraPower proposed that the fuel compositions (uranium-alloy elements and element concentration in the uranium) and the fuel slug heat treatment process for experiments AFC-4B (five capsules currently in ATR) and AFC-4D (two new capsules not yet fabricated) become TerraPower Proprietary Information. After discussions and disagreements between both Parties, TerraPower management stopped work on AFC-4D fabrication until the issue could be resolved. On April 3, 2015 TerraPower management sent the same request formally to INL. Fabrication of AFC-4D is still on hold pending resolution.

The uranium-alloy elements, concentration of those elements in the uranium, and the heat treatment process are determined to obtain the desired microstructure of the fuel slug during fabrication. INL researchers believe that these parameters were developed jointly by both Parties, are CRADA Generated Information, and therefore cannot be TerraPower Proprietary Information as defined in the Terms and Conditions of 12-CR-24.

Regarding the heat treatment process, during the course of establishing and performing the CRADA, TerraPower established a WFO agreement with Y-12 to develop a heat treatment process while INL was developing the capability for heat treatment for the AFC-4B experiment pursuant to 12-CR-24. INL was not a party to the Y-12 WFO and Y-12 was not a party to 12-CR-24. TerraPower believes that the heat treatment process was developed at Y-12 pursuant to their WFO agreement with Y-12, and therefore, the process parameters are TerraPower

---

[6] CRADA No. 13-CR-15 between Battelle Energy Alliance, LLC and TerraPower, LLC; Appendix A Statement of Work "Support of TerraPower Fast Spectrum Fuels Tests," Section I. Background and Purpose

INL and TerraPower Agreement Development Background
for Clarification of CRADA Generated Information

August 5, 2015

---

Proprietary Information. However, email correspondence indicates that 12-CR-24 was in effect while the process parameters were being developed and that INL researchers provided input or further refined certain aspects of the heat treatment parameters.

NOTE: After numerous discussions between INL and TerraPower, on July 20 2015, TerraPower informed INL that they will no longer pursue designating the heat treatment process as TerraPower Proprietary Information, nor as Protected CRADA Information.

2. Possible Subject Invention

In early 2014 a TerraPower employee unofficially commented that TerraPower had submitted a patent application associated with 'coatings and liners'. This caused concerns with INL researchers because their perception was that TerraPower was trying to patent ideas and research that the U.S. Government had been funding for decades. On November 6, 2014 a meeting was held at TerraPower's Idaho Falls office. During the meeting, and as documented in the TerraPower prepared meeting minutes, BEA asked TerraPower management if TerraPower had filed any patent applications or Invention Disclosures to date that may be considered as being under the CRADAs, the answer was "*No*".

However, on March 14, 2015, INL was informed that, in March 2013, TerraPower had filed a U.S. Patent titled "Nuclear Fuel Element" that disclosed embodiments including fuel assemblies, methods of making a fuel element, and methods of using a fuel element. The patent application (No. 13/794,633) included descriptions of an invention with characteristics (cladding with coatings and liners) similar to those described by INL prior to and after agreements were in place; however, the invention was never reported to INL or DOE pursuant to the Terms and Conditions for a CRADA Subject Invention. In addition, there are no INL inventors listed on the application.

At least most if not all of the disclosed embodiments of the "Nuclear Fuel Element" is believed by INL researchers to be a Subject Invention as defined in the Terms and Conditions of a CRADA (most likely 11-CR-19 and/or 12-CR-24). TerraPower does not consider it to be a Subject Invention and did not disclose it to INL (or DOE) until March 14, 2015 when TerraPower noted it as Participant Background Intellectual Property while developing CRADA No. 15-CR-01 (aka the Master CRADA). FCCI barrier concepts are described in the patent application. INL was not a party to the Veridiam and U. S. Photonics Inc. agreements, and Veridiam and U. S. Photonics Inc. were not a party to 12-CR-24. However, DOE owned cladding materials were supplied by INL as part of these development activities under the CRADA. A timeline (not to scale) depicting the timing between CRADA development and establishment, publication of the patent application, and when INL was informed of the application, is shown below.



INL and TerraPower Agreement Development Background
for Clarification of CRADA Generated Information

August 5, 2015

**Summary:**

Clarification of the definition of CRADA Generated Information, including what is considered to fall within a CRADA and whether who produced the information, where it was produced, or how it was produced or funded affects its determination, is needed by both Parties to help minimize future disagreements and subsequent schedule impacts or potential impasse.  Some general examples where clarification is needed are:

1. Information produced during the development of a CRADA (prior to the CRADA effective date),

2. Information produced before or after the CRADA effective date in the performance of a CRADA by a third party (not party to the CRADA),

3. Information produced before or after the CRADA effective date in performance of a WFO to support performance of a CRADA, and

4. Information produced before or after the CRADA effective date for other reasons and then used in performance of the CRADA.

The issues associated with TerraPower's patent application and Proprietary Information proposal are representative of issues that are likely to arise during performance of complex agreements with industry entities.  It is crucial that the 'spirit and intent' and boundaries of a CRADA are clear and well understood by all Parties.  These issues are examples of where clarification of the definition of CRADA Generated Information and what is considered to fall within a CRADA is needed.  Clarification of Generated Information and resolution of these issues will set a precedent not only for work performed in existing and future INL/TerraPower CRADAs, but for CRADAs with other Parties as well, especially where new knowledge is created when neither Party has a lot of experience.